UNITED STATES, Appellee

v.

Dwight J. LOVING, Private
U.S. Army, Appellant.

No. 68,033.
CMR No. 8901123.

U.S. Court of Appeals for
the Armed Forces.

Argued Sept. 30, 1993.

Decided Nov. 10, 1994.

*Lieutenant Colonel James H. Weise, Major Fran W. Walterhouse* (on brief); *Captain Roy H. Hewitt.*

For Appellee: *Major Joseph C. Swetnam* (argued); *Colonel Dayton M. Cramer* and *Lieutenant Colonel Joseph A. Russelburg* (on brief); *Major James L. Pohl* and *Captain John G. Giovannelli.*

*Amicus Curiae* on behalf of Appellant: John H. Blume (on brief); *George H. Kendall*—For NAACP Legal Defense Fund.

For Appellant: *Captain Teresa L. Norris* and *Captain David L. Thomas* (argued);

## INDEX

| | | Page | Para. |
|---|---|---|---|
| APPELLATE HISTORY | | 229 | 1 |
| FACTUAL BACKGROUND | | | |
| LEGAL ISSUES | | | |
| I. | Court Members' Affidavits Regarding Voting Procedures on Sentencing | 232 | 6 |
| II. | Denial of Reliable Mental Health Evaluation | 239 | 19 |
| III. | Denial of Effective Assistance of Counsel for Failure: | 241 | |
| | A. To discover drug and alcohol use | | 24 |
| | B. To move to suppress confessions as coerced | 242 | 26 |
| | C. To challenge search of apartment | 244 | 28 |
| | D. To object to uncharged misconduct | 245 | 31 |
| | E. To present intoxication defense or mental condition evidence | 246 | 33 |
| | F. To object to evidence of lack of rehabilitative potential | | 34 |
| | 1. As aggravation evidence | | |
| | 2. As aggravating circumstance | | |
| | G. To investigate reliability of sanity board and psychological evidence | 249 | 41 |
| | H. To request funds for mitigation specialist or adequately investigate accused's history | | |
| | I. To object to improper rebuttal | 251 | 44 |
| | J. To request instruction saying which offenses were capital | | 46 |
| | K. Cumulative error. | 252 | 47 |
| IV. | Military Judge Became Partisan As To: | 252 | 48 |
| | A. Access to evidence of media coverage of case | 253 | 50 |
| | B. Accusing defense counsel of being unethical and manipulative | 254 | 51 |
| | C. Requiring use of inadequate expert | | 52 |
| | D. Excusal of pro-life court member | | |
| | E. Treatment of defense counsel during *voir dire* | 255 | 53 |
| | 1. Restrictions on *voir dire* | | |
| | 2. Bias of Military Judge | 257 | 56 |
| | 3. Chastising defense counsel | 258 | 57 |
| | F. Criticizing defense counsel regarding objection to hearsay testimony of medical examiner | | |
| | G. Allowing murder victim's wife to testify on merits | 258 | 58 |
| | H. Allowing witness to testify without adequate notice | 259 | 59 |
| | I. Restricting examination of Ms. Pessina | 260 | 61 |
| | 1. As accomplice | | |
| | 2. As hostile witness | 262 | 67 |

| | | Page | Para. |
|---|---|---|---|
| J. | Calling defense theory "ridiculous" and threatening defense counsel for challenging ruling | 264 | 70 |
| K. | Showing dislike for defense counsel | | 71 |
| V. | Prosecutorial Misconduct Denying Fair Trial | | 72 |
| VI. | Requirement of *In Favorem Vitae* Review of Capital Cases Because Counsel Lack Experience to Prevent Waiver | 266 | 74 |
| VII. | Failure to Give Notice of Aggravating Circumstances | | 75 |
| VIII. | Allowing Consideration of Aggravating Circumstances Without Notice to Defense | | |
| IX. | Double Counting of Aggravating Factors | 267 | 77 |
| X. | Consideration of Lack of Rehabilitative Potential, Preservation of Good Order and Discipline, and Specific Deterrence | 268 | 79 |
| XI. | Denial of Fair Sentencing Hearing | 269 | |
| A. | Admission of Article 15 punishments | | 80 |
| B. | Improper rebuttal | 270 | |
| C. | Improper bolstering of Ms. Pessina | | 81 |
| D. | Improper bolstering of Private Brown | | 83 |
| XII. | Impeachment of Findings by Testimony that Felony–Murder was Committed for Fun, Rather than in Furtherance of Robbery | 271 | 84 |
| XIII. | Failure to Dismiss Felony–Murder instead of Premeditated Murder as Multiplicious | | 85 |
| XIV. | Denial of Fair Sentencing Proceeding | 272 | |
| A. | Exclusion of testimony of Ms. Fisher | | 86 |
| B. | Refusal to permit argument that victim did not suffer | 273 | 88 |
| C. | Exclusion of testimony that accused was subject to manipulation | | |
| D. | Adding disclaimer to summary of defense evidence | | |
| XV. | Failure to Instruct that Death Sentence can only be Based on Murder Convictions | | |
| XVI. | Refusal to Instruct that Race could not be Factor in Sentencing | 274 | 89 |
| XVII. | Refusal to Summarize Defense Sentencing Evidence after Summarizing Government Evidence | | 90 |
| XVIII. | Failure to Instruct to Disregard any Perceived Indication of Judge's Opinion as to Sentence | 276 | 92 |
| XIX. | Errors in Sentencing Instructions | | |
| A. | Failure to Instruct on Absolute Discretion not to Impose Death Sentence Regardless of Findings Regarding Sentence | | 93 |
| B. | Failure to Define Extenuation and Mitigation | 277 | 95 |
| C. | Failure to Define "Substantially Outweighed" | 278 | 96 |
| XX. | Allowing Victim Impact Evidence on Findings (see Issue IV, subissue G) | 279 | 97 |
| XXI. | Characterizing Defense Theory as Absolutely Ridiculous (see Issue IV, subissue J) | | |
| XXII. | Refusal to Treat Ms. Pessina as Hostile Witness (see Issue IV, subissue I) | | |
| XXIII. | Refusal to Give Accomplice Instruction (see Issue IV, subissue I) | | |
| XXIV. | Absence of Meaningful Distinction in Art. 118 between Premeditated and Unpremeditated Murder | 279 | 98 |
| XXV. | Failure of Instructions to Distinguish between Premeditated and Unpremeditated Murder | 280 | 99 |
| XXVI. | Need for "Criminal State of Mind" for Robbery as Ambiguous | 281 | 100 |
| XXVII. | Definition of Reasonable Doubt Inadequate | | 101 |
| XXVIII. | Failure to Instruct that Accused's Silence could not be Held Against Him | 282 | 102 |
| XXIX. | Failure to Grant Change of Venue or to Sequester Panel | | 103 |
| XXX. | Restriction of *Voir Dire* (see Issue IV, subissue E) | 283 | |
| XXXI. | Exclusion of Potential Court Members Based on Race | | 105 |
| XXXII. | Exclusion of Potential Court Members Based on Gender | | |

| | | Page | Para. |
|---|---|---|---|
| XXXIII. | Trial of Capital Case in Peacetime by Court-Martial of Less than 12 Members as Denial of Due Process | 287 | 111 |
| XXXIV. | Amendment of Robbery Charges After Arraignment | | 112 |
| XXXV. | Correction of Defects in Pretrial Advice without Rereferral of Charges | 288 | 113 |
| XXXVI. | Staff Judge Advocate Disqualified where Initial Advice Challenged | | 114 |
| XXXVII. | Convening Authority Disqualified after Pretrial Advice and Capital Referral Challenged | | |
| XXXVIII. | Omission from Verbatim Record of Part of Findings Instructions | 289 | 115 |
| XXXIX. | Denial of *En Banc* Consideration by Court of Military Review (CMR) | | 116 |
| XL. | Sufficiency of Proportionality Review by CMR | 290 | 118 |
| XLI. | Validity of Military Death Penalty Standards Because Not Enacted By Congress | 291 | 119 |
| XLII. | Standard for Weighing Aggravating Circumstances Against Extenuating and Mitigating Circumstances (see Issue XIX, subissue C) | | |
| XLIII. | Lack of Sentencing Instruction on Meaning of "substantially outweigh" as Plain Error (see Issues XIX & XLII) | | |
| XLIV. | Trial by Members as Violation of Requirement for Reliable Verdict | | |
| XLV. | Denial of Equal Protection of the Laws in Appointment of Lead Defense Appellate Counsel | | 120 |
| XLVI. | Reconstruction of Defense Opening Statement as Making Record Non–Verbatim | 292 | |
| XLVII. | Improper Sentencing Argument to Vindicate Victims | | |
| XLVIII. | Lack of Remorse: Evidence, Argument, & Instructions | | 121 |
| XLIX. | Denial of Right to Plead Guilty | | |
| L. | President's Exceeding Authority by Issuing RCM 1004 | 293 | |
| LI. | Death Penalty in Article 118 as Not Applying to Peacetime Crime Committed in U.S. | | |
| LII. | Death Penalty not Narrowed by Congress | | 122 |
| LIII. | Capital Referral System as Arbitrary and Capricious | | |
| LIV. | Denial of Equal Protection of the Laws where Military Subject to Death Penalty when Civilian who Committed Similar Crime was Not | 294 | 123 |
| LV. | Aggravating Factor in RCM 1004(c)(7)(I) as Invalid | | |
| LVI. | Allowing Prosecutor to Peremptorily Challenge Member Whose Bias Against Death Penalty would not Justify Challenge for Cause | | |
| LVII. | Military Judges Lack Fixed Term of Office | 295 | 124 |
| LVIII. | Military Judge's Appointment Violates Appointments Clause | | |
| LIX. | Power of U.S. Court of Appeals for the Armed Forces to Review Death Sentence | | |
| LX. | Denial of Equal Protection of the Laws where Civilians have Their Cases Reviewed by Article III Court but Soldiers Do Not | | 125 |
| LXI. | Power of U.S. Court of Appeals for the Armed Forces under Article I to Review Constitutional Issues | 296 | |
| LXII. | Denial of Right to Poll Members or Require Them to Sign Sentence Worksheet | | |
| LXIII. | Convening Authority (CA) Acting as Grand Jury, Selecting Court Members, Having Law Enforcement Functions, and Being First Level of Appeal Creates Presumption CA Acts as Prosecutor, Judge, & Jury | | 126 |
| LXIV. | Lack of Power in Military Judge to Adjust or Suspend Death Sentence | 297 | 127 |
| LXV. | Defect in Convening Order | | |
| LXVI. | Denial of Defense Expert of Choice | 298 | |
| LXVII. | Refusal to Require Prosecution to Stipulate to Robberies | | 128 |
| LXVIII. | Challenge to Appointment of Defense Counsel in Capital Cases | | |
| LXIX. | Defense Appellate Counsel Failed to Adequately Investigate and Failed to Raise Many Viable Issues Not Identified | 299 | 131 |
| LXX. | Requirement for Minimum Standards for Trial and Defense Appellate Counsel in Capital Cases | 300 | |
| DECISION | | 300 | |

ON MANDATORY REVIEW

*Opinion of the Court*

GIERKE, Judge:

1. A general court-martial composed of officers convicted appellant, contrary to his pleas, of premeditated murder, felony murder, attempted murder, and robbery (5 specifications), in violation of Articles 118, 80, and 122, Uniform Code of Military Justice, 10 USC §§ 918, 880, and 922, respectively. The court-martial sentenced appellant to a dishonorable discharge, total forfeitures, and to be put to death.

The Court of Military Review * affirmed the findings and sentence twice. 34 MJ 956 (1992), *on recon.*, 34 MJ 1065 (1992). The record is before us for mandatory review pursuant to Article 67(a)(1), UCMJ, 10 USC § 867(a)(1) (1989). Appellant has assigned 70 errors, each of which is discussed seriatim. Having found no prejudicial error, we affirm the findings of guilty and the sentence of death.

*Factual Background*

On the evening of December 11, 1988, appellant robbed at gunpoint a 7–Eleven convenience store in Killeen, Texas, and obtained approximately $38.00. About an hour later, he robbed a second 7–Eleven store in Killeen, also at gunpoint, and obtained approximately $52.00.

Disappointed with the small amounts of money he had obtained from the 7–Eleven stores, he decided to rob taxicab drivers. At about 8:00 p.m. on the night of December 12, appellant called a cab to take him from the Handy Grocery Store in Killeen to Fort Hood. The cab driver was an active-duty soldier, Private (PVT) E–2 Christopher L. Fay, working for extra money. Appellant directed Fay to a secluded area on Fort Hood and, at gunpoint, demanded all his money. After receiving an unknown amount of money from Fay, appellant shot him in the back of the head. While watching the blood

"gushing out" of the back of Fay's head, appellant shot him in the back of the head a second time. Fay died as a result of the gunshots. His body was discovered by another soldier at Fort Hood about 30 minutes later.

Appellant fled from the cab to his barracks room, counted the money, and called for a second cab at about 8:15 p.m. The driver of the second cab was Bobby Sharbino, a retired Army sergeant. Appellant directed Sharbino to a secluded street in Killeen and, at gunpoint, took his money pouch, wallet, and a green BIC cigarette lighter. He ordered Sharbino to lie down on the seat and shot him in the head, killing him.

2. After killing Mr. Sharbino, appellant went to the home of his girlfriend, Ms. Nadia Pessina. They and a group of friends went to the Vegas Club, where Ms. Pessina was employed, to pick up her paycheck. They then went to another club, the Nubia Temple, where appellant became involved in an altercation with another male patron because the patron was staring at Ms. Pessina. During the altercation, appellant drew his pistol and invited the patron to go outside. As the patron advanced toward appellant, appellant backed up, stumbled over a chair, and dropped his pistol on the ground, causing it to discharge.

Appellant and Ms. Pessina hurriedly left the Nubia Temple. They went to a cab stand across the street from the Chapparal Club and took a cab, driven by Howard Douglas Harrison, to Ms. Pessina's residence, located at 909 Mimosa Street in Killeen. Mr. Harrison had difficulty pronouncing "Mimosa" and needed help to find the street. Appellant dropped off Ms. Pessina near her residence. After pulling a gun, he directed Harrison to a secluded street, demanded money, and took Harrison's wallet and coin changer, obtaining about $94.00. Appellant jerked Harrison's head around and told him to open his mouth. Believing that he was about to be killed, Harrison grabbed

---

* This court became a Court of Criminal Appeals effective October 5, 1994. Pub.L. No. 103–337, § 924(b), 108 Stat. 2663. The name of the court at the time of its decision in this case will be used herein.

the pistol. During the ensuing struggle, Harrison gained possession of the pistol after it went off. Then he attempted to shoot appellant, but the pistol would not fire. Harrison fled the scene, with appellant chasing him. After Harrison hit him, appellant ran to Ms. Pessina's house, having regained possession of the pistol.

Harrison returned to his cab and reported to his dispatcher that he had been robbed and that his assailant was going toward Mimosa street. Appellant spent the remainder of the night at Ms. Pessina's residence.

In the morning appellant took a cab back to his unit and accompanied his unit on field training. At about 3:00 p.m. he rode back from the field to the unit motor pool with his supervisor, Staff Sergeant (SSG) Barshaw. During the 35–40 minute ride from the field, appellant told SSG Barshaw that he had left his weapon and his field jacket behind. SSG Barshaw told him that he would retrieve them later and bring them to appellant.

At about the time that appellant was returning from the field with SSG Barshaw, a joint investigative team composed of members of the FBI, Army Criminal Investigation Command (CID), local police, and Texas Rangers were in Ms. Pessina's neighborhood. They had received a general description of appellant and Ms. Pessina from Mr. Harrison, the surviving cab driver. They talked to people at the Handy Grocery Store and in the neighborhood and were told, "Yeah, that's Nadia and she has a black boyfriend." They saw Ms. Pessina with her friend, Ms. Ira Printers. They asked her to state her name and she identified herself. They asked her where she lived, and she told them that she lived at 909 Mimosa Street. At that point "something clicked" which "connected" Ms. Pessina to Mr. Harrison's report. They asked her to come with them to the Killeen police station and she agreed.

3. The Killeen police did not consider Ms. Pessina a suspect at the time. She gave a statement to the police in which she described her activities, including the cab ride to her residence, but she did not implicate appellant in any crimes. She stated that, after the cab driver dropped her off at her residence, appellant left in the cab to buy her some cigarettes, returned about 5 minutes later, and then spent the night with her.

At the end of the interview, at about 6:45 p.m., she signed a written consent to a search of her residence. At trial Ms. Pessina, whose command of the English language is limited, testified regarding her consent as follows:

I don't know if they have to have a warrant, or if they no need to have a warrant; I no know that.... But then—but, when I—no, when I was to the police station, they told me ... that, if I want, I can get a warrant, to my house. And, they say: But, they gonna look, anyway, so ... I let them look.

At about the time that the interview of Ms. Pessina was ending, appellant was apprehended in the unit motor pool by CID Special Agent (SA) Schnayerson. He was transported to the CID office, advised of his rights, and at about 7:30 p.m. waived his rights and agreed to make a statement. He denied any involvement for about 30 minutes. After SA Schnayerson asked appellant who would take care of the families of the murdered cab drivers, appellant confessed. Appellant's confession was videotaped.

In his confession appellant told SA Schnayerson that the pistol used in the crimes was hidden in a paper bag behind Ms. Pessina's residence. He also mentioned that he had worn black gloves during the offenses and that he took a ski mask to the 7–Eleven stores but decided not to wear it. He told SA Schnayerson that he only took cash from PVT Fay. He took money, a wallet, and a green BIC cigarette lighter from Mr. Sharbino. He threw the wallet into a dumpster next to his barracks but left the green BIC lighter at Ms. Pessina's residence. He told SA Schnayerson that he kept Mr. Harrison's wallet and its contents.

At about 9:00 p.m., while appellant was still being interviewed, SSG Barshaw returned to the unit's field location and retrieved appellant's field jacket and weapon. He found a coin changer after it fell out of a pocket of the field jacket. Suspecting some significance since he had been present when

appellant had been apprehended in the motor pool, SSG Barshaw gave the field jacket and coin changer to his first sergeant and a CID agent. At trial, Mr. Harrison identified the coin changer as the one taken from him by appellant.

The taped interview of appellant ended at about 10:00 p.m., at which time appellant went to sleep on a sofa in the CID office. From 10:00 p.m. until 6:00 a.m., the CID prepared a written transcript of the video-taped confession.

4. Meanwhile, a search outside Ms. Pessina's residence had yielded appellant's pistol, which was later identified as the weapon used in the murders and robberies; several spent and unspent bullets; and a blood-stained man's jacket. At 11:50 p.m., Ms. Pessina returned to the Killeen police station, was advised of her rights as a suspect, and gave a second statement. She admitted driving appellant to the vicinity of the two 7–Eleven stores on December 11. She admitted seeing appellant with a pistol at an unknown time prior to the murders and robberies. She said that appellant had told her on December 12 that "he was going to go and get some money" and "he was going to go kill somebody." Ms. Pessina said that she did not believe that appellant was serious. When appellant left the house in the early evening of December 12, Ms. Pessina "felt a bulge in his waistband" that she thought was a pistol. When appellant returned, he said, "I got the money.... I shot him."

After completing her second statement, she signed a written consent form for a second search of her residence, which occurred at about 2:15 a.m. on the morning of December 14. The second search resulted in seizure of a black ski mask, a pair of gloves, and a green BIC cigarette lighter.

Appellant was awakened in the CID office at about 6:00 a.m. on December 14. From about 6:15 to 7:15 a.m. he reviewed the 14–page transcript of his confession. He then signed it and swore to it. At 7:45 a.m. he was interviewed by Investigator John Wedge, a member of the Killeen police, and again confessed.

On December 16, Ms. Pessina gave a third statement to the police in which she said that appellant told her he had "shot two people" but she did not believe him. She also said that while in the cab on the way to 909 Mimosa, appellant "had the pistol I believe in the front of his pants or on the side and he pulled it out and keep it in his hand on the seat." She stated further, "I don't know what he was going to do, but I had a bad feeling about it."

5. The court-martial convicted appellant of the following Charges and specifications:

*Charge I*

Specification 1—Premeditated murder of Christopher L. Fay

Specification 2—Premeditated murder of Bobby Sharbino

Specification 3—Felony murder of Christopher L. Fay

Specification 4—Felony murder of Bobby Sharbino

*Charge II*

Specification—Attempted murder of Howard Douglas Harrison

*Charge III*

Specification 1—Robbery of Christopher L. Fay

Specification 2—Robbery of Bobby Sharbino

Specification 3—Robbery of Howard Douglas Harrison

Specification 4—Robbery of Genevieve Grant (7–Eleven cashier)

Specification 5—Robbery of Kimberly Gray and Guy Ensinger (7–Eleven cashiers)

The findings of guilty of the premeditated murder of Bobby Sharbino (specification 2 of Charge I), the felony murder of Christopher L. Fay (specification 3 of Charge I), and the felony murder of Bobby Sharbino (specification 4 of Charge I) were announced as unanimous. The fraction of the court voting for all other findings of guilty was not announced.

After the findings were announced, the military judge dismissed as multiplicious

specification 1 of Charge I (premeditated murder of Fay), specification 4 of Charge I (felony murder of Sharbino), and specification 1 of Charge III (robbery of Fay). A sentencing hearing was conducted in accordance with RCM 1004, Manual for Courts–Martial, United States, 1984 (Change 2), after which the court-martial, by unanimous vote, sentenced appellant to a dishonorable discharge, total forfeitures, and "to be put to death."

Additional relevant facts are set out below in connection with specific issues.

## ISSUE I

WHETHER APPELLANT'S SENTENCE OF DEATH MUST BE SET ASIDE AND ONLY A LIFE SENTENCE AFFIRMED BECAUSE THE PANEL MEMBERS FOLLOWED IMPROPER VOTING PROCEDURES DURING THE SENTENCING DELIBERATIONS.

6. Based on *ex parte* affidavits obtained from 3 of the 8 court members almost 4 years after the court-martial, appellant now contends that the members did not vote at all on aggravating factors, did not follow the correct procedure for proposing sentences, did not vote first on the least severe sentence proposal, voted on proposals for life imprisonment and the death sentence at the same time, and reconsidered a less than unanimous vote to impose the death sentence without following the procedures for reconsideration.

### A. Procedural Rules

In order to adjudge a death sentence, members must follow the voting procedures set forth in RCM 1004 (Change 2) and 1006. RCM 1004(b)(7) provides:

In closed session, before voting on a sentence, the members shall vote by secret written ballot separately on each aggravating factor under subsection (c) of this rule on which they have been instructed. Death may not be adjudged unless all members concur in a finding of the existence of at least one such aggravating factor. After voting on all the aggravating factors on which they have been instruct-

ed, the members shall vote on a sentence in accordance with RCM 1006.

Under RCM 1006(c), "[a]ny member may propose a sentence." When the voting begins, RCM 1006(d)(3)(A) provides:

All members shall vote on each proposed sentence in its entirety beginning with the least severe and continuing, as necessary, with the next least severe, until a sentence is adopted by the concurrence of the number of members required under subsection (d)(4) of this rule. The process of proposing sentences and voting on them may be repeated as necessary until a sentence is adopted.

RCM 1006(d)(4) provides that a death sentence must be adopted by unanimous vote and a sentence to life imprisonment requires a consensus of three-fourths of the members. *See Garrett v. Lowe*, 39 MJ 293 (CMA 1994).

### B. The Instructions

7. During his sentencing instructions, the military judge informed the members that "a death sentence may not be adjudged unless all the court members find beyond a reasonable doubt that one or more of the aggravating circumstances existed." He then described the three aggravating circumstances listed on the sentence worksheet and explained that "all the members of the court must agree beyond a reasonable doubt that one or more of the aggravating circumstances that I just mentioned existed at the time of the offenses or resulted from the offenses." He further explained:

It is not sufficient that some members find that one aggravating circumstance existed while the remaining members find that a different aggravating circumstance existed. Rather, all of you must find beyond a reasonable doubt that the same aggravating circumstance or circumstances existed before a sentence of death may be adjudged.

After further instructions repeating the definition of reasonable doubt and describing the aggravating circumstances, he gave the following procedural instructions:

You may consider all the evidence that has been presented to you in this case, including evidence presented prior to the findings of guilty in this case, as well as evidence, of course, presented after the findings during the sentencing phase of the trial. Your deliberation on the aggravating circumstances should properly include a full and free discussion of all the evidence that has been presented to you.

After you have completed your discussion, then voting on each aggravating circumstance must be accomplished by secret written ballot. All of the members must vote, none of you are allowed to abstain. If you fail to find unanimously that at least one aggravating circumstance existed, then you may not adjudge a sentence of death. If, however, you determine that at least one of the aggravating circumstances existed, then you may consider, along with all other appropriate sentence possibilities, for example, punitive discharge and forfeitures in this case, whether a sentence of death should be adjudged. In this regard, you may not adjudge a sentence of death unless all of you find that any and all extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances, including such circumstances as you have found existed in the first step of the procedure. . . .

The military judge then listed six other "nonstatutory" aggravating circumstances as well as the extenuating and mitigating circumstances. The military judge concluded this portion of the instructions by again reminding the members that "[a] sentence of death may be adjudged only upon the unanimous vote of all the members."

8. Turning to the sentence worksheet, the military judge explained:

Part A are those aggravating factors that I mentioned and at least one of them has to be found beyond a reasonable doubt, a unanimous finding on that particular aggravating circumstance before the rest of the procedures even apply in this case, and that would be the death sentencing procedures. All right. So that's step one.

Step two, then, as you see on the worksheet, is this balancing of the aggravating and mitigating—extenuating and mitigating factors, it should be. It should read, Balancing of Aggravating and Extenuating and Mitigating Factors. There's a word left out. You might want to jot that in on the title under Part B. But in any case, that's step two, and what's reflected under Part B on the worksheet is step two of this process.

Then, you move down to Part C, which is the actual sentence and that—that is step three, as I say, and I'll go into that in just a few moments with you in how to go about then determining an actual sentence in this case.

After instructing the members on forfeitures and punitive discharges, the military judge then gave the following procedural instructions for "step three," voting on sentences:

When you close to deliberate and vote, only the members will be present during your closed session deliberations and your deliberations should begin, first, with a full and free discussion on the general subject of sentencing. The influence of superiority in rank shall not be employed in any manner in an attempt to control the independence or judgment of any other court member. When you have completed that discussion, then any member who desires to do so may propose a sentence and you do that by writing it down on a slip of paper, and that would be a complete or entire sentence. The idea behind that instruction is you shouldn't piecemeal the punishments. The junior member will collect those proposed sentences, submit them to the president, who will arrange them in the order of severity.

You then vote on those proposed sentences by secret written ballot. All of you must vote, none of you are allowed to abstain. You vote on each proposed sentence in its entirety, beginning with the lightest, until you arrive at the required concurrence. For a sentence to death, all of you must concur in the sentence. For a sentence that includes life imprisonment, which is the mandatory minimum sentence,

three-fourths of the members must agree on a sentence and that would be, because there are eight, six of you must agree.

The junior member will then collect and count the votes. The count is then checked by the president, who will immediately announce the result of the ballot to the rest of the court members. If you vote upon all of the proposed sentences without arriving at the required concurrence, then you repeat the process of proposing and voting on the sentences. The second time around, a member may desire—if a member desires to do so, you may vote on all new proposals or proposals rejected by an earlier vote. But remember, unanimous— a death sentence, unanimous vote, all the members, three-quarters for a sentence that includes life in prison.

Now, you may reconsider your sentence, no matter what it is, you may reconsider that sentence at any time before it is announced in open court by the colonel. If that occurs, then the proper procedure would be, just as I've indicated on findings, and that procedure would be: Number one, don't try to do it yourselves; number two, come back out, open the court, tell me, in very general terms, colonel, that a member, no specifics, please, a member has requested reconsideration. Then, at that time, I'll tell you what those instructions are. They are somewhat lengthy and involved, a little complicated, so I won't give them now, remember though that, legally, any member may request reconsideration. Please, though, remember the process.

### C. The Announcement of the Sentence

9. The court members closed to determine a sentence at 1:14 p.m. Four hours and 41 minutes later, at 5:55 p.m., they informed the military judge that they had arrived at a sentence. The president of the court-martial then announced that they had unanimously found, "beyond a reasonable doubt," all three aggravating factors. Then he announced that the court-martial had found unanimously that "any extenuating and mitigating circumstances are substantially outweighed by any aggravating circum-stances, including the factors as found indicated in Part A." Finally, the president announced the sentence: "To forfeit all pay and allowances, to be discharged from the service with a Dishonorable Discharge, to be put to death." A copy of the sentence worksheet is attached as an Appendix at 301.

### D. The Post–Trial Affidavits

10. The sentence was adjudged on April 3, 1989. In February 1993, appellate defense counsel obtained affidavits from Colonel Aylor, the court-martial president; and Major Napoli and Captain (CPT) Williams, members. Defense Appellate Exhibits (Def.App. Ex.) F, G, and H.

Colonel Aylor's affidavit states the following:

> The jury received instructions from the judge on sentencing and then we went into the jury room. I explained to the other members of the jury what we were supposed to do and how we would do it. I also reminded everyone that the minimum sentence was life imprisonment as explained to me by the judge. We did not re-vote and [sic] aggravating factors during the sentencing procedure.... The first vote resulted in the following: 7 votes of reduce to E1, forfeiture of all pay and allowances, bad conduct discharge and death; 1 vote of reduce to E1, forfeiture of all pay and allowances, bad conduct discharge and life imprisonment. The judge had explained before we adjourned that the death penalty required a unanimous vote..... After another 1½ hours of review, I asked if everyone was prepared to vote again. They said they were.... The second vote resulted in the following: 8 votes of reduce to E1, forfeiture of all pay and allowances, bad-conduct [sic] discharge and death.

Major Napoli's affidavit states the following:

> Following Colonel Aylor's remarks, we voted by secret written ballot. Colonel Aylor counted the ballots.
>
> Since there was not a consensus, we discussed the facts and evidence in the case again. Afterwhich [sic] Colonel Aylor in-

structed us to vote again. This vote resulted in an unanimous sentence to death....

Captain Williams' affidavit states the following:

We discussed the facts and evidence in the case. Then Colonel Aylor told us that we each had two options, we could vote life imprisonment or death, but that death required a unanimous vote.

Following Colonel Aylor's remarks, we voted by secret written ballot. Colonel Aylor counted the ballots and the result was seven in favor of death and one in favor of life imprisonment.

Since there was no consensus, we discussed the facts and evidence in this case again. We did not seek help from the military judge. Instead, following our continued deliberations, Colonel Aylor instructed us to vote again. We voted using the same procedure as before, picking between death and life imprisonment. The result of the second vote was eight in favor of death and zero in favor of life....

Based on the affidavits, appellant argues that the court-martial members did not follow the judge's procedural instructions. More specifically, he argues that the members did not vote at all on the aggravating factors, did not follow the correct procedure for proposing sentences, did not vote first on the least severe proposed sentence, voted on the sentences to life imprisonment and death at the same time, and revoted after a 7–1 vote to impose the death sentence without following the procedures for reconsideration.

We conclude that the affidavits are ambiguous at best. For example, it is unclear what COL Aylor means when he speaks of a "revote" on aggravating factors. Likewise, it is unclear whether the 7–1 "vote" was actually the first round of proposed sentences or a permissible "straw poll." *See United States v. Lawson,* 16 MJ 38, 41 (CMA 1983).

■ 11. Court members "are presumed to follow the military judge's instructions." *United States v. Holt,* 33 MJ 400, 408 (CMA 1991). In this case that presumption is reinforced by the sentence worksheet and the president's announcement that all members found that the aggravating factors were proven beyond a reasonable doubt, that all members found that the aggravating circumstances outweighed the extenuating and mitigating circumstances, and that all members voted to impose the death sentence. No court member disputed the president's announcement at the time.

■ We recognize that the presumption of compliance with the military judge's instructions can be rebutted by competent evidence to the contrary. The pivotal question with respect to Issue I is whether the affidavits are competent evidence. In this regard, Mil. R.Evid. 606(b), Manual, *supra,* provides:

Upon an inquiry into the validity of the findings or sentence, a member may not testify as to any matter or statement occurring during the course of the deliberations of the members of the court-martial or, to the effect of anything upon the member's or any other member's mind or emotions as influencing the member to assent to or dissent from the findings or sentence or concerning the member's mental process in connection therewith, except that a member may testify on the question whether extraneous prejudicial information was improperly brought to the attention of the members of the court-martial, whether any outside influence was improperly brought to bear upon any member, or whether there was unlawful command influence....

Mil.R.Evid. 606(b) is taken from Fed. R.Evid. 606(b). Except for changes to reflect court-martial terminology, Mil.R.Evid. 606(b) is identical to Fed.R.Evid. 606(b) with one addition: the reference to unlawful command influence. *See* Drafters' Analysis of Mil.R.Evid. 606, Manual, *supra* at A22–41 (Change 2). The identical language is consistent with the statutory mandate in Article 36(a), UCMJ, 10 USC § 836(a), that the President prescribe procedures which, "so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts...." By adopting the language of Fed.R.Evid. 606(b) in Mil.R.Evid. 606(b), the

drafters clearly intended that the federal rule apply to courts-martial, with an additional provision for cases involving unlawful command influence.

12. The purpose of this rule is to protect "freedom of deliberation," protect "the stability and finality of verdicts," and protect court members "from annoyance and embarrassment." *United States v. Bishop*, 11 MJ 7, 9 (CMA 1981).

Appellant makes three arguments for considering the affidavits in this case. First, he argues that the rule is only intended to protect the subjective thoughts of the court members and does not preclude inquiry into objective factors such as voting procedures. Second, he argues that the affidavits indicate unlawful command influence on the part of the president, Colonel Aylor. Third, he argues that "death is different" and that Mil. R.Evid. 606(b) should not be strictly applied if there is evidence of a procedural irregularity in imposition of the death sentence. We find these arguments unpersuasive. Based on our review of judicial and legislative history, we hold that the affidavits are not competent evidence.

With regard to appellant's first argument, there is some authority among the precedents of this Court for the proposition that affidavits of court members may not be considered to support an allegation that the court members used erroneous procedures during deliberations. *See United States v. West*, 23 USCMA 77, 48 CMR 548 (1974) (opinion by Duncan, C.J., with Quinn, J., concurring in the result and Ferguson, S.J., not participating). Two Courts of Military Review have permitted asking court members whether voting was by secret written ballot, but both cases have justified such an inquiry on the ground that the possibility of oral voting raises the possibility of unlawful command influence. *See United States v. Greene*, 36 MJ 1068, 1071 (1993 ACMR), *aff'd on other grounds*, 41 MJ 57 (CMA 1994); *United States v. Martinez*, 17 MJ 916, 918, 919–20 (NMCMR 1984). Most recently, in a capital murder case, the Navy–Marine Corps Court of Military Review has refused to consider post-trial evidence that court members

did not follow the proper procedure for reconsidering their findings. *United States v. Thomas*, 39 MJ 626 (1993) (on motion).

The federal Courts of Appeals have uniformly refused to consider evidence from jurors indicating that the jury ignored or misunderstood instructions in criminal cases. *See United States v. Miller*, 806 F.2d 223, 225 (10th Cir.1986) (rejected general allegation by juror that she may not have understood judge's instructions); *United States v. Neary*, 552 F.2d 1184, 1190 (7th Cir.), *cert. denied*, 434 U.S. 864, 98 S.Ct. 197, 54 L.Ed.2d 139 (1977) (rejected evidence that juror may not have understood burden of proof in criminal case); *United States v. Stacey*, 475 F.2d 1119, 1121 (9th Cir.1973) (rejected evidence that three jurors did not understand that "intent to defraud" was element of offense); *United States v. Dioguardi*, 492 F.2d 70 (2d Cir.) (rejected opinions of psychiatrists that juror was mentally incompetent and incapable of understanding instructions), *cert. denied*, 419 U.S. 829, 95 S.Ct. 49, 42 L.Ed.2d 53 (1974); *Dobbs v. Zant*, 720 F.Supp. 1566, 1568–69 (NDGa. 1989) (rejected evidence that jury may have considered prior convictions contrary to judge's instructions), *aff'd*, 963 F.2d 1403 (11th Cir.1991), *rev'd on other grounds*, — U.S. ——, 113 S.Ct. 835, 122 L.Ed.2d 103 (1993). *See generally* 65 ALR Fed. § 10 at 852 (1983). As noted by Chief Judge Sullivan in his separate concurrence, 41 MJ at 303 ¶ 134, several state courts have held, even in capital cases, that evidence obtained from jurors concerning the deliberative process may not be used to impeach the verdict.

13. It may be improper even to ask jurors whether they followed the judge's instructions. *See United States v. Greer*, 620 F.2d 1383, 1385 n. 2 (10th Cir.1980). *See also* RCM 922(e) and 1007(c) ("Except as provided in Mil.R.Evid. 606, members may not be questioned about their deliberations and voting.").

Appellant argues that Fed.R.Evid. 606(b) and its military counterpart preclude inquiry only into the jury's compliance with substan-

tive instructions such as what the jury may consider, but do not preclude inquiry into the jury's compliance with objective instruction such as voting procedures. This objective-subjective distinction was expressly rejected in *Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). In *Tanner* the Supreme Court traced the legislative history of Fed.R.Evid. 606. They observed that Congress rejected an expansive House version of the rule which would have allowed juror testimony regarding "objective juror misconduct." The House version specifically drew a distinction between inquiry into "the mental processes" of jurors and "what happened in terms of conduct in the jury room." 483 U.S. at 123, 107 S.Ct. at 2749. The House version would have allowed a juror to testify as to "what happened during the jury's internal deliberations, for example, where a juror alleged that the jury refused to follow the trial judge's instructions or that some of the jurors did not take part in deliberations." 483 U.S. at 123–24, 107 S.Ct. at 2749, *citing* S.Rep. No. 93–1277, 2d Sess., at 13–14, U.S.Code Cong. & Admin.News 1974, pp. 7051, 7060. Congress rejected the House version and instead adopted the more restrictive Senate version, which prohibits all juror testimony about what occurred during deliberations, except for testimony about extraneous influences. 483 U.S. at 125, 107 S.Ct. at 2750.

The Supreme Court made it clear in *Tanner* that Fed.R.Evid. 606(b) is a blanket prohibition on juror testimony to impeach a verdict. The only exception in that rule is for evidence of extraneous influence. Absent that exception, a juror "may not testify as to *any matter* ... occurring during the course of the jury's deliberations." Fed.R.Evid. 606(b) (emphasis added).

14. Fed.R.Evid. 606(b) makes incompetent any testimony from jurors about the decision-making process of the jury as well as the mental processes of individual jurors. Following the Supreme Court's decision in *Tanner*, at least two federal Courts of Appeals have refused to inquire into allegations of irregularities in jury voting procedures. In *United States v. Ortiz*, 942 F.2d 903, 913 (1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2966, 119 L.Ed.2d 587 (1992), the Fifth Circuit rejected an affidavit of a juror alleging oral voting, voting on all counts together instead of voting on each count presented against each defendant, and alleging that the verdict announced in court was not her verdict. The court in *Ortiz* specifically noted that "the Advisory Committee notes accompanying 606(b) single out voting as such a 'component of deliberation.'" In *United States v. Ford*, 840 F.2d 460 (7th Cir 1988), the court rejected evidence that votes were taken before all evidence was reviewed and "votes were cast verbally." The court held that it "will not inquire into the jury's deliberative process, including arguments, statements, discussions, mental and emotional reactions, and *votes*, in the absence of a claim of external influence." *Id.* at 465 (emphasis added). Based upon the foregoing, we are satisfied that the overwhelming weight of authority prohibits inquiry into the voting procedures actually used by court members to arrive at a sentence.

Since Mil.R.Evid. 606 was taken from Fed.R.Evid. 606, that same blanket prohibition applies to testimony of court members about "any matter," including voting procedures, "occurring during the course of the deliberations." Accordingly, we hold that the affidavits of Colonel Aylor, Major Napoli, and Captain Williams may not be considered except for the limited purpose of determining if extraneous influence or unlawful command influence may have been injected into the deliberations. *See United States v. Accordino*, 20 MJ 102, 105 (CMA 1985).

Appellant has not alleged that Colonel Aylor exercised unlawful command influence during the deliberations. Nevertheless, our dissenting brother detects "a distinctly disconcerting aroma" of unlawful command influence "emanating" from the affidavits of the court members. 41 MJ at 315 ¶155 (Wiss, J.). We note first that the reference to unlawful command influence in Mil.R.Evid. 606(b) is not limited to "external command influences." It also applies to "use of rank by a court member to pervert military justice." *United States v. Accordino*, 20 MJ at 104. *See United States v. Carr*, 18 MJ 297, 302

(CMA 1984) (allegation that president of court-martial used influence of rank to pressure other members during deliberations falls within "unlawful command influence" exception to Mil.R.Evid. 606(b)).

■■■ 15. Our review of the affidavits is limited to determining if there is any evidence of unlawful command influence. *United ed States v. Accordino, supra* at 105. We hold that the affidavits do not raise an issue of unlawful command influence in this case. Colonel Aylor was the president of the court-martial and, as such, had certain administrative duties and discretion in the performance of those duties. His authority as president included "the discretion to call for a vote when, in [his] judgment, discussion of the issues is complete or further debate would be pointless." 20 MJ at 105. The affidavits reflect no more than Colonel Aylor's proper exercise of authority as president to preside over the deliberations. The affidavits also contain no evidence that Colonel Aylor used his "rank to 'enhance' an argument—*i.e.,* to coerce a subordinate to vote in a particular manner." *Id.* at 105. In this regard, it is important to remember that full and free discussion cuts both ways. "Senior ranking court members, like their juniors, are free to express their opinions in the strongest terms and to engage in the most robust discussions without fear of retribution or appellate sniping." *Id.* at 105.

■■■ Our dissenting brother relies on the oral arguments of appellate counsel to conclude that "the command influence issue is squarely before this Court." 41 MJ at 315 ¶ 155. Suffice it to say, oral arguments are not evidence. There must be more than a mere allegation of command influence to raise the issue; there must be evidence. *See United States v. Levite,* 25 MJ 334, 341 (CMA 1987) (Cox, J., concurring) ("[A]n appellant's unsubstantiated assertion that unlawful command influence exists is not going anywhere. . . ."). There is absolutely no suggestion in the affidavits that Colonel Aylor exercised unlawful command influence.

■■■ 16. We turn finally to appellant's argument that "death is different." Appellant argues that the nature of the death sentence requires heightened scrutiny of the process by which it is imposed. He cites the Supreme Court's observation in *McDonald v. Pless,* 238 U.S. 264, 268–69, 35 S.Ct. 783, 785, 59 L.Ed. 1300 (1915), "that it would not be safe to lay down any inflexible rule because there might be instances in which such testimony of the juror could not be excluded without 'violating the plainest principles of justice.'" *Mattox v. United States,* 146 U.S. 140, 148, 13 S.Ct. 50, 52, 36 L.Ed. 917 (1892), was cited to support this statement. We do not believe that *McDonald v. Pless, supra,* supports appellant's argument. In *McDonald v. Pless* and *Mattox v. United States* (a capital murder case), *both supra,* the Supreme Court was dealing with the common law rule "that a juror cannot impeach his own verdict," 238 U.S. at 267, 35 S.Ct. at 784, and they decided that an exception should be made where external influences on the jury were involved. Of course, that exception was later adopted in Fed.R.Evid. 606(b) and Mil. R.Evid. 606(b). We have found no authority for a capital-case exception to the general prohibition against jurors impeaching their sentence. In fact, the weight of authority is to the contrary. *See Dobbs v. Zant,* 963 F.2d 1403, 1411 (11th Cir.1991) (refused to consider juror's testimony that jury arbitrarily imposed death sentence because they did not believe it would be executed), *rev'd on other grounds,* —— U.S. ——, 113 S.Ct. 835, 122 L.Ed.2d 103 (1993); *Silagy v. Peters,* 905 F.2d 986, 1008 (7th Cir.1990) (refused to consider juror's testimony that jury did not believe a death sentence would be executed), *cert. denied,* 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991); *Dobbs v. Zant,* 720 F.Supp. at 1568 (refused to consider juror's deposition that she voted for death sentence because of prior convictions which judge had instructed jurors not to consider), *rev'd on other grounds,* —— U.S. ——, 113 S.Ct. 835, 122 L.Ed.2d 103 (1993). *See also Songer v. State,* 463 So.2d 229, 231 (Fla.1985) (refused to consider juror's testimony that she erroneously thought she could not consider nonstatutory mitigating factors).

One federal Court of Appeals appeared to recognize a "due process" exception to Fed.

R.Evid. 606 in *Shillcutt v. Gagnon,* 827 F.2d 1155, 1159 (7th Cir.1987):

> The rule of juror incompetency cannot be applied in such an unfair manner as to deny due process. Thus, further review may be necessary in the occasional case to discover the extremely rare abuse that could exist even after the court has applied the rule and determined the evidence incompetent.

In fact, however, *Shillcutt* actually involved an external influence on the jury, *i.e.*, racial prejudice, and thus may not involve an exception to Fed.R.Evid. 606. *See Tobias v. Smith,* 468 F.Supp. 1287, 1291 (WDNY 1979) (racial prejudice is external influence).

17. Likewise, there is some authority for a "clerical error" exception, which may or may not fall under the "due process" umbrella, in which affidavits of a juror were received to show that the verdict announced was not the verdict "actually agreed upon." *United States v. Dotson,* 817 F.2d 1127, 1130 (5th Cir.1987), *revised in part on other grounds,* 821 F.2d 1034 (5th Cir.1987). There is no allegation of clerical error in appellant's case. Even if the affidavits are construed in the light most favorable to appellant, they fall short of suggesting that the multiple findings regarding aggravating circumstances, the balancing of aggravating circumstances against extenuating and mitigating circumstances, and the announced sentence are not what was actually agreed upon. At most, the affidavit of Colonel Aylor could be construed to suggest that the court members did not "revote" on the aggravating factors after their earlier unanimous findings. Accordingly, the clerical error exception does not apply to this case.

18. The only remaining question is whether this Court should carve out an exception for military capital cases. We decline to do so. We believe that invading the court-martial deliberations on the basis of the three affidavits proffered by appellant would be contrary to the intent of Congress in adopting Fed.R.Evid. 606(b), contrary to the intent of the President in promulgating Mil.R.Evid. 606(b), and contrary to the decision of the Supreme Court in *Tanner v. United States, supra,* and the overwhelming weight of authority among the federal courts which have considered the issue. Accordingly, we will not consider the affidavits or order further inquiry into the matters addressed by them. Moreover, in the absence of any competent evidence to the contrary, we hold that the court members followed the military judge's correct instructions on voting procedures to be followed during the sentencing deliberations.

## ISSUE II

WHETHER APPELLANT WAS DEPRIVED OF HIS RIGHT TO A RELIABLE MENTAL HEALTH EVALUATION WHICH IN TURN DEPRIVED APPELLANT OF THE EFFECTIVE ASSISTANCE OF TRIAL DEFENSE COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ, 10 USC § 855.

19. Appellant did not attack the qualifications of his sanity board at trial or before the Court of Military Review. He attacked his counsel before the Court of Military Review, contending that they were ineffective for not raising the issue of his mental responsibility. 34 MJ at 1067–68. Having lost before the Court of Military Review on the ineffectiveness-of-counsel issue, appellant now maintains that he was deprived of the effective assistance of counsel because his counsel relied on a defective sanity board.

On January 6, 1989, prior to his court-martial, appellant requested psychiatric assistance in accordance with *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) and *United States v. Toledo,* 25 MJ 270 (CMA 1987), *cert. denied,* 488 U.S. 889, 109 S.Ct. 220, 102 L.Ed.2d 211 (1988). On January 9, a sanity board was ordered in accordance with RCM 706 (Change 3). The sanity board was composed of two psychiatrists, Major David Orman, M.D. and Captain Richard Moczygemba, M.D.; and a clinical psychologist, Captain Lang Coleman. The board concluded that appellant had an antisocial personality disorder and a border-

line personality disorder but no severe mental disease or defect.

The sanity board submitted its report on February 6, 1989. On February 9, defense counsel repeated concern expressed earlier that appellant had an organic brain dysfunction. Captain Moczygemba, a member of the sanity board, agreed that appellant should be tested further and referred him to Dr. Pamelia F. Clement, Ph.D., a clinical psychologist, for neuropsychological evaluation. Dr. Clement found no evidence of mental impairment.

CPT Moczygemba also requested radiologic testing to exclude possible organic brain defects. A CT scan was conducted on appellant, which showed no abnormalities. The sanity board issued an addendum on February 17 reflecting the additional testing. Def. App. Ex. C.

20. Defense counsel also requested funding to hire a defense psychiatric expert and later named the one they wanted. The request for funding was denied on January 27, 1989, but the Government offered a military psychiatrist as a substitute. After rejecting two military psychiatrists, the defense accepted COL David Armitage, a forensic psychiatrist, who holds professional degrees in both medicine and law. COL Armitage is Associate Chairman for Forensic Science and Litigation Support, Department of Legal Medicine, Armed Forces Institute of Pathology, Washington, D.C., and Consultant Emeritus to the Surgeon General of the Army on Forensic Psychiatry. COL Armitage worked as a member of the defense team, was present at most of appellant's court-martial, and participated in *voir dire* of the court members.

After appellant was convicted and sentenced, appellate defense counsel obtained evidence that Captain Coleman, who had been identified in the sanity board report (¶ 3) as "Ph.D. clinical psychologist," did not receive his Ph.D. until May 1989 and was not licensed by the State of Wisconsin until September 1989. In response to the defense evidence, government appellate counsel produced evidence that Captain Coleman completed all his educational requirements for his Ph.D. in the fall of 1988, even though he did not receive his degree until May of 1989

and that Captain Coleman was credentialed by the Army to serve as a clinical psychologist.

After trial, appellate defense counsel obtained several affidavits attacking the validity of the psychological and neuropsychological tests performed by Captain Coleman and Dr. Clement. An affidavit from Dr. Niles, Director of the Trauma Recovery and Counseling Center, Alexandria, Virginia, asserts that Captain Coleman erred by not conducting follow-up psychological tests for Post–Traumatic Stress Disorder. Dr. Niles further asserts that there are clear indicators that appellant suffers from post-traumatic stress disorder. Affidavits from Dr. H. Anthony Semone (psychologist) and Dr. James Merikangas (psychiatrist) assert that the neuropsychological testing conducted by Dr. Clement was performed improperly and thus is invalid.

21. The first question is whether appellant's constitutional right to have access to a competent psychiatrist has been infringed. In *Ake v. Oklahoma*, 470 U.S. at 83, 105 S.Ct. at 1096, the Supreme Court set out the standard:

We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the ... defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own....

We hold that the *Ake* standard has been met in appellant's case. Appellant was given access to several competent psychiatrists. Major Orman and Captain Moczygemba, whose credentials have not been attacked, evaluated appellant during his initial sanity board. Colonel Armitage, whose competence has not been attacked, participated throughout the trial as a member of the defense team.

■ The next question is whether the requirements of RCM 706 (Change 3) have been met. RCM 706(c)(1) provides that an inquiry into mental capacity or mental responsibility "shall be referred to a board consisting of one or more persons. Each member of the board shall be either a physician or a clinical psychologist."

■ 22. We hold that the requirements of RCM 706(c)(1) have been met in appellant's case. A board consisting of a single psychiatrist would have satisfied the rule. Furthermore, even assuming *arguendo* that CPT Coleman had not received his Ph.D. degree at the time he participated in the board, there is nothing in the rule requiring that a "clinical psychologist" possess a Ph.D. The record before us reflects that CPT Coleman was a trained psychologist, was credentialed by Army medical authorities as a clinical psychologist, and was assigned to duties as a clinical psychologist. RCM 706 was amended in 1986 to parallel prevailing federal practice of allowing use of clinical psychologists in mental status evaluations. Drafters' Analysis of RCM 706(c)(1), Manual, *supra* at A21–36 (Change 3). Unlike 18 USC § 4247(b), RCM 706(c)(1) does not specify that the psychiatrist or psychologist performing the evaluation be "licensed or certified." Nevertheless, in the absence of evidence to the contrary, the fact that CPT Coleman was credentialed by military medical authorities to perform duties as a clinical psychologist raises a presumption that he was qualified to do so. *See United States v. Masusock*, 1 USCMA 32, 35, 1 CMR 32, 35 (1951) ("presumption of regularity in the conduct of governmental affairs"). That presumption has not been rebutted in this case.

■ 23. Next we must ask whether the post-trial affidavits warrant additional mental examinations pursuant to RCM 706(c)(4). We hold that they do not. While the defense experts attack the methodology of the mental health professionals who evaluated appellant, there is not one iota of evidence that appellant lacked mental responsibility at the time of the offenses or mental capacity at the time of trial.

Finally, we must address appellant's claim that he was deprived of effective assistance of counsel because they relied on a flawed examination into his mental health. While appellant has produced affidavits of experts who assert that the methodology was flawed, he has produced nothing to show that the results are incorrect. Disagreements among professionals do not *per se* show incompetence. Appellant has premised his ineffective-counsel argument on an *Ake* violation, which, as noted above, he has not shown. Since we hold that there was no *Ake* violation, we resolve this issue against appellant.

### III

WHETHER APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE SIXTH AMENDMENT AT BOTH STAGES OF HIS BIFURCATED TRIAL.

Appellant alleges ten different errors that he asserts rise to the level of ineffective assistance of counsel as defined in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We will analyze each alleged error separately.

*A. Trial defense counsel failed to conduct an adequate investigation and thus did not discover necessary and relevant information concerning appellant's drug and alcohol use prior to and during the offenses.*

■ 24. Appellant contends that defense counsel failed to utilize the testimony of two potential witnesses, Ms. Gerlinde Joseph and Ms. Beverly Sedberry. It is unclear from the post-trial affidavits of counsel whether defense counsel knew prior to trial what these potential witnesses would have said if called to testify.

In a post-trial affidavit, Ms. Joseph declared that on the night of December 12, 1988, she noticed appellant "drinking an entire bottle of Jack Daniels, and taking cocaine, hash, marijuana, and amphetamines." She further swore that "[h]e seemed to be taking anything that he could get his hands on. By the time he left, he was extremely intoxicated and high."

In a post-trial statement, Ms. Sedberry stated that on the day of the 7–Eleven robberies, appellant used cocaine. She also declared that on December 12, 1988, she knew "for a fact that he got some cocaine that afternoon. At the very least, Dwight was doing cocaine, marijuana and drinking." Def.App. Ex. R (Vol. IV, Appellate Papers).

Appellant contends that defense counsel failed to properly investigate this evidence and failed to raise intoxication as a defense. Government appellate counsel argue that defense counsel's pretrial investigation of the case was reasonable.

■■■ 25. The Supreme Court has stated that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." However, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington,* 466 U.S. at 691, 104 S.Ct. at 2066.

In this case appellant told his counsel that "he had been drinking" alcohol "and smoking some marijuana prior to the murders," but that his marijuana and alcohol usage had "not intoxicated or affected" him during his crimes. Govt.App. Ex. R at 1. *See Mattheson v. King,* 751 F.2d 1432 (5th Cir.1985) (rejecting a post-trial attack on counsel's performance where appellant did not tell counsel he was intoxicated at the time of the offense), *cert. dismissed,* 475 U.S. 1138, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986); *Bertolotti v. Dugger,* 883 F.2d 1503 (11th Cir.1989) (counsel not ineffective where he failed to raise voluntary intoxication defense to murder where defendant told police that he lied about his intoxication and where evidence of intoxication was not sufficient), *cert. denied,* 497 U.S. 1031, 110 S.Ct. 3296, 111 L.Ed.2d 804 (1990).

In post-trial affidavits, defense counsel have stated that they chose not to present evidence of voluntary intoxication for strategic reasons. Defense counsel discussed the possibility of an intoxication defense with a medical expert who advised against raising such a defense. The defense team was aware of psychological literature stating that criminals use "alcohol and drugs to 'get up their nerve' to commit crimes" and were concerned that appellant's use of drugs would be viewed as an aggravating factor rather than a mitigating factor. Govt.App. Ex. 2 at 7. *See Rogers v. Zant,* 13 F.3d 384 (11th Cir.) (decision not to investigate possible defense based on drug use was reasonable where counsel knew that local jury would likely react hostilely to such a defense), *cert. denied,* —— U.S. ——, 115 S.Ct. 255, 130 L.Ed.2d 175 (1994); *Wilkins v. Iowa,* 957 F.2d 537, 541 (8th Cir.1992) (failure to present evidence of voluntary intoxication a "reasonable professional judgment[ ]" because jury might be unsympathetic to "self-induced intoxication").

Furthermore, defense counsel believed that a voluntary intoxication defense could be impeached by appellant's detailed confession and the detailed statements to the psychiatrist at the sanity board. These detailed recollections were not likely to come from a mind significantly diminished in capacity by drugs and alcohol, thus they would have made the defense appear contrived.

We hold that appellant has not satisfied the first prong of *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. at 2064, by showing that his counsel's performance was deficient. Although defense counsel were aware of some evidence of voluntary intoxication, they chose not to pursue that defense. They have offered sound reasons for their decision, and we will not second-guess counsel after-the-fact. *Id.* at 689, 104 S.Ct. at 2065. *See id.* at 690–91, 104 S.Ct. at 2066 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

B. *Trial defense counsel failed to move to suppress appellant's confessions on the basis that they were improperly coerced and involuntary.*

■■■ 26. Appellant does not claim that he was interrogated without being advised of his rights, but rather that his confession was coerced. Mil.R.Evid. 304 states that, notwithstanding valid police warnings given pur-

suant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Article 31, UCMJ, 10 USC § 831(b), involuntary statements made by an accused are *per se* inadmissible to prove guilt. Voluntariness is to be determined through a totality-of-the-circumstances test. *Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960).

Appellant asserts four reasons why his confession was involuntary: (1) he was denied the opportunity to talk with an attorney; (2) CID threatened to deport appellant's girlfriend; (3) appellant was intoxicated; and (4) investigators consistently promised appellant that he could see his girlfriend. Appellant argues that his counsel was aware of these indicators of involuntariness but failed to move to suppress appellant's confessions.

■ Appellant's first reason is unsupported by the record. The record reflects that appellant was advised of his rights by SA Schnayerson, that he waived his right to a lawyer in writing, that his confession was videotaped, and that appellant slept for 8 hours while the tapes were transcribed into a written statement. On the following morning appellant acknowledged in writing that he had again been advised of his right to a lawyer. He took about an hour to review the 14–page, single-spaced transcript of his interview, initialed each page, and then signed and swore to his statement. Other than his bare post-trial assertion, appellant has offered no evidence to contradict the evidence of record. On the basis of the record before us, we cannot fault counsel for failing to object to the confession based on a denial of counsel.

■ 27. The second reason is likewise unsupported by the record. Appellant claims that this allegation is corroborated by the fact that his girlfriend was located in an adjoining room during part of appellant's confession where the police would have ready access to her passport. In fact, the record reflects that Ms. Pessina was at her home in Killeen while it was being searched at the same time appellant was being questioned at Fort Hood by the CID. Unfortunately for appellant, the record is devoid of any evi-

dence that Ms. Pessina was threatened with deportation, that any such threats were communicated to appellant, or that appellant complained to his counsel or anyone else of any threats to deport his girlfriend. Indeed, in an affidavit, the lead defense counsel specifically denied that appellant told him about any mention of deportation or of appellant's being shown her passport during the interrogation. (Def.App. Ex. S at 3d page.) Appellant, however, asserts the contrary. (Def. App. Ex. T.)

■ Appellant also asserts that his confession was involuntary because he was intoxicated at the time of the confession. This assertion is also unsupported by the record. On the evening of appellant's arrest, he had been at work for 8 hours. Appellant gave a detailed and coherent confession, which was videotaped. After sleeping for 8 hours, appellant reviewed the transcript of his interview, signed it, and swore to it. We cannot fault counsel for failure to raise this baseless objection. *See Boggs v. Bair*, 892 F.2d 1193, 1199 (4th Cir.1989) (defendant's "confession was not made inadmissible by any degree of intoxication he may have suffered the night in question," where the record supported findings that he was not "so intoxicated that his will was overborne"), *cert. denied*, 495 U.S. 940, 110 S.Ct. 2193, 109 L.Ed.2d 521 (1990).

■ Finally appellant asserts that his confession was coerced through promises that he could see his girlfriend, Nadia. Once again, the record does not support his assertion. The only evidence of record pertaining to this alleged coercion is SA Schnayerson's testimony that appellant asked to talk to Nadia and SA Schnayerson responded that it would be "no problem." Because the Killeen Police also were conducting interviews, appellant and Nadia "just never got together." *See Miller v. Fenton*, 741 F.2d 1456, 1467 (3d Cir.1984) ("promises by interrogators will not invalidate confession unless they are sufficient to overbear defendant's will"), *rev'd on other grounds*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). We cannot fault counsel for failure to raise this unsupportable objection.

We hold that appellant's confession was properly received in evidence and that failure of defense counsel to seek suppression of appellant's confessions did not make their representation deficient.

C. *Trial defense counsel failed to move to suppress evidence which was unlawfully seized from Ms. Pessina's apartment.*

28. Appellant's girlfriend, Ms. Pessina, was approached by police investigators on the afternoon of December 13, 1988, and asked to come to the Killeen police station for questioning. She provided a written statement and signed a written consent to a search of her residence. The search yielded appellant's pistol, spent and unspent bullets, and a blood-stained man's jacket.

Ms. Pessina returned to the police station just before midnight on December 13–14 for further questioning, at which time she made a second statement and again consented to a search of her residence, which resulted in seizure of a black ski mask, a pair of gloves, and a green BIC lighter.

■ Appellant argues that defense counsel's performance was ineffective in that he failed to move to suppress the evidence obtained during the two searches on the grounds that Ms. Pessina's consent was not voluntary. Since the written consent forms were not introduced in evidence, *see* Appendix I to Answer to Final Brief; and Pros. Ex. 104 for ID, we will not consider them to uphold the search but will consider them for the limited purpose of determining whether counsel were ineffective for failing to contest their efficacy. In each form, Ms. Pessina acknowledges that she was advised of her "constitutional right" to have a search of her property made only with a warrant and of her "right to refuse to consent to such a search." App. I, *supra.*

Ms. Pessina's testimony at trial suggests that she may not have understood that she had a right to refuse. What is clear is that she understood that her residence would be searched whether she consented or not.

Appellant bases his argument on primarily two factors: Ms. Pessina was unfamiliar with search and seizure procedures; and investigators coerced Ms. Pessina by telling her that if she did not consent, they could obtain a warrant anyway.

■ 29. Where a claim of ineffective assistance of counsel is based on "defense counsel's failure to litigate a Fourth Amendment" objection to evidence, appellant "must ... prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence...." *Kimmelman v. Morrison,* 477 U.S. 365, 375, 106 S.Ct. 2574, 2583, 91 L.Ed.2d 305 (1986).

■ Assuming *arguendo* that appellant would have had standing to object to a search of Ms. Pessina's home, which is questionable, we hold that appellant has failed to demonstrate that a Fourth Amendment objection to the evidence would have been meritorious. While defense counsel could have challenged the validity of Ms. Pessina's consent, a motion to suppress would not have been meritorious for two reasons. First, an otherwise valid consent is not vitiated by a threat to obtain a warrant if the threat is well-founded. *United States v. Duran,* 957 F.2d 499, 502 (7th Cir.1992). Second, a search of Ms. Pessina's residence was inevitable.

■ The investigators' threat to obtain a search warrant was firmly grounded in that they had probable cause to search the residence. At the time of the first search, the investigators knew that appellant and Ms. Pessina fit the general description given by Mr. Harrison, the surviving cab driver. Mr. Harrison's destination when he was robbed and almost murdered was Ms. Pessina's residence. She had told police that she and appellant had taken a cab to her residence, that she exited at her residence while appellant purportedly continued in the cab to buy cigarettes, and that appellant returned to her residence after a short time and spent the night. Mr. Harrison remembered taking appellant and Ms. Pessina to the vicinity of 909 Mimosa Street and told police and his dispatcher that he observed his assailant going back toward Mimosa Street with the pistol and the fruits of his robbery. Under the

circumstances, we hold that there was probable cause to search the premises at 909 Mimosa Street, making any police threat to obtain a warrant well-founded.

30. By the time of the second search, police also had found a cab driver's coin changer in appellant's field jacket, appellant had confessed, and in his confession he said that he left a green lighter taken from one of his victims in Nadia's residence.

■ Apart from the validity of Ms. Pessina's consent, it is clear that the items seized during the two searches were admissible because a search of her residence was inevitable. Mil.R.Evid. 311(b)(2); *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *United States v. Kozak,* 12 MJ 389 (CMA 1982). While the search of Ms. Pessina's residence was ongoing, appellant was confessing. In his confession, he told investigators that he had hidden the murder weapon and some of the fruits of the crime in Ms. Pessina's residence. We have no doubt that the fast-moving investigation of appellant's crimes would have included a search of Ms. Pessina's residence.

Appellant is not entitled to "a windfall" based on erroneous exclusion of evidence. *See Lockhart v. Fretwell,* —— U.S. ——, ——, 113 S.Ct. 838, 843, 122 L.Ed.2d 180 (1993). In this case the evidence was clearly admissible, and appellant's counsel were not ineffective for failing to object to its admission.

D. *Trial defense counsel failed to object to improper evidence of uncharged misconduct during findings.*

31. During the Government's case-in-chief, one of the court members asked Ms. Ira Printers, Ms. Pessina's roommate, if appellant had ever been physically violent towards Ms. Pessina. Without objection from defense counsel, Ms. Printers responded that she did not know about it beforehand, but found out during Ms. Pessina's statements to police that appellant had assaulted Ms. Pessina previously.

Defense counsel then submitted Ms. Pessina's sworn statements to police as defense exhibits without requesting that the refer-

ences to physical violence be redacted. Furthermore, defense counsel did not object to admission of Ms. Pessina's hospital records concerning injuries allegedly caused by appellant. The same court member who questioned Ms. Printers about the physical violence asked about the hospital records which were then admitted without defense objection. Finally, defense counsel did not object to Ms. Pessina's testimony concerning the alleged assaults.

Appellant argues that the evidence of uncharged misconduct violated Mil.R.Evid. 404(b) and 403. The Government argues that the uncharged misconduct was admissible as rebuttal evidence under RCM 913(c)(1)(C).

■ 32. This Court has set out a basic test for determining admissibility of evidence of uncharged misconduct. "The threshold question ... 'is whether the evidence of the misconduct is offered for some purpose other than to demonstrate the accused's predisposition to crime....'" *United States v. Rodriguez,* 31 MJ 150, 155 (CMA 1990). If this threshold is crossed, the uncharged misconduct must meet a three-part test. First, the extrinsic evidence is not admissible unless it reasonably tends to prove that the accused committed the uncharged crimes, wrongs, or acts. *Id.* at 155. Second, the evidence must make some "fact that is of consequence to ... the action more probable or less probable." *United States v. Ferguson,* 28 MJ 104, 108 (CMA 1989). Finally, the "probative value" of the evidence must not be substantially outweighed by "the danger of unfair prejudice" or confusion. *United States v. Reynolds,* 29 MJ 105, 109 (CMA 1989).

Appellant pays little attention to the threshold question and the first part of the test. Instead, appellant argues that the prior assaults on Ms. Pessina do not relate to a material issue in the case. *See United States v. Munoz,* 32 MJ 359, 364 (CMA) (Extrinsic evidence must relate to a "material issue" in the case.), *cert. denied,* 502 U.S. 967, 112 S.Ct. 437, 116 L.Ed.2d 456 (1991). Specifically, appellant argues that the assaults did not have anything to do with the murders, attempted murders, and robberies of unrelat-

ed persons. Furthermore, appellant argues that any probative value of the evidence is substantially outweighed by the danger of unfair prejudice.

We hold that defense counsel were not deficient for failing to object to the evidence of uncharged misconduct, because such an objection would not have been meritorious. The overall defense approach was to portray Ms. Pessina as a manipulator who was deeply involved in appellant's crimes. Evidence depicting appellant as a person who abuses his girlfriend directly contradicted the defense's theory that appellant was under her domination. Furthermore, the probative value of such evidence does not appear to be substantially outweighed by danger of unfair prejudice.

E. *Trial defense counsel failed to present the defense of voluntary intoxication or to introduce any evidence, either on the merits or at sentencing, regarding appellant's mental condition at the time of the offenses.*

33. We hold that defense counsel was not deficient for failing to present evidence of voluntary intoxication, for the reasons stated with respect to sub-issue A, 41 MJ at 242 ¶ 25. We hold that defense counsel was not deficient for failing to introduce evidence regarding appellant's mental condition for the reasons stated with respect to Issue II, 41 MJ at 241 ¶ 23.

F. *Trial defense counsel failed to object to improper aggravation evidence and improper instructions allowing the panel to consider "lack of rehabilitative potential" during the sentencing proceedings.*

34. During the sentencing hearing, the prosecution introduced evidence of appellant's unsatisfactory performance as a soldier, including three records of nonjudicial punishment under Article 15, UCMJ, 10 USC § 815, and one record of proceedings in which a suspension of nonjudicial punishment was vacated. The records show the following nonjudicial actions: (1) punishment imposed on May 19, 1987 for a 1–day unauthorized absence; (2) punishment imposed on July 31, 1987, for wrongful use of marijuana; (3) punishment imposed on October 4, 1988, for missing formations on three occasions and

willfully disobeying a noncommissioned officer's order to lay out equipment for an inspection; and (4) an action dated October 28, 1988, vacating the suspension of the forfeiture imposed on October 4, because appellant broke restriction.

35. The prosecution also called Captain (CPT) Bush, appellant's battery commander, who testified about appellant's duty performance and disciplinary problems. CPT Bush testified that when he assumed command, approximately 1 year prior to appellant's court-martial, the outgoing commander and he discussed all the soldiers in the battery. The outgoing commander told CPT Bush that appellant "had been in trouble before and that he was somebody you might want to keep an eye on, but he seemed to be doing good at the time." During the early days of CPT Bush's command, appellant's "duty performance was pretty good, motivated, worked hard for his section chief. He stayed out of trouble, basically." In January of 1988, the unit recommended appellant for a medal because of his performance at the National Training Center. After a short while, "[h]e got involved with a—a woman downtown and he just started showing up late for formations and missing formations and problems like that." After counseling and other corrective actions failed, appellant received nonjudicial punishment from the battalion commander, and part of the punishment was suspended. CPT Bush testified that he believed "if we suspended [sic] him for the maximum amount of time it might break up the relationship with the woman he was hanging around with and that might help solve his problems." Within 10 days, the suspension was vacated because of further misconduct. At that point, CPT Bush decided to recommend that appellant be administratively discharged from the Army. When trial counsel asked, "How much rehabilitation potential did he have as a soldier?," CPT Bush responded, "At that point he had—in my opinion, he had none. There was nothing we could do for him."

On cross-examination, defense counsel further explored the effects of appellant's relationship with Ms. Pessina on his duty perfor-

mance. CPT Bush testified that appellant responded to the leadership of Sergeant (SGT) Key and himself and "[h]e was doing well for a while." Appellant earned back the rank he had lost. In the words of defense counsel, "And then Nadia came into the picture," after which appellant's performance deteriorated.

36. The military judge later instructed the members, without defense objection, that they could consider the evidence of appellant's nonjudicial punishment and CPT Bush's testimony as aggravating circumstances. The military judge also instructed the members that the military recognizes five principal reasons for sentencing those who violate the law: 1) "protection of the society from the wrongdoer"; 2) "punishment of the wrongdoer"; 3) "rehabilitation of the wrongdoer"; 4) "preservation of good order and discipline"; and 5) "deterrence of the wrongdoer and those who know of his crime and his sentence." Defense counsel objected only to the deterrence portion of the instruction.

Appellant now asserts that the failure of trial defense counsel to object to CPT Bush's testimony and the military judge's sentencing instruction constituted ineffective assistance of counsel. Appellant argues that CPT Bush's testimony concerning appellant's rehabilitative potential should not have been considered as an aggravating circumstance and that his defense counsel was deficient in not objecting to it.

Furthermore, appellant asserts that the judge erred in instructing the members to consider all five reasons for sentencing in the military since only two (punishment and deterrence of others) have been recognized to be appropriate in capital cases, and his defense counsel was deficient for failing to object to the instructions. *See Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2929–30, 49 L.Ed.2d 859 (1976) (Opinion of Stewart, Powell, and Stevens, JJ.); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

37. Appellant buttresses his argument that rehabilitation evidence is not admissible in a capital murder case by citing *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). In a separate opinion, Justices Stevens, Brennan, and Marshall stated:

> In general, punishment may rationally be imposed for four reasons: (1) to rehabilitate the offender; (2) to incapacitate him from committing offenses in the future; (3) to deter others from committing offenses; or (4) to assuage the victims's or the community's desire for revenge or retribution. *The first of these purposes is obviously inapplicable to the death sentence.* The second would be served by execution, but in view of the availability of imprisonment as an alternative means of preventing the defendant from violating the law in the future, the death sentence would clearly be an excessive response to this concern. We are thus left with deterrence and retribution as the justification for capital punishment.

*Id.* at 477–78, 104 S.Ct. at 3171–72 (emphasis added). *See also Furman v. Georgia,* 408 U.S. 238, 306, 92 S.Ct. 2726, 2760, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring) (The death penalty "is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice."); *Beam v. Pasket,* 966 F.2d 1563, 1572 (9th Cir.1992) (A death sentence cannot be obtained unless the sentence is in furtherance of "its interest in retribution, in deterrence, or in the elimination of those likely to kill again."), *vacated,* —— U.S. ——, 113 S.Ct. 1837, 123 L.Ed.2d 464 (1993), *rev'd on other grounds,* 3 F.3d 1301 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1631, 128 L.Ed.2d 354 (1994).

The Government, however, points to RCM 1001(b)(5), which states that the prosecution may present "evidence, in the form of opinion, concerning the accused's previous performance as a servicemember and potential for rehabilitation." *See United States v. Stinson,* 34 MJ 233 (CMA 1992) (In a sentencing hearing, an accused's potential for rehabilitation is a proper subject of testimony by qualified experts.).

38. We agree with the Government that appellant's nonjudicial punishment and CPT Bush's opinion about his duty performance

were admissible under RCM 1001(b)(2) and (5). *Cf. Barclay v. Florida*, 463 U.S. 939, 956, 103 S.Ct. 3418, 3428, 77 L.Ed.2d 1134 (1983) (evidence admissible to show that mitigating circumstance did not exist). CPT Bush's testimony arguably violated our prohibition against euphemisms for a punitive discharge in *United States v. Ohrt*, 28 MJ 301 (CMA 1989), but we do not find defense counsel's performance deficient for failing to object to it. Defense counsel had already presented the testimony of SGT Key, appellant's first-line supervisor on the merits. SGT Key had testified that appellant was "having problems" when SGT Key first arrived, but that he later responded to leadership and "was squared away for 12 good months." SGT Key testified further that "[w]hen he met Nadia, it went out the window." It is clear from the cross-examination of CPT Bush that trial counsel played into defense counsel's hands by reinforcing the defense proposition that appellant was obsessed with Ms. Pessina. Rather than object to the testimony, defense counsel used it to advantage by cross-examining CPT Bush to establish that appellant was developing into a good, responsible soldier until he fell under the spell of Nadia Pessina. In our view, this defense strategy was sound.

 39. We turn next to the question whether the military judge erred by characterizing appellant's lack of rehabilitative potential as an aggravating circumstance. RCM 1004 creates two categories of aggravating evidence: a broad category of aggravating "circumstances" and a narrower category of aggravating "factors." RCM 1004(b)(4) (Change 2) provides:

Death may not be adjudged unless:

(A) The members find that at least one of the aggravating factors under subsection (c) existed;

(B) Notice of such factor was provided in accordance with paragraph (1) of this subsection and all members concur in the finding with respect to such factor; and

(C) All members concur that any extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances admissible under RCM

1001(b)(4), including the factors under subsection (c) of this rule.

RCM 1004 combines the two procedures generally employed by the states in capital cases. The states generally fall into two categories: "weighing" and "nonweighing." A "weighing" state balances extenuating and mitigating circumstances against statutory aggravating factors. A "nonweighing" state requires that a statutory aggravating factor be found in order to adjudge a death sentence, but does not require that it be weighed against extenuating and mitigating circumstances. RCM 1004 combines both processes, by first requiring that an aggravating factor be found, and then requiring that extenuating and mitigating circumstances be weighed against aggravating circumstances, which include the aggravating factors.

This Court has specifically opined that lack of rehabilitative potential is *not* an aggravating circumstance. *United States v. Aurich*, 31 MJ 95, 96–97 n. \*. *See* RCM 1001(b)(4) and (5). Accordingly, we hold that the military judge's characterization of appellant's disciplinary record and CPT Bush's testimony as aggravating circumstances, as that term is used in RCM 1001(b)(5), was error.

 40. Where, as in this case, the sentencing authority in a "weighing" jurisdiction has considered an invalid aggravating circumstance, an appellate court may either reweigh the circumstances or conduct a harmless-error analysis. *Stringer v. Black*, 503 U.S. 222, 230, 112 S.Ct. 1130, 1136, 117 L.Ed.2d 367 (1992); *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983).

 We hold that appellant was not prejudiced by the military judge's characterization of appellant's duty performance as an aggravating circumstance or by his counsel's failure to object to that characterization, because the error was harmless. The Supreme Court has recently held that when ineffective assistance is alleged, "a criminal defendant alleging prejudice must show 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Lockhart v. Fretwell*, —— U.S. at ——, 113 S.Ct. at 842, *citing Strickland v.*

*Washington,* 466 U.S. at 687, 104 S.Ct. at 2064. "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison,* 477 U.S. at 374, 106 S.Ct. at 2582.

In the case before us, CPT Bush's evaluation of appellant's potential for military service pales in the context of the overwhelming evidence of a series of brutal murders and robberies. We are satisfied that the military judge's characterization of appellant's disciplinary record and CPT Bush's testimony as an aggravating circumstance did not prejudice appellant, especially in light of the defense strategy of attributing appellant's decline in performance to Ms. Pessina's domination. *See Zant v. Stephens,* 462 U.S. 862, 889, 103 S.Ct. 2733, 2749, 77 L.Ed.2d 235 (1983) (mislabeling aggravating evidence had " 'an inconsequential impact on the jury's decision regarding the death penalty' "). Furthermore, our review of the evidence presented and the arguments of counsel satisfy us that the decision to impose the death sentence was based on the facts and circumstances of the case rather than a numerical weighing of aggravating factors and circumstances against mitigating circumstances.

G. *Trial defense counsel failed to adequately investigate and ensure the accuracy and reliability of the pretrial sanity board and neuropsychological evidence before relying on the evidence.*

■ 41. Based on defense counsel's exhaustive inquiry into appellant's mental condition, as outlined in our discussion of Issue II, 41 MJ at 239–240 ¶¶ 19–20, we hold that defense counsel fully complied with the requirement to "make reasonable investigations." *Strickland v. Washington,* 466 U.S. at 691, 104 S.Ct. at 2066.

H. *Trial defense counsel failed to request funds for a mitigation specialist or to present a cohesive, comprehensible background, social, medical, and environmental history for appellant.*

Appellant argues two points on this subissue; trial defense counsel failed to request funds for a mitigation specialist, and counsel failed to present all of the mitigation evidence available, including the testimony of Dr. Armitage.

Trial defense counsel did not utilize a mitigation expert. Instead, defense counsel conducted his own investigation and presented his evidence through lay witnesses, and then used his sentencing argument to link the evidence to an appropriate sentence. Through the testimony of appellant's father, mother, brother, and sister, and the affidavit of another brother, defense counsel established that appellant was the youngest of eight children. They produced evidence that appellant's father drank heavily, had a long police record, was physically abusive, did not know appellant's age or birthday, and left all responsibility for child rearing with appellant's mother. They established that appellant's mother worked nights to support the family until she could no longer work because of illness. Finally, using the testimony of family members as well as the testimony of a police officer from appellant's home town, they established that appellant grew up in an economically depressed, violent, drug-infested neighborhood with substandard schools.

Through the stipulated testimony of a teacher and appellant's school records, defense counsel established that appellant was academically substandard in high school and a frequent truant and disciplinary problem. Appellant was "moody and temperamental in the classroom" and "would easily flare up." Appellant's parents showed no interest in "his progress or problems."

Mr. Lord Johnson, a boxing coach, testified that appellant entered his program when he was 7 or 8 years old. Appellant trained hard and did well. They had a "beautiful relationship" until appellant left the program when he was 15 years old. Mr. Johnson opined that appellant could be "manipulated or controlled." Finally, Mr. Johnson testified that in his opinion appellant would not be a dangerous person if confined.

42. Finally, defense counsel called two noncommissioned officers from the Fort Hood Detention Facility, who testified that

appellant presented no disciplinary problems while in pretrial confinement, that he was a good worker, and that he "adjusted well to confinement."

CPT Bush, during his testimony, established that appellant responded well to the leadership of SGT Key and was performing well until he became involved with Ms. Pessina.

The thrust of the defense case on sentencing was to convince the court-martial to confine appellant rather than execute him. The defense presented evidence to show that, if appellant were isolated from external influences and placed in a structured environment, he would not be dangerous and that, therefore, the needs of justice and society made his execution unnecessary.

In argument, defense counsel pointed out that appellant was the product of parental neglect and violent surroundings. Defense counsel portrayed appellant as a person of limited intelligence and arrested emotional development, who was a follower, manipulated and controlled by Ms. Pessina. Defense counsel emphasized that appellant, in spite of his upbringing, responded well to leadership of Mr. Johnson and SGT Key, adjusted well to confinement, and would not be a threat to society if he were confined.

43. Appellant asserts that mitigation experts are essential for capital murder cases. He argues that a mitigation expert would have been able to present all the appropriate evidence in a more logical and coherent order. He further asserts that the mitigating factors presented should have been linked through expert testimony with the actions of appellant. Finally, appellant argues that the mitigating evidence presented was disjointed and piecemeal.

█ Trial defense counsel explains that his failure to present expert mitigation testimony was a tactical choice. Trial defense counsel specifically considered using expert testimony for the purpose of drawing "a nexus between" appellant's "past problems and his present conduct." COL Armitage, a forensic psychiatrist and a member of the defense team, could have testified and "draw[n]

a nexus between" appellant's past and the present and his "tendency to be led," but if he had done so, he also would have had to acknowledge on cross-examination that appellant had a classic "sociopathic personality" and could very easily commit similar crimes in the future. To prevent this damaging result, defense counsel avoided psychiatric testimony.

█ We hold that counsel's decision not to utilize Colonel Armitage's testimony or that of any other mental health professional was a reasonable tactical choice. See White v. Singletary, 972 F.2d 1218, 1225–26 (11th Cir.1992) (trial defense counsel did not provide ineffective assistance of counsel during penalty phase of capital murder prosecution by failing to present mitigation expert testimony on defendant's intoxication because it contradicted trial testimony regarding defense and because jurors generally disdain "drunkenness as an excuse for violent behavior"). The mere fact that defense counsel did not "shop around" for another more favorable expert does not render them ineffective. See Poyner v. Murray, 964 F.2d 1404, 1419 (4th Cir.), cert. denied, —— U.S. ——, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992).

█ We hold further that defense counsel's investigation and presentation of defense mitigation evidence and their decisions regarding use of expert testimony were reasonable. While use of an analysis prepared by an independent mitigation expert is often useful, we decline to hold that such an expert is required. What is required is a reasonable investigation and competent presentation of mitigation evidence. Presentation of mitigation evidence is primarily the responsibility of counsel, not expert witnesses. In this case defense counsel investigated appellant's background and competently presented his evidence during the sentencing phase of the trial. Based on the advice of Colonel Armitage, defense counsel wisely used argument to link the evidence to appellant rather than use an expert who would be vulnerable to devastating cross-examination or rebuttal. This was not ineffective assistance.

*I. Trial defense counsel failed to object to improper government rebuttal evidence.*

 44. Appellant contends that trial counsel elicited improper rebuttal evidence from two witnesses, Texas Ranger Aycock and Private Brown. As to Aycock, appellant asserts that it was improper to permit him to testify that, to the best of his knowledge, Ms. Pessina had no criminal activity in her past, that she was "not a suspect here," and that there were no state charges pending against her for concealing knowledge of the felony, making false statement to police, or possession of drugs.

Defense counsel had cross-examined CPT Bush about rumors of Ms. Pessina's drug use and involvement in criminal activity, including murder. This testimony was tendered by the defense to support their theory that Ms. Pessina was the instigator of appellant's crimes.

We hold that Ranger Aycock's testimony was proper rebuttal, and therefore defense counsel were not deficient in failing to object to it. In *United States v. Banks*, 36 MJ 150, 166 (CMA 1992), we explained that "the function of rebuttal evidence is to explain, repel, counteract or disprove the evidence introduced by the opposing party." Of course, proper rebuttal evidence must be restricted to the scope outlined by the evidence of the opposing side. *United States v. Hallum*, 31 MJ 254, 255 (CMA 1990). In this case Ranger Aycock's testimony rebutted the defense evidence characterizing Ms. Pessina as a known criminal who exercised undue influence over appellant.

 45. Appellant also asserts that his counsel failed to object to improper rebuttal testimony by Private Brown. Brown testified that, in private conversation, appellant told him that he "did it the first time to see if he could get away with it, and then he did it because it was fun." Brown testified further that he heard appellant say that if he could do it over again, "the only difference" would be that he would not "get caught." Appellant argues that this evidence was improper because the defense produced no evidence of remorse.

We hold that the evidence was proper rebuttal and that counsel were not deficient for failing to object to it. During cross-examination of SA Schnayerson, who had interrogated appellant regarding the offenses, defense counsel elicited testimony that SA Schnayerson had asked appellant hypothetical questions about the families of the victims, to which appellant responded that he was sorry. During sentencing argument defense counsel specifically mentioned appellant's remorse as a mitigating factor, arguing that "Agent Schnayerson, when he was interviewing Dwight over at the CID building, asked him about feelings for the family or feeling of remorse at that time and asked him if he was sorry, and he did say he was sorry. And that is what prompted the confession, that's when he made the confession and that—that is evidence of remorse." We hold that defense counsel opened the door to the issue of remorse during cross-examination of SA Schnayerson, making Private Brown's testimony proper rebuttal.

*J. Trial defense counsel were ineffective in failing to request a sentencing instruction which would properly inform the panel members that the only offenses which authorized the death sentence were felony murder and premeditated murder.*

 46. During instructions on sentencing, the military judge instructed the panel that "a single sentence shall be adjudged for all of the offenses." He then properly instructed the panel that the court-martial was authorized to adjudge a sentence of death or the mandatory minimum sentence of life imprisonment. The military judge failed to instruct the panel, however, that death was an authorized punishment only for the offenses of premeditated murder and felony murder. Defense counsel neither objected to the sentencing instruction nor requested a specific instruction identifying the offenses for which death was an authorized punishment.

The Government contends that the aggregate effect of the other offenses did not render the death sentence improper because the members' discretion was circumscribed by the three specific aggravating factors concerning which the judge instructed the members. Furthermore, the list of aggravating circumstances presented to the court members by trial counsel and the judge did not

include the robbery or attempted murder offenses.

Appellant's argument is founded on this Court's previous cases in which we have held that the court members must be informed of the basis for permissible additional punishment if the additional punishment is permitted based on previous convictions or multiple offenses. *See United States v. Yocum*, 17 USCMA 270, 273, 38 CMR 68, 71 (1967) (must tell members punitive discharge (BCD) authorized because accused convicted of 2 or more offenses for which authorized total confinement is 6 months or more); *United States v. Hutton*, 14 USCMA 366, 370, 34 CMR 146, 150 (1964) (must tell members BCD authorized because accused had two or more previous convictions).

The factual premise for appellant's argument is that the court members did not know which offenses were punishable by death and, therefore, they sentenced him to death for an aggregate of offenses. Neither side's brief mentions the military judge's instructions on *findings*, in which he explained how to announce the vote on the four *capital* offenses. The four capital offenses were specifically identified on the findings worksheet (App. Ex. CXXIII) and specifically identified by the military judge when he was instructing on the voting procedures for findings. The military judge called specific attention to pages 1, 3, 5, and 6 of the worksheet which identified the four capital offenses and contained specific instructions on how to announce whether the findings were unanimous with respect to those offenses.

47. While it might have been better practice for the military judge to again identify the offenses punishable by death in his sentencing instructions, we are unwilling to presume that the court members did not know that a "capital" offense is punishable by death. We note that defense counsel told the court members on general *voir dire* that "this is a capital murder case" and that "you may have to make a decision whether or not to confine ... [appellant] in prison for the rest of his life, or to execute him." We hold that the military judge did not err by failing to repeat the portion of his findings instruc-

tion which identified which offenses were "capital." We further hold that defense counsel's failure to object or request additional instructions was not ineffective representation within the meaning of *Strickland*.

### K. *Cumulative error.*

Although not specifically asserted by appellant, we deem it appropriate to consider whether defense counsel's conduct of the trial as a whole might have been defective within the meaning of *Strickland*, even though individual oversights or mistakes standing alone might not satisfy *Strickland*. *See Frey v. Fulcomer*, 974 F.2d 348, 361 n. 12 (3d Cir. 1992) (prejudice determined by review of all of counsel's errors combined), *cert. denied*, ⸺ U.S. ⸺, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). Our review of the entire record satisfies us that appellant was vigorously and competently defended.

### ISSUE IV

WHETHER THE MILITARY JUDGE ABANDONED HIS ROLE AS A NEUTRAL OFFICER OF THE COURT THEREBY DENYING APPELLANT A FAIR TRIAL.

48. Appellant contends that the military judge denied him a fair trial by becoming an advocate for the prosecution. At the initial session of the court-martial under Article 39(a), UCMJ, 10 USC § 839(a), on January 31, 1989, defense counsel conducted an extensive *voir dire* of the military judge and then elected not to challenge him for cause at that time. At an Article 39(a) session on March 16, 1989, defense counsel challenged the military judge for cause based on adverse rulings and comments by the military judge at preceding pretrial sessions.

It is axiomatic that a military "judge may not abandon" his "impartial" role and "assist" the prosecution. *United States v. Reynolds*, 24 MJ 261, 264 (CMA 1987). On the other hand, the military judge "is not a mere figurehead" or "simply an umpire in a contest between the Government and accused." *United States v. Kimble*, 23 USCMA 251, 253, 49 CMR 384, 386 (1974). The military judge has the responsibility to "exer-

cise reasonable control over the proceedings." RCM 801(a)(3). He "should prevent unnecessary waste of time and promote the ascertainment of truth, but must avoid undue interference with the parties' presentations or the appearance of partiality." RCM 801(a)(3), Discussion. Because "jurors are ever watchful of the words that fall from him," a military judge must be circumspect in what he says to the parties and in how he examines witnesses. *United States v. Clower*, 23 USCMA 15, 18, 48 CMR 307, 310 (1974), *quoting Bollenbach v. United States*, 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946).

■■■■ RCM 902(a) provides that "a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." RCM 902 is based on 28 USC § 455 and contains substantially the same language. Drafters' Analysis of RCM 902, Manual, *supra* at A21–45. The standard of appellate review of the recusal decision is abuse of discretion. S. Childress & M. Davis, 2 *Federal Standards of Review* § 12.05 at 12–37 (2d ed. 1992). The standard is based on "the 'reasonable person' test: if a reasonable person would not question the judge's impartiality on the basis of the facts presented, then it is not an abuse of discretion for the judge to deny the motion for recusal." *Id.* at 12–38.

■■■■ 49. Appellant has asked this Court to consider the military judge's "track record" and has cited nine cases in which the military judge has allegedly exhibited pro-government conduct. Final Brief at 155–57. We decline to decide this case on the basis of the military judge's "track record." In the first place, we do not regard nine cases as a representative sample of the record of an experienced trial judge. Second, our obligation is to review the record of trial in this case, not that in other decided cases, to determine if the military judge was partial in this case. *See Litekey v. United States*, — U.S. —, —, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994) ("[J]udicial rulings alone almost never constitute [a] valid basis for a bias or partiality motion."), *citing United*

States v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966).

In support of appellant's assertion that the military judge "has a track record of pro-government conduct," Final Brief at 155, appellate defense counsel assert that the military judge "had reason to celebrate with the prosecution, law enforcement agents, and the murder victim's families the very night appellant was sentenced to die." Final Brief at 157–58. This accusation is based on an affidavit from former-Captain Ibbotson, lead defense counsel, in which he asserts, "After the verdict was announced, the prosecutors held a party." Mr. Ibbotson further asserts, "The defense later learned that, in addition to the prosecutors, investigators and family members, the Military Judge attended as an invited guest." Def.App. Ex. S. Mr. Ibbotson does not disclose the source of his information. The defense has produced no direct or corroborating evidence of this assertion.

The Government countered with an affidavit from Lieutenant Colonel (LTC) (then-Major) Ley, the lead prosecutor and one of the alleged sponsors of the party. LTC Ley asserts unequivocally, "There was no party." Govt.App. Ex. 6, ¶ 2. After comparing Mr. Ibbotson's accusation based on hearsay with LTC Ley's denial based on personal knowledge, we conclude that further inquiry is not warranted.

We turn next to appellant's specific allegations regarding the military judge's conduct of the trial, which we discuss *seriatim*.

A. *The military judge refused to allow appellant access to information showing inaccurate media coverage which bore upon the advisability of changing venue.*

■■■■ 50. At trial appellant requested a change of venue, which the military judge denied. Appellant also requested funding for a "clipping service" and subpoenas to the news directors of all local television stations in order to obtain videotapes of television coverage regarding the charges against appellant. These requests were denied as unnecessary after the military judge received assurances from the Government that the Fort Hood Public Affairs Office would make all news clippings and videotapes of televi-

sion coverage available to the defense. We hold that the record does not support appellant's allegation that he was refused access to relevant information.

■ Appellant also asserts that the military judge demonstrated bias by stating that his ruling on the requested change of venue "wouldn't change by my viewing any of these television reports of this trial." The military judge stated that the defense would be permitted to raise the venue issue again if *voir dire* of the court members indicated that they had been influenced by pretrial publicity and that he would liberally grant challenges based on exposure to pretrial publicity.

We note that the military judge's ruling was unsuccessfully challenged before the Court of Military Review. 34 MJ at 964–65. Appellant now asserts that the military judge's treatment of the issue reflects bias against him.

■ We do not regard the military judge's statement as a demonstration of bias, but rather as a reflection that he correctly understood the law. Pretrial publicity does not necessarily establish that court members have been influenced. The question is whether the members, having been exposed to publicity, can "fairly and honestly try the issues." *United States v. Vigneault*, 3 USC-MA 247, 255, 12 CMR 3, 11 (1953). It is only when pretrial publicity creates "so great a prejudice against the accused that the accused cannot obtain a fair and impartial trial" that he is entitled to a change of venue. RCM 906(b)(11), Discussion; *United States v. Gravitt*, 5 USCMA 249, 256–57, 17 CMR 249, 256–57 (1954).

B. *The military judge accused defense counsel of being unethical and manipulating the speedy trial clock.*

■ 51. Appellant's argument is based on an exchange regarding a trial date. After listing what needed to be done, defense counsel argued, "There's an awful lot of things hanging here, and it seems unfair to make the defense go to trial on the 27th and say we're held to any delay." Trial counsel retorted, "Your Honor, we're not . . . opposing a defense delay, but I get the feeling that the

Government is being maneuvered here into somehow the defense saying, 'I'm not ready to go, we're going to need to evaluate a lot of different things; but somehow, it should all be accountable to the Government.' " The military judge responded:

Well, that's my perception exactly. Certainly, you fellows aren't trying to maneuver the system, are you? If you want delay, I'd be more than happy to give you delay. If you want time to check out these things, be my guest; take whatever time you feel is necessary. But in my view so far, the Government has been extremely cooperative with you. If you want more time, as I say, just ask.

To the extent that the military judge perceived that the defense was attempting to gain additional preparation time without foregoing a possible speedy-trial motion, we agree with appellant that defense counsel were "accused" of attempting to use the speedy-trial rules to their advantage. We disagree, however, that the military judge's use of the term "maneuver" amounted to an accusation of unethical conduct.

C. *The military judge suggested to trial defense counsel that he should use an inadequate expert to prepare for trial.*

52. The allegation is unsupported by the record. After the defense requested expert assistance, the Government proffered two medical officers in succession who were unacceptable to the defense. The military judge declined to force the defense to accept them. A third medical officer, Colonel Armitage, was offered by the Government and was acceptable to the defense. The basis of the controversy was not being forced to accept an "inadequate expert"; the basis of the controversy was whether, for speedy-trial purposes, the delay in finding an acceptable expert would be charged to the defense.

D. *The military judge ignored prosecutorial misconduct in excusing a pro-life court member without cause.*

■ LTC Hardie was detailed to be a court member in appellant's case on February 14, 1989. On February 21, appellant requested enlisted members. On February 23 LTC Hardie completed an extensive

"Court–Martial Member Questionnaire" in which he wrote, "I have morale [sic] reservations regarding capital punishment." On March 23 appellant changed his mind and requested an all-officer court. On March 24, LTC Hardie "faxed" a handwritten request for excusal from court-martial duty to the convening authority, reciting that he had been notified just that morning that he was required to be present for court-martial duty. LTC Hardie, a battalion commander at Fort Sill, listed training commitments scheduled to begin on March 30 which could not be rescheduled because of short notice. Also on March 24, the division staff judge advocate (SJA) submitted a decision paper and a list of nominees to the convening authority. The convening authority relieved the enlisted members and appointed five more officers. LTC Hardie was not reappointed.

■ 53. Appellant's accusation that the military judge ignored prosecutorial misconduct is unsupported by the record. In the first place, there is no evidence of prosecutorial involvement in the selection of court members. All correspondence was between the SJA and the convening authority. Furthermore, there is no evidence that the convening authority was aware of the questionnaire, which apparently was sent out by counsel and returned to counsel in preparation for *voir dire* of court members. Finally, even if the convening authority had been aware of the questionnaire, he would have been justified in not appointing LTC Hardie to sit on appellant's case, because LTC Hardie would not have been "best qualified" within the meaning of Article 25, UCMJ, 10 USC § 825, by virtue of the likelihood of his being challenged for cause based on his moral opposition to the death penalty. *See United States v. Curtis*, 33 MJ 101, 106–07 (CMA 1991) (juror subject to challenge for cause if "religious views or moral scruples" against death sentence would prevent giving "meaningful consideration to impose a death penalty"), *cert. denied*, 502 U.S. 1097, 112 S.Ct. 1177, 117 L.Ed.2d 421 (1992); RCM 503(a)(1), Discussion and Drafters' Analysis to RCM 503(a)(1), Manual, *supra* at A21–25 (convening authority should avoid detailing

members who would be subject to challenge for cause).

E. *The military judge restricted defense counsel's voir dire and chastised him in the presence of a court member.*

Appellant's assertion involves three issues: (1) whether the military judge improperly restricted *voir dire;* and (2) whether the oral exchanges between defense counsel and the military judge reflect that the judge was biased; and (3) whether the military judge prejudiced appellant by scolding defense counsel in the presence of a court member.

1. *Restrictions on voir dire.*

■ Prior to trial each court member completed and submitted a 7-page "Court–Martial Member Questionnaire," consisting of 35 questions covering personal and family history, civilian and military education, past duty assignments, non-military employment, awards and decorations, volunteer work, previous contacts with the legal system, hobbies, memberships in organizations, and reading habits. These questionnaires were submitted to trial counsel and used by counsel for both sides.

During general *voir dire,* defense counsel asked about familiarity with the evidence, witnesses, and court personnel; court-martial experience; hobbies and reading habits; associations with judges, lawyers, and policemen; attitudes about capital punishment; and general attitudes toward sentencing.

After general *voir dire* was completed, the military judge asked counsel for both sides how much time they needed for individual *voir dire.* Trial counsel anticipated "a few moments," but defense counsel anticipated 45 minutes per member. The military judge then scheduled the members for individual *voir dire* at 30–minute intervals, closed the court, and moved *voir dire* to a more informal setting in another room.

54. The first court member, LTC Dobbs, was then questioned individually for 57 minutes by both sides, without comment or interruption by opposing counsel or the military judge. Questioning by trial counsel included civilian education, prior experience as a crime victim, previous military assignments, attitudes toward the criminal justice system in general and capital punishment in particu-

lar, as well as his attitude toward conflicts between court-martial duty and other duties.

Defense counsel then questioned LTC Dobbs about his career as a public affairs officer in the Army, other military assignments, family history, participation in sports, volunteer work, attitude toward bumper stickers, reading habits, prior court-martial experience, personal values, capital punishment, and race relations.

After LTC Dobbs was excused, the following exchange took place between the military judge and defense counsel:

MJ: ... You guys are going to have to hold down this process [to defense]. I'm not going to take an hour for every one of these guys. For example, I'm having great difficulty understanding why you need to know whether a court member has done any volunteer work, put stickers on his car, anything about a divorce, concept [sic] with the enemy in time of war, thoughts on boxing. This process is going to have to be streamlined; because as I say, I'm not going to allow you to have an hour for each one of these guys, with questions like that. Can we get to the core issues? Be my guest and get to those core issues, and do it quickly. So let's jettison some of this stuff that I see as non-essential. Those are just some indications of what I think is non-essential information.

IDC: Sir, in the ones you pointed out there, we have certain reasons why we asked some of those questions. I can— just to give you an example on the stickers. When somebody has a sticker on there that, you know, "my wife, yes; my dog, maybe; my gun, never," or something like that, it tells a little bit about the ——

MJ: Ask them about gun control, or something like that. We're not going to go through all of this stuff here. And volunteer work, tell me why you need to know about his volunteer work; clue me in on that one.

[No response from the defense.]

MJ: Well, my point exactly.

DC: No, sir. Well, sir—

MJ: Well, then answer.

DC: Sir, we've consulted with [a] jury consultant on this, as well as our expert, and we feel that this discloses attitudes of the panel, just as the attitudes on divorce, and these other matters. Many of these matters directly have to do with certain mitigating evidence we plan on presenting in this case, as does boxing. It all ties into specific elements and the mitigating evidence we plan on presenting, and their attitudes—or lack of attitude—on these issues is important. We'll drop the part on volunteer work if you insist. We'd just note on the record that we're not able to ask about this....

MJ: Well, I feel that you're wasting time.

DC: Okay, sir.

MJ: Do not waste time. Get to the core issues. Let's move on quickly. Let's not ask these people their entire life history; that's not the design behind voir dire. The design is whether they can sit as an impartial court member.

The individual *voir dire* of the second court member, LTC Griffith, then commenced. Questioning followed the same general pattern and covered the same topics as with LTC Dobbs. Neither opposing counsel nor the military judge interrupted until near the end of the *voir dire,* when defense counsel asked about boxing. The military judge interjected and the following exchange occurred:

MJ: Didn't I tell you, no? I could have sworn I said, don't do that. What is this, open defiance here?

DC: No, sir.

MJ: What are you doing then?

DC: As I've explained to you, some of the key elements in our mitigation case involve—In fact, one of our witnesses, a boxer—

MJ: Answer the question. What are you doing?

DC: I thought that I explained to you about that, sir.

MJ: You can asked [sic] one boxing question, and that's it. That's all the question [sic] you can ask.

Defense counsel then asked LTC Griffith what he thought about boxing, and LTC Griffith gave a lengthy and detailed response.

55. After LTC Griffith was excused, defense counsel asked the military judge to examine their *voir dire* outline and indicate which questions he considered irrelevant or objectionable. Defense counsel then pointed out to the military judge that LTC Griffith had reacted to the military judge's interruption of the questioning about boxing. The military judge responded:

> Call him back and ask him. I'm not going to be defied at this court-martial. When I tell you guys to do something, I expect you to do it. I said no boxing questions. You mentioned boxing would be an issue, or something you would present during extenuation and mitigation. That was what I understood.

The military judge then asked defense counsel to explain why questions about boxing were important. After considerable discussion, defense counsel explained that one of the defense witnesses would be appellant's boxing coach and that the coach's "evaluation of" appellant's "character is inextricably tied to the sport of boxing." Defense counsel then repeated their request that the military judge annotate their *voir dire* outline. The military judge responded:

> Well, I'm not going to waste my time doing that. Ask the questions you want to ask. I'll do this, though. I'll jump in and tell you when to stop, when I think you're just wasting time. I'll allow you to ask a boxing question, then, if you think it's so important to your case. Let's not explore every punch that's ever been thrown by a man here. Let's just ask a nice, brief, brisk question on boxing.

The remainder of *voir dire* was conducted without controversy or interruption, except for one question by trial counsel to which the military judge responded, "An unfair question," and one time when the military judge interrupted a series of defense questions about the importance of schools by interjecting, "Last question in that area. Move on." The next six court members (Major (MAJ)

Napoli, MAJ Wilson, CPT Williams, CPT Weiss, Chief Warrant Officer (CW)4 Giebner, and CW3 Hasenauer) were asked substantially the same questions, including questions about boxing, without interruption. Four court members (LTC Thomas, LTC Keating, LTC Aylor, and MAJ Staples) were not asked about boxing.

LTC Keating was challenged for cause and excused. LTC Griffith, the only court member who witnessed any of the exchanges between defense counsel and the military judge, was challenged peremptorily by trial counsel. LTC Thomas and LTC Dobbs were peremptorily challenged by defense counsel.

[52] 56. When this Court reviews a military judge's limitations on *voir dire*, we "should reverse only when a clear abuse of discretion, prejudicial to a defendant, is shown." *United States v. Smith*, 27 MJ 25, 28 (CMA 1988), *quoting United States v. Parker*, 6 USCMA 274, 280, 19 CMR 400, 406 (1955). *See* RCM 912(d), Discussion ("The nature and scope of the examination of members is within the discretion of the military judge.").

We hold that the military judge did not abuse his discretion in this case. Virtually no topic was off-limits for *voir dire*. Even questions about boxing, the basis of all exchanges between the military judge and counsel, were permitted after defense counsel explained the relevance of the questions.

2. *Bias of the military judge.*

In order to constitute grounds for reversal, a "judge's bias" against a party "must be personal and extrajudicial." *McWhorter v. Birmingham*, 906 F.2d 674, 678 (11th Cir.1990). *See Liteky v. United States*, —— U.S. ——, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Generally, courtroom clashes between counsel and the judge do not constitute disqualifying bias. *In re Cooper*, 821 F.2d 833, 838 (1st Cir.1987). *See Liteky v. United States*, —— U.S. at ——, 114 S.Ct. at 1157 ("expressions of impatience, dissatisfaction, annoyance, and even anger" not sufficient to disqualify judge). Where bias is alleged to be against an attorney rather than a party, it must be so virulent "that the judge's impartiality toward the client may reasonably be questioned." 821 F.2d at 839;

*United States v. Jacobs,* 855 F.2d 652, 656 n. 2 (9th Cir.1988). Applying these principles, we hold that the clashes between defense counsel and the military judge regarding the scope of *voir dire* were not sufficient to disqualify the military judge.

3. *Chastising defense counsel in the presence of a court member.*

■ 57. The record reflects that defense counsel were not chastised in the presence of any court member who sat on appellant's case. All exchanges between the military judge and counsel during *voir dire* were out of the presence of the members, except for one exchange. That was in the presence of LTC Griffith, who was peremptorily challenged by the prosecution, thus mooting any question of prejudice.

F. *The military judge sarcastically criticized defense counsel in the presence of the court members when defense counsel objected to inadmissible hearsay testimony of the medical examiner.*

■ This assertion is unsupported by the record. The exchange in question did not start with an "objection" by defense counsel, but with the following comment as the pathologist began to read from a report that had not been marked as an exhibit: "Uh-sir, it might be good, just for the record, that she's referring to some notes—I believe it's the autopsy report." The military judge responded, "Don't interrupt, will you please?" The military judge then turned to trial counsel and asked, "[D]o you want to get that into evidence, first, so that the doctor can talk from it?" After laying an incomplete foundation, trial counsel offered several documents in evidence. The military judge commented, "Well, it's slightly premature; but, do you have any objections to it, defense?" Defense counsel responded, "Well, we'd agree with you, sir; but we don't have any objections to it being admitted."

In our view the record does not reflect hostility to the defense, but impatience with both sides as trial counsel was having difficulty with what should have been straightforward testimony of a pathologist on an uncontested issue: the cause and manner of death of Private (PVT) Fay. While the military judge demonstrated impatience with both counsel, his comments fall far short of the "verbal abuse" alleged by appellant. Final Brief at 144–46. *See Liteky v. United States, supra* (impatience not sufficient to disqualify judge).

G. *The military judge allowed a murder victim's wife to testify as to cumulative matters.*

■ 58. During a preliminary session prior to arraignment, the military judge ruled that he would permit non-witness members of the victims' families to sit in the courtroom, but would caution them against any displays of emotion or opinion. During the prosecution case on the merits, trial counsel called Mrs. Sharbino, widow of the victim Bobby Sharbino, to testify. Defense counsel remarked, "Your Honor, we would just note, for the record, our earlier comments—at this juncture." The "earlier comments" referred to defense counsel's concern that family members of the victims might influence the court members by making comments or "doing something physically." The military judge did not respond.

Mrs. Sharbino then testified for the limited purpose of identifying Mr. Sharbino's money bag and wallet. After Mrs. Sharbino was excused, defense counsel asked for and received a side-bar conference, where he stated: "We renew our objections to the testimony of the previous witness——" The military judge responded, "Don't waste my time . . . Your objection's on the record. Her demeanor was neutral: She didn't cry; she didn't raise her voice; she didn't use any hand gestures . . . [A]s a matter of fact, she was rigid, [o]n the stand." Defense counsel then protested, "She had little eye-contact, but she began to lose her voice, and her control." The military judge concluded the side-bar by stating, "She had only eye-contact with the prosecutor, when he was asking questions. Let's drive on here."

Based on this exchange, appellant now argues that the military judge "torpedo[ed]" a defense objection to victim-impact testimony with an "order to sit down and 'don't waste my time.'" Appellant argues that "[t]he message to the panel was clear; appellant's

life was worthless and to put up a defense was an inconvenience to the judge's valuable time." Final Brief at 145.

59. This argument misstates the record on several counts. First, defense counsel did not lodge a specific objection prior to Mrs. Sharbino's testimony. Second, Mrs. Sharbino did not give victim-impact testimony; she merely identified two items of real evidence which had been found in a trash container. Third, counsel were not told to "sit down." Fourth, there was no message sent to the panel members because the exchange occurred in a side-bar conference out of the hearing of the members. The members were unaware that there was any controversy about Mrs. Sharbino's testimony.

We are satisfied that the military judge did not abandon his impartial role by allowing Mrs. Sharbino to testify. Her neutral testimony on an uncontested matter was admissible and did not unfairly prejudice appellant as to findings.

H. *The military judge allowed a surprise government witness to testify without adequate notice or discovery to the defense.*

■ On December 28, 1988, and January 7, 1989, defense counsel filed discovery requests for, among other things, "[a]ny statements, confessions, or admissions by the accused"; "[t]he name, identity, and current location of any informant"; and "[a] list of the names, addresses, and telephone numbers for all witnesses ... on the merits or sentencing...." On February 25, 1989, military judge ordered the Government to disclose the identity of all informants to the defense. On March 24, 1989, trial counsel notified the defense that Private Forrest Brown, an inmate at the U.S. Army Correctional Activity at Fort Riley, Kansas, was a possible prosecution witness. On March 26, defense counsel filed a motion *in limine*, asking that the prosecution be prohibited from introducing the testimony of Private Brown "until the Government complies with all discovery requests submitted by the defense in this case and the defense is given an opportunity to interview and confront this witness against Private Loving."

At an Article 39(a) session on March 27, the military judge asked trial counsel if he was "attempting to provide the information requested by defense." Upon being told that virtually everything the defense requested was available through Private Brown's former unit and his court-martial record, the military judge then ordered the prosecution to call Private Brown's former unit and to provide the record of trial pertaining to Private Brown's court-martial to the defense.

60. During the sentencing hearing, Private Brown testified for the prosecution, without further objection by the defense. He was asked if appellant said "anything about how he felt about the shootings." Private Brown responded:

> I believe he said—I—we were talking and I believe he said—I asked him why he did something like that—I thought he was joking or he wasn't serious or he was bragging—he said—he did the first—did it the first time to see if he could get away with it, and then he did it because it was fun, and then he said something along the lines, "Because love makes you do crazy things."

Private Brown testified that at a "later time" he heard appellant say "if he had to do it over, the only difference is he wouldn't get caught." On cross-examination defense counsel questioned PVT Brown about his court-martial conviction, his pretrial agreement, and other drug offenses for which Brown was investigated but not tried. In a post-trial affidavit, MAJ Hayden, individual defense counsel, states that the defense was "notified" about PVT Brown "the night before [the Government] presented rebuttal testimony." PVT Brown was interviewed by CPT Ibbotson, the lead defense counsel. MAJ Hayden states, "In hindsight, I would have liked more time to investigate PVT Brown." Def.App. Ex. Y. The defense did not request additional time.

RCM 701(a)(5)(B) requires the prosecution to disclose sentencing witnesses upon defense request. If a party fails to comply with the discovery rules, RCM 701(g)(3) empowers a military judge to "[o]rder the [noncompliant] party to permit discovery"; "[g]rant a continuance"; exclude the evidence; or "[e]n-

ter such other order as is just under the circumstances."

Appellant now argues that the military judge demonstrated an "apathetic attitude over a government surprise witness, Private Brown." He also argues that the military judge "idly ignored defense counsel's motion to exclude his testimony for failure to provide adequate notice." Final Brief at 147.

The record in this case does not reflect noncompliance. Trial counsel disclosed the witness on March 24, 1989. There is no evidence of an attempt to ambush the defense. *See generally United States v. Dancy*, 38 MJ 1, 5 n. 3 (CMA 1993) ("[D]iscovery rules are intended to eliminate ... 'gamesmanship.'"). Since the defense case did not begin until March 30, the defense had time to adjust their strategy. Private Brown did not testify until April 1. Defense counsel interviewed the witness prior to his testimony and did not request additional time or other relief. The record does not support appellant's accusation of an "apathetic attitude" or "idly ignor[ing]" defense counsel's motion. To the contrary, the military judge acted on the motion and directed the Government to comply.

I. *The military judge restricted trial defense counsel's direct examination of Ms. Pessina so that she would not be viewed as an accomplice.*

■■ 61. There are two elements to this sub-issue. Appellant contends that (1) Ms. Pessina was an accomplice and should have been treated as such on cross-examination and in the military judge's instructions; and (2) Ms. Pessina, although called by the defense, was a hostile witness.

### 1. Ms. Pessina as an accomplice

Confronted with overwhelming evidence of guilt, defense counsel wisely focused on avoiding a death sentence. Integral to the defense strategy was an effort to shift the focus from appellant to Ms. Pessina. In his opening statement defense counsel asked the court members to look for "any evidence of Dwight Loving's motivation of what was pushing him toward this crime." Defense counsel urged the members to "[l]ook at the

involvement of Nadia in this, and his viewing of that incident; and, see how it all fits together.... Look at who needed the money. Look at who had the real agenda for these crimes; who was the idea behind all of this."

62. Appellant asserts that the following evidence supports his argument that Ms. Pessina was an accomplice:

(1) she and appellant were lovers;

(2) she needed money;

(3) she drove the car for the 7–Eleven robberies;

(4) she used money from the robberies to buy cocaine;

(5) before the cab driver murders, appellant told her that he was going to kill someone for money;

(6) appellant told her about the murders and showed her some of the proceeds;

(7) she slept with appellant after he confessed his crimes to her;

(8) the murder weapon and other evidence were found "littered throughout her home";

(9) she lied to the police;

(10) her letters to appellant in prison expressed concern about their being screened by prison authorities;

(11) Mr. Harrison heard her "crinkling" something in the backseat of his cab, which probably was the pistol concealed in a paper bag, and the murder weapon was later found in a crinkled paper bag outside her home;

(12) as they exited Mr. Harrison's cab, she asked appellant, "Have you got everything?";

(13) it was her idea to ride a cab home because her feet hurt;

(14) she saw appellant with the weapon outside the cab and did nothing to stop him;

(15) despite her aching feet, she exited the cab a block from her house and walked home;

(16) she wore the blood-stained jacket which appellant wore in the murders;

(17) she was told by police not to leave the area;

(18) she had no alibi;

(19) she manipulated and controlled appellant; and

(20) she had a motive to avoid involvement because she could be deported if she got into trouble.

Final Brief at 287–89.

At the outset we note that several of appellant's assertions are unsupported by the record. Ms. Pessina was gainfully employed, regularly received money from her father, and denied needing money or asking appellant for money. The testimony of SGT Key, pointed to in appellant's brief in support of his assertion, establishes that appellant was "burning off a lot of money," but makes no references to Ms. Pessina's needs or requests.

63. Appellant's assertion that Ms. Pessina used the proceeds from the robberies to buy cocaine is overstated. She testified that after the 7–Eleven robberies, appellant put some of the money in her jacket pocket, but that she did not use it. The money remained in the jacket pocket until discovered by the police. She testified that she and appellant purchased cocaine on the night after the 7–Eleven robberies. When asked where they obtained the money for the purchase of cocaine, she speculated, "I guess, with the money from the store."

Appellant's assertion that the murder weapon and other evidence were found "littered throughout [Ms. Pessina's] home" is hyperbolic at best. The record reflects that four unspent bullets were found in a dresser drawer along with some clothing; some empty shell casings and one unspent round were found in a trash can in the kitchen; a jacket, ski mask, and gloves were in a closet; and the murder weapon was hidden in a paper bag outside the rear door.

Ms. Pessina's letters to appellant in prison add nothing to appellant's theory. As found by the Court of Military Review, the letters were love letters, nothing more. 34 MJ at 961 n. 6. Ms. Pessina's question whether her letters are inspected reveals nothing more than concern about her intimate letters to appellant being read by prison censors.

Appellant's theory that Ms. Pessina carried the pistol into Mr. Harrison's cab is unsupported by the record. When Mr. Harrison was asked if Ms. Pessina was taking something out of a bag, he prefaced his answer by describing it as "speculation." He then answered that he "heard some *plastic* bag." (Emphasis added.) The murder weapon was found in a paper bag.

64. Appellant's theory that Ms. Pessina manipulated and controlled appellant is likewise unsupported. SGT Key testified that appellant was "overwhelmed with [Ms. Pessina]. He was possessed." On the other hand, she told appellant that he was getting too serious. While it is beyond cavil that appellant was obsessed with Ms. Pessina, there is no evidence that she exploited his obsession to cause the murders and robberies.

With respect to the fact that Ms. Pessina drove the car when appellant robbed the two 7–Eleven stores, the record reflects that appellant did not tell her where he was going. He told her to stop in a place where the first 7–Eleven store was not visible. Both before and after the first robbery she saw him carrying nothing. They then drove to "a street with houses on it" where the 7–Eleven was not in sight. Only after the second 7–Eleven robbery did appellant tell Ms. Pessina what he had done.

With respect to Ms. Pessina's participation in the robbery of Mr. Harrison, the most that the evidence shows is that she knew what was going to happen when she saw appellant's pistol as she exited the cab.

65. In determining whether Ms. Pessina was an accomplice, the test is whether she could have been convicted of any of appellant's crimes. *United States v. McKinnie*, 32 MJ 141, 143 (CMA 1991). If the evidence in this case "raises a reasonable inference that [Ms. Pessina] may have been an accomplice," then the military judge should have allowed the question whether she was an accomplice to have been submitted to the court members with proper instructions upon request. *United States v. Gillette*, 35 MJ 468, 470 (CMA 1992).

We hold that the military judge correctly refused to allow Ms. Pessina to be treated as

an accomplice. Even if we construe all the evidence and inferences in the light most favorable to appellant's theory, they fall short of making Ms. Pessina an accomplice. Indeed, in his detailed confession, appellant told SA Schnayerson that Ms. Pessina "didn't have anything to do with it. Nothing at all. She didn't know nothing."

66. There is no evidence that Ms. Pessina knew of the robberies and murders before-hand, that she aided or encouraged them, or that she shared appellant's criminal intent. *See United States v. Knudson,* 14 MJ 13, 15 (CMA 1982) ("The law requires that it be established that there is a concert of purpose or the aiding or encouraging of the commission of the criminal act and a conscious sharing of the criminal intent."). Her knowledge of appellant's robberies and murders after the fact, her failure to stop appellant from robbing Mr. Harrison, her failure to report appellant's crimes after he admitted them to her were insufficient to make her an accomplice. *See* para. 1b(3)(b), Part IV, Manual for Courts–Martial, United States, 1984 ("Mere presence at the scene of a crime does not make one a principal...."); *United States v. Pritchett,* 31 MJ 213, 217 (CMA 1990) ("[M]ere presence at the scene of a crime committed by another is not sufficient evidence...."); *United States v. Epps,* 25 MJ 319, 321 (CMA 1987) ("failure to stop" a crime is not sufficient). Her less-than-candid initial statements to the police may have made her an accessory after the fact, but no more. *See* Art. 78, UCMJ, 10 USC § 878; para. 3b(4), Part IV.

While Ms. Pessina may have been an accomplice to appellant's offenses involving cocaine, those offenses were not before the court. Appellant's theory was that Ms. Pessina was an accomplice to the murders and robberies. Unlike the accomplice contemplated by the law, Ms. Pessina was not trying to save herself at appellant's expense. To the contrary, all the evidence indicates that she was trying to protect him. Accordingly, we hold that the military judge properly refused to treat Ms. Pessina as an accomplice.

## 2. Ms. Pessina as a hostile witness

67. Ms. Pessina was called as the first defense witness on the merits. After defense counsel questioned her about her place of birth, family background, education, language abilities, marital status, previous residences, immigration status, and present employment, trial counsel objected to defense counsel's leading questions. The military judge excused the court members and convened an Article 39(a) session. Defense counsel argued that Ms. Pessina was "a key person in the investigation" and that he was "compromised in [his] ability to present evidence" without using leading questions. Upon inquiry by the military judge, defense counsel stated that Ms. Pessina had cooperated in submitting to interviews but had not been responsive to all his questions and that he had not asked her about certain areas which he intended to explore on direct examination. Trial counsel stated that he "would not object to leading questions" if Ms. Pessina demonstrated during her testimony "that she is, in fact, hostile." The military judge then concluded the Article 39(a) session by ruling, "She's not a hostile witness—not now."

Defense counsel then questioned Ms. Pessina on her relationship with appellant, her knowledge of appellant's crimes, her driving the car used in the 7–Eleven robberies, her conversations with appellant after the 7–Eleven robberies, her use of cocaine with appellant, the events leading up to the robbery and attempted murder of Mr. Harrison, the two searches of her residence, and her withholding of information from the police. At that point trial counsel again objected to use of leading questions. Defense counsel again asked permission to use leading questions, arguing that "[s]he is clearly adverse to my client." The military judge responded, "No—absolutely ridiculous. Proceed."

At that point the president of the panel asked the military judge to define an "adverse witness." The military judge explained that counsel were arguing about whether they should be allowed to ask leading questions as an exception to the general prohibi-

tion against leading questions on direct examination.

68. After a few more minutes of testimony, the military judge sustained another prosecution objection to leading questions. Defense counsel argued: "The testimony that I seek to elicit from her is that [the police] told her that she was the key witness in the case against Dwight Loving; which makes her—in the defense view—an adverse witness to my client." With the panel members still present, the following exchange then occurred:

MJ: I told you that was ridiculous, before. How many times have I gotta tell you it's ridiculous? The objection is sustained.

DC: Yes, sir.

MJ: Don't challenge me.

DC: Yes, sir. We will—we would like to submit a written brief, on this, at a later date, if we could, to make sure that we note all the objections we have.

MJ: No.

DC: No.

MJ: You've entered your objections—

DC: All right—

MJ: —I have listened to your objections— three or four times—I have sustained; and, you're not going to ask any leading questions.

DC: Yes, sir.

MJ: So, please, drive on.

DC: We feel this—

MJ: You open your mouth about it, again, counsel, and I'm going to clear the courtroom and we're going to have a discussion.

DC: Yes, sir.

IDC [Major Hayden]: Your Honor, may we have a side-bar?

MJ: I think we'd better. Gentlemen, why don't you take a break. Court's in recess.

The military judge then convened an Article 39(a) session. Individual defense counsel (Major Hayden) expressed concern about the military judge's characterization of the defense position as "absolutely ridiculous." The military judge offered to give a curative instruction and invited the defense to draft an appropriate instruction. He concluded the session by explaining:

But, I'll tell you—and, especially you (to defense counsel)—that I'm not going to be challenged. When I tell you a ruling— when I give you a ruling—that's it. I'll be more than happy to reconsider; but, you have to tell me, "Please, Judge, reconsider; based on X, Y, and Z." You just can't keep bringing it up—especially, in front of the court members. Now, they asked a question about what an adverse witness is all about. You just can't keep bringing it up, and in my view, try and challenge the bench. That's what I perceived it as ... but I understand your point; and, I will be more than happy to work with you. Major Hayden, you fashion some language that you think appropriate.... Please—if you want to write something out—show it to the prosecutor. Court is in recess.

After a short recess the Article 39(a) session resumed, and defense counsel requested, for the fifth time, that the military judge reconsider his ruling on leading questions. After extensive argument by both sides, the military judge again denied the request.

69. Defense counsel then moved for a mistrial based on the military judge's characterization of the defense argument as "absolutely ridiculous," and objected to any curative instruction at that point in the trial on the ground that they did not "want to 'red flag' that any more than it has occurred, at this time." The military judge denied the request for a mistrial and acceded to the defense request that no on-the-spot curative instruction be given. Thereafter, Ms. Pessina was questioned at length by counsel for both sides, court members, and the military judge, with no further clashes between the military judge and counsel.

Mil.R.Evid. 611(a) directs the military judge to "exercise reasonable control over the mode and order of interrogating witnesses...." Mil.R.Evid. 611(c) permits use of leading questions on direct examination if the witness is "a hostile witness or a witness identified with an adverse party." The question whether to permit "leading questions is discretionary with the military judge." Drafters' Analysis of Mil.R.Evid. 611(c), Manual, *supra* at A22–44 (Change 2). *See*

*Nutter v. United States,* 412 F.2d 178, 183 (9th Cir.1969) ("The decision to declare a witness hostile ... is within the court's discretion and will be grounds for reversal only on showing an abuse of that discretion."), *cert. denied,* 397 U.S. 927, 90 S.Ct. 935, 25 L.Ed.2d 107 (1970).

We hold that the military judge did not become an advocate for the Government or abuse his discretion by refusing to declare Ms. Pessina a hostile witness. It was obvious that she felt great affection for appellant and had attempted to protect him. She answered without resistance or evasion even when questioned about the intimate details of her relationship with appellant, her use of cocaine, her marriage, and her knowledge of appellant's criminal conduct.

J. *The military judge called the defense theory of the case "ridiculous" in the presence of the court members and threatened to deal with defense counsel when he challenged the ruling.*

■ 70. Appellant contends that he was denied a fair trial because the military judge characterized the defense theory as "ridiculous" in the presence of the court members. We hold that appellant was not prejudiced by the military judge's remarks.

It was obvious to the court members, as indicated by the panel president's question, that the controversy was not about the facts of the case or the defense theory, but rather about whether defense counsel should be allowed to ask leading questions on the ground that Ms. Pessina was hostile. Our review of the military judge's remarks, in the context in which they were made, satisfies us that the panel members understood that only defense counsel's assertion that Ms. Pessina was hostile, and not the overall defense theory, was covered by the judge's comment.

We also hold that the military judge did not show bias against appellant. The military judge's remarks clearly were directed at defense counsel's refusal to accept his ruling on leading questions and counsel's continued challenging of the military judge in the presence of the court members. While the remarks may have been intemperate, they were not disqualifying. *See Liteky v. United*

*States,* —— U.S. at ——, 114 S.Ct. at 1157 ("expressions of impatience, dissatisfaction, annoyance, and even anger" not sufficient to establish "bias or partiality"; "even a stern and short-tempered judge's ordinary efforts at courtroom administration" do not establish bias or partiality.).

K. *The military judge displayed his dislike for defense counsel throughout the trial by making critical comments.*

■ 71. Virtually all of the comments complained of have been discussed with respect to Issue IV, subissue E(1), 41 MJ at 255 ¶¶ 54–56 and Issue IV, subissues F and G, 41 MJ at 258 ¶¶ 57, 58. In addition, appellant asserts that the military judge implied "that defense counsel was a liar for suggesting that Mr. Sharbino" lost consciousness "instantly after being shot." Final Brief at 145.

This assertion is unsupported by the record. The discussion referenced by appellant occurred just prior to sentencing arguments and pertained to items proposed by the defense to be listed by the military judge as mitigating factors. After individual defense counsel requested a ruling on the proposed mitigating factors prior to making his argument, the military judge said, "Well, I have some difficulty with number eighteen," which recited that "[t]he murder victims experienced minimal pain and suffering." Defense counsel argued that the forensic pathologist had testified that "any kind of major brain trauma ... would have resulted in immediate loss of consciousness." After trial counsel argued that "[w]e don't know what these people went through," the military judge agreed with trial counsel, but told defense counsel, "Now, you can certainly argue whatever you want to argue in that regard to the court members, but I'm not going to list that as a mitigating factor." In our view, the military judge's ruling and comment fall far short of implying that defense counsel was lying.

ISSUE V

WHETHER APPELLANT WAS DENIED A FAIR TRIAL DUE TO NU-

MEROUS ACTS OF PROSECUTORIAL AND LAW ENFORCEMENT MISCONDUCT, WHICH INCLUDE HIDING EXCULPATORY EVIDENCE, DESTROYING POLICE NOTES CONCERNING 16 MINUTES OF APPELLANT'S CONFESSION, LYING ABOUT MS. PESSINA'S INVOLVEMENT IN THE CRIMES TO THE JUDGE AND PANEL, AND USE OF A SURPRISE WITNESS WITHOUT REASONABLE NOTICE AND WITHOUT PROVIDING APPROPRIATE DISCOVERY.

72. Appellant asserts that exculpatory evidence, in the form of tests of his blood for alcohol and drug abuse, were illegally hidden from the defense. His assertion is unsupported by the evidence. Although blood, saliva, and hair samples were taken from him, they were not tested for alcohol or drugs because neither side requested such tests. The evidence which appellant asserts was hidden from him did not exist. Govt.App. Ex. 6, ¶ 4.

Appellant asserts that SA Schnayerson's interview notes for a 16–minute period preceding appellant's confession were concealed from him. He claims that the last entry in SA Schnayerson's notes was made at 7:56 p.m. and Investigator Wedge's investigative report reflects that appellant confessed at 8:12 p.m. Based on this evidence he speculates that there must have been additional entries which were concealed because they reflected coercive interview tactics. Final Brief at 171–72. In a post-trial affidavit SA Schnayerson asserts that there are no missing notes. Also, Government Appellate Exhibit 7 (Vol. VII, Appellate Papers) includes a page of SA Schnayerson's notes with entries at 7:58 and 8:05 and noting the confession at 8:12. Furthermore, Investigator Wedge's report reflects that at approximately 8:00 p.m. he was advised that the murder weapon was found at Ms. Pessina's residence, and he interrupted SA Schnayerson to inform him of the results of the search in appellant's presence. This Court is unwilling to assume sinister motives based on this evidence, especially when the defense chose not to litigate the voluntariness of appellant's confession at trial.

73. Appellant also asserts that Investigator Wedge's handwritten notes, made while observing the interrogation of appellant by SA Schnayerson, "have vanished without a trace." Final Brief at 170. This assertion is unsupported by the record. Investigator Wedge's investigative report recites that his interview notes were dictated onto microtape and transcribed. He also recited that his handwritten notes were marked as evidence and secured. At an Article 39(a) session on March 17, 1989, trial counsel represented that he had provided the defense with a "four-inch-thick packet" from the Killeen Police Department, as well as reports from the FBI and the Texas Rangers. Trial counsel recited, "I just don't know of anything, out there, possibly, that they couldn't have." The military judge specifically asked about investigator's notes, and trial counsel responded:

> It had everything. Yes, it had the notes—written—and, typed reports.... If there is something else, out there—if the defense is made aware—or, if something comes up—I'll be happy to issue a subpoena.

At no time during subsequent Article 39(a) sessions or during the trial on the merits did the defense complain about the absence of Investigator Wedge's handwritten interview notes, even though they were specifically mentioned in his typed report of investigation. During Investigator Wedge's testimony on the merits, defense counsel did not cross-examine him about the allegedly missing notes. Based on the record before us, we will not presume noncompliance with the discovery request or that the notes were hidden or destroyed.

Appellant's assertion that the prosecution concealed evidence of Ms. Pessina's involvement in the crimes is unsupported by the record. Ms. Pessina's personal life, marital status, relationship with appellant, drug use, and involvement in the crimes were fully explored on the record. There is not one iota of evidence that the prosecution withheld information from the defense about Ms. Pessina.

Appellant's assertions concerning Private Brown's testimony as a "surprise witness" are without merit for the reasons set out in our disposition of Issue IV, subissue H, 41 MJ at 259 ¶¶ 59–60.

## ISSUE VI

WHETHER MILITARY DUE PROCESS AND ARTICLES 66 AND 67, UCMJ, 10 USC §§ 866, 867 REQUIRE THIS COURT AND THE COURTS OF MILITARY REVIEW TO REVIEW ALL CAPITAL CASES *IN FAVOREM VITAE* SINCE CAPITAL LITIGATION IS IN ITS INFANCY IN THE MILITARY JUSTICE SYSTEM AND TRIAL AND APPELLATE DEFENSE COUNSEL LACK THE TRAINING AND EXPERIENCE NECESSARY TO PRESERVE THE RECORD ON ALL ISSUES AND PREVENT APPLICATION OF WAIVER.

74. Appellant requests this Court to refrain from applying "waiver to any issues not technically preserved by trial defense counsel"; specify any meritorious issues not raised by appellate defense counsel; and "order that a death sentence may not be affirmed unless the Courts of Military Review and this Court are satisfied beyond a reasonable doubt that the findings and sentence are proper." Final Brief at 197.

■■■■ As conceded by appellant, this *in favorem vitae* ("in favor of life") approach to appellate review of capital cases has been rejected by the Supreme Court. *See Smith v. Murray*, 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). To the extent that appellant asks us to suspend the waiver provisions of Mil.R.Evid. 103 and the scope of appellate review under Articles 66 and 67, UCMJ, 10 USC §§ 866 and 867 (1989), respectively, we decline to do so. Those powers are reserved to Congress and the President.

Furthermore, we are not persuaded that such a broad scope of *de novo* review is warranted. While the military counsel in this case had limited experience in capital cases, most of the issues in this case dealing with pretrial discovery, *voir dire*, selection of court members, admissibility of evidence, and the like are not peculiar to capital cases. The broad power of plenary review exercised by Courts of Military Review, as well as this Court's authority to specify issues; order a hearing under *United States v. DuBay*, 17 USCMA 147, 37 CMR 411 (1967); apply the "plain error" doctrine; and find counsel ineffective for egregious errors, provide ample protection for the accused in this case.

## ISSUES VII AND VIII

WHETHER THE GOVERNMENT'S FAILURE TO GIVE NOTICE OF THE AGGRAVATING CIRCUMSTANCES THEY INTENDED TO PROVE, OTHER THAN THOSE SPECIFICALLY LISTED IN RCM 1004, VIOLATED THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, AND ARTICLE 55, UCMJ.

WHETHER THE MILITARY JUDGE ERRED IN INSTRUCTING APPELLANT'S SENTENCING PANEL THAT THEY COULD CONSIDER AGGRAVATING CIRCUMSTANCES OF WHICH THE DEFENSE HAD BEEN GIVEN NO NOTICE PRIOR TO TRIAL, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, AND ARTICLE 55, UCMJ.

■■■■ 75. Appellant contends that because the prosecution failed to give pretrial notice of evidence in aggravation, "[t]he unforeseen ambush of additional aggravating factors had an overwhelming prejudicial effect." Final Brief at 205. We hold that appellant's constitutional rights under the Fifth, Sixth, and Eighth Amendments as well as his rights under Article 55, UCMJ, 10 USC § 855, were not violated.

Surprises should be avoided in capital sentencing. *See Smith v. Estelle*, 602 F.2d 694, 699–703, *aff'd*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). In a capital case, RCM 1004(b)(1) requires the prosecution to give the defense written notice of the "aggravating factors" set out in (c) that it intends to prove. RCM 1004(b) specifically provides that the capital sentencing procedures are in

addition to those in RCM 1001. RCM 1001(b)(4) allows the prosecution to present evidence in aggravation. Although RCM 1001(b)(4) has no specific notice requirement, RCM 701(a)(5) requires disclosure of sentencing evidence upon request of the defense. Compliance with these rules will eliminate surprises during the sentencing hearing.

Prior to appellant's trial the prosecution complied with RCM 1004(b)(1) by serving the defense with written notice of the Government's intent to prove six aggravating factors. Appellant does not contest the prosecution's compliance with RCM 1004(b)(1), but asserts that he was "ambush[ed]" by proof of the following aggravating circumstances (Final Brief at 205) not included in the prosecution's written notice: (1) appellant's records of nonjudicial punishment; (2) Captain Bush's testimony regarding appellant's lack of rehabilitative potential; (3) "the nature of the weapon used" in "the offenses and the fact that" appellant "fired the weapon during the course of each offense"; (4) the fact that appellant "killed his victims after they had fully cooperated"; (5) "the nature and extent of the injuries suffered by the victims"; (6) appellant's "lack of any remorse"; and (7) appellant's statements to PVT Brown "that the first killing was to see if he could get away with it and, after that, it was for fun." Final Brief at 203.

76. The record does not support appellant's claim of a trial by ambush. Prior to trial, defense counsel requested disclosure of sentencing evidence. When compliance with discovery requests was discussed at an Article 39(a) session prior to the trial on the merits, defense counsel made no complaint. At an Article 39(a) session prior to the sentencing hearing, trial counsel listed the evidence he intended to introduce, which included appellant's service records, his records of nonjudicial punishment, and CPT Bush's testimony. Although defense lodged several objections, none were based on lack of pretrial disclosure.

With respect to the testimony of Private Brown, we resolved the issue of adequate notice against appellant in our disposition of Issue IV, subissue H, 41 MJ at 259 ¶ 60. On the basis of the record before us, we hold that appellant's claim of inadequate notice is not supported by the evidence.

## ISSUE IX

WHETHER APPELLANT'S DEATH SENTENCE VIOLATES THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ, IN THAT APPELLANT WAS GIVEN THE DEATH PENALTY BASED UPON A CONGLOMERATION OF AGGRAVATING FACTORS WHICH INEXTRICABLY DOUBLE COUNTED APPELLANT'S CRIMES.

77. Appellant's court-martial unanimously found, beyond a reasonable doubt, that the following aggravating factors had been proven: (1) "The premeditated murder of Bobby Gene Sharbino was committed while" appellant "was engaged in the commission or attempted commission of a robbery" (RCM 1004(c)(7)(B)); (2) appellant "was the actual perpetrator of the killing" in the felony murder of Christopher Fay (RCM 1004(c)(8)); and (3) "[h]aving been found guilty of premeditated murder of Bobby Gene Sharbino," appellant was also convicted "of another violation of Article 118, UCMJ, in the same case" (RCM 1004(c)(7)(J)). These findings as to aggravating factors were consistent with the court-martial's unanimous findings of guilty as to the premeditated murder of Bobby Gene Sharbino (specification 2 of Charge I); the felony murder of Bobby Gene Sharbino (specification 4 of Charge I), which was later dismissed as multiplicious; and the felony murder of Christopher Fay (specification 3 of Charge I).

Appellant contends that there was a double counting of aggravating factors, since the same two murders constituting the first two aggravating factors were used to constitute the third. See *United States v. Curtis* (Curtis I), 32 MJ 252, 269 (CMA), *cert. denied,* 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991). He argues that the double counting was prejudicial because the court members sentenced him to death based on three aggravating factors, when there were only two. As we noted in our second

consideration of *United States v. Curtis* (Curtis II), 33 MJ 101, 108 (CMA 1991), *cert. denied,* 502 U.S. 1097, 112 S.Ct. 1177, 117 L.Ed.2d 421 (1992), "we doubt that the President intended for commission of a double murder to constitute two 'aggravating factors,' rather than only one."

In *Curtis II,* we remanded the case to the Court of Military Review to determine "[w]hether the number of 'aggravating factors' in th[at] case had any effect on the sentence." 33 MJ at 108. We need not remand appellant's case, however, because the Court of Military Review has already found, and we agree, "that the number of aggravating factors" did not affect the decision of the court-martial "to impose the death sentence." 34 MJ at 969.

■■■ 78. Furthermore, unlike *Curtis II,* there was no double counting in appellant's case. In *Curtis II,* the following aggravating factors were found:

1) "the premeditated murder of" Mrs. Lotz "was committed while [Curtis] was engaged in the commission of a burglary"; 2) "with regard to the premeditated murder of" Mrs. Lotz, Curtis had "been found guilty in the same case of another murder"—that of Lieutenant Lotz; and 3) "with regard to the premeditated murder of" Lieutenant Lotz, Curtis had "been found guilty in the same case of another murder"—that of Mrs. Lotz.

33 MJ at 108, *quoting* 32 MJ at 269 (*Curtis I* ).

Appellant's case is distinguishable from *Curtis II.* In appellant's case the premeditated murder of Bobby Gene Sharbino was aggravated by two factors: (1) the murder was committed while appellant was engaged in the commission of a robbery, and (2) appellant was found guilty of another Article 118 violation (the felony murder of Christopher Fay) in the same case. RCM 1004(c)(7)(B). The felony murder of Christopher Fay was aggravated by one factor, that the accused was the actual perpetrator of the killing. RCM 1004(c)(8). The two aggravating factors applicable to the murder of Bobby Gene Sharbino are distinct from the aggravating factor applicable to the felony murder of

Christopher Fay. Unlike *Curtis II,* the two murders were not used to aggravate each other. Although the felony murder of Christopher Fay was used to aggravate the premeditated murder of Bobby Gene Sharbino, the premeditated murder of Bobby Gene Sharbino was not used to aggravate the felony murder of Christopher Fay. Accordingly, we hold that there was no double counting of aggravating factors in appellant's case.

## ISSUE X

WHETHER APPELLANT'S DEATH SENTENCE IS INVALID UNDER THE FIFTH AND EIGHTH AMENDMENTS TO THE CONSTITUTION AND ARTICLE 55, UCMJ, BECAUSE THE SENTENCING PANEL WAS IMPROPERLY PERMITTED TO CONSIDER "LACK OF REHABILITATIVE POTENTIAL," "PRESERVATION OF GOOD ORDER AND DISCIPLINE," AND "SPECIFIC DETERRENCE" IN SENTENCING DELIBERATIONS.

79. As previously noted in our disposition of Issue III, subissue F, 41 MJ at 247–48 ¶¶ 38–39, appellant's records of nonjudicial punishment were admissible under RCM 1001(b)(2), and CPT Bush's testimony regarding appellant's previous performance of duty was admissible under RCM 1001(b)(5), but the military judge erred by characterizing that evidence as aggravating circumstances.

■■■ The question remains whether it was error for the military judge to permit the court-martial to consider "lack of rehabilitative potential" at all in a capital case. Appellant argues that rehabilitative potential was not in issue in this case, since life imprisonment was the mandatory minimum and a punitive discharge is included in a death sentence and is "virtually a foregone conclusion" even if death was not imposed. Final Brief at 217. *See* RCM 1004(e) ("A sentence of death includes a dishonorable discharge...."). To the extent that CPT Bush's testimony was a prohibited euphemism for a punitive discharge (*see United States v. Ohrt,* 28 MJ 301, 305 (CMA 1989)), any error in its admission was waived and

does not rise to the level of plain error. Mil.R.Evid. 103(a) and (d).

Nevertheless, appellant's past performance was not irrelevant. The defense case on the merits had included the testimony of SGT Key regarding appellant's erratic duty performance. *See* Issue III, subissue F, 41 MJ at 248 ¶ 38. In addition, the defense submitted appellant's "good duty performance under the guidance of strong leadership" as a mitigating factor on sentencing. CPT Bush's testimony was relevant to determining whether appellant's performance under SGT Key's leadership merited consideration as a mitigating factor.

Appellant also contends that the military judge erred by instructing the members as follows:

In the military, we recognize five principal reasons for sentencing those who violate the law ... [T]hose principles are the following:

Number one, protection of society from the wrongdoer;

Number two, the punishment of the wrongdoer;

Number three, the rehabilitation of the wrongdoer;

Number four, the preservation of good order and discipline in the military; and

Number five, the deterrence of the wrongdoer and those who know of his crime and his sentence from committing the same or similar type offenses.

80. Appellant now argues that the instruction "injected arbitrary and improper considerations into the sentencing deliberations." Final Brief at 218. He argues that only punishment and deterrence are relevant in a capital case. Final Brief at 211.

█ We hold that any issue as to the propriety of the military judge's instructions on sentencing principles was waived. Defense counsel objected only to mention of specific deterrence. Defense counsel specifically requested that a similar instruction be given during *voir dire* (R. 380–81), and did not object or propose additional instructions when it was given prior to deliberations on sentence. RCM 1005(f).

The context in which the instruction was given minimized any opportunity for misunderstanding. It was phrased in terms of general principles applicable to all cases involving "those who violate the law," not just appellant's case. The instruction followed very detailed instructions for voting on the aggravating factors relied on by the prosecution to qualify appellant for the death penalty, considering the other aggravating circumstances, weighing the aggravating factors and circumstances against the mitigating factors, and then determining whether to impose a sentence of death or life imprisonment. In context, the instruction merely presented a general philosophical background for the very specific and detailed instructions which had preceded it.

█ Finally, we disagree with appellant's assertion that protection of society and preservation of good order and discipline were not permissible considerations in this case. Protection of society was a consideration in this case, but the means available to the court-martial were limited in view of the mandatory minimum punishment. Defense counsel used this principle of sentencing to advantage by arguing that the needs of society for protection could be satisfied by life imprisonment, and they presented evidence that appellant adapted well to prison life and would not present a continuing danger in that controlled environment. Preservation of good order and discipline may have been redundant with deterrence in this case, but nevertheless was a relevant principle.

## ISSUE XI

WHETHER APPELLANT'S DEATH SENTENCE VIOLATES THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ, IN THAT APPELLANT WAS DENIED A FAIR SENTENCING HEARING.

This issue involves four sub-issues that will be analyzed individually.

A. *Whether the military judge erroneously admitted into evidence punishments and vacations of suspensions of punishments under Article 15, UCMJ, and erro-*

neously failed to limit the panel's consideration of this evidence, by instruction, to the character of appellant's prior service.

We resolved this issue against appellant in connection with Issue III, subissue F, 41 MJ at 246 ¶¶ 34–40.

B. *Whether the military judge erred in failing, sua sponte, to restrict the improper "rebuttal" testimonies of Ranger Aycock and Private Brown to the proper scope of rebuttal.*

We resolved this issue against appellant in connection with Issue III, subissue I, 41 MJ at 251 ¶¶ 44–45, and Issue IV, subissue H, 41 MJ at 259 ¶ 60.

C. *Whether trial counsel improperly bolstered the credibility of Ms. Pessina by declaring that her testimony was not immunized and she could not be charged with a criminal offense in connection with this case.*

▆ 81. Appellant asserts that trial counsel improperly bolstered the credibility of Ms. Pessina by injecting information outside the record about her lack of immunity, eliciting testimony from Ranger Aycock that she could not be charged with joint possession of the marijuana found in her residence, and improperly arguing that she was not criminally involved in the offenses.

After her testimony on the merits, Ms. Pessina was asked by a court member, "Do you have any kind of immunity, to testify here at this court-martial?" She responded, "I no understand 'immunity.'" Trial counsel interjected, "Your Honor, I'll make an offer of proof that no immunity has been offered, nor has any immunity been granted to this witness." Following further discussion and explanation, Ms. Pessina testified that no one had promised her anything for her testimony, except, "if I lie, I gonna go to jail." On redirect examination, defense counsel again raised the subject of immunity, to which Ms. Pessina replied, "They just say, if I lie, something gonna happen to me."

During trial counsel's argument on findings, he argued that appellant committed his crimes alone and "there was nobody else with him." He concluded by arguing, "If there is evidence of conspiracy or accomplice, then somebody better come forth and provide that to the Bell County District Attorney, because there is not enough yet to say that Nadia Pessina was involved in these crimes."

During the sentencing hearing, Ranger Aycock testified that a small quantity of marijuana was found in Ms. Pessina's residence, which she shared with Ms. Ira Printers and sometimes with appellant. Trial counsel asked, "[I]sn't it true that ... there were no fingerprints found on the marijuana taken out of 909 Mimosa?" Ranger Aycock responded, "Major, there wasn't enough marijuana there to roll a good cigarette.... I don't know how you guys work it in the military ... but in the State of Texas you've got to prove possession of a drug on someone. Joint possession is not going to get it. You've got to put it on somebody and prove that it's theirs...." Trial counsel remarked, "Ranger, that's true in the military too." When defense counsel objected, trial counsel withdrew his remark.

82. On the basis of the record before us, we hold that there was no improper bolstering of Ms. Pessina's testimony. This case is virtually the opposite of *United States v. Simtob,* 901 F.2d 799 (9th Cir.1990), cited by appellant. Trial counsel was not attempting to bolster his own witness, because Ms. Pessina was a defense witness. The subject of immunity was introduced by a court member and further developed by defense counsel on redirect examination. There was nothing to bolster because the absence of immunity was uncontroverted.

With respect to trial counsel's argument on findings, we hold that it was within the range of fair comment on the evidence. *See United States v. White,* 23 MJ 84, 88 (CMA 1986). Lastly, with respect to Ranger Aycock's testimony, we think it abundantly clear that Ranger Aycock was not vouching for Ms. Pessina's innocence, but only opining that he didn't have enough evidence to prove that she owned the marijuana.

D. *Whether trial counsel improperly bolstered the credibility of Private Brown by declaring that he was not immunized, had*

*not asked for any favors, and was testifying only because he was ordered to do so.*

▪ 83. One final argument raised by appellant is that the testimony of Private Brown was improperly bolstered when trial counsel, during closing argument, stated that Private Brown never received any incentives for his testimony and appeared to testify truthfully based on his demeanor. Trial counsel's comment was based on Private Brown's response to a question from a court member who asked if he had been promised anything in return for his testimony. Private Brown responded that he did not want to testify but had been "ordered to," but that no one had promised him anything, including a reduction in his prison sentence, for his testimony.

Appellant's assertion that trial counsel insinuated facts outside the record is undermined by the record itself. Private Brown unequivocally testified, without contradiction, that he was promised nothing for his testimony. Furthermore, trial counsel's contention that PVT Brown's demeanor indicated his truthfulness was simply fair comment on the evidence. *See Dyer v. McDougall,* 201 F.2d 265, 268–69 (2d Cir.1952) (demeanor of witness is evidence). We hold that trial counsel did not improperly bolster the credibility of Private Brown.

## ISSUE XII

WHETHER PRIVATE FORREST BROWN, A GOVERNMENT WITNESS AT SENTENCING, IMPEACHED THE VERDICT OF GUILTY OF THE FELONY–MURDER VERDICT OF FAY WHEN HE TOLD THE PANEL THAT APPELLANT EXPRESSLY DID NOT KILL IN FURTHERANCE OF THE ROBBERY (TO EFFECTUATE APPELLANT'S ESCAPE AS ARGUED BY THE GOVERNMENT ON THE MERITS), BUT INSTEAD KILLED FAY FOR FUN, MERELY "TO SEE IF HE COULD DO IT."

▪ 84. During the sentencing hearing, PVT Brown testified that appellant told him that his reasons for "the shootings" were "to see if he could get away with it, and then he did it because it was fun." Appellant now

argues that PVT Brown's testimony improperly impeached the verdict, because it contradicted trial counsel's argument on findings that appellant "at the time of the killing ... was participating in the commission of a robbery, ... [a]nd by killing them he prevents an identification of him with the robbery." Final Brief at 239. He asserts that the military judge should have *sua sponte* intervened and either set aside the conviction of felony-murder with respect to Christopher Fay or ordered Private Brown's testimony stricken.

We disagree with appellant's interpretation of the testimony. PVT Brown did not specify which "shootings" appellant was talking about, although PVT Brown referred to the 7–Eleven robberies as well as the robberies and murders of the cab drivers. More importantly, we reject appellant's theory that killing for fun and killing to prevent identification are mutually exclusive. We hold that the military judge had no legal duty to intervene.

## ISSUE XIII

WHETHER THE MILITARY JUDGE ERRONEOUSLY DENIED APPELLANT'S MULTIPLICITY MOTION TO DISMISS THE UNANIMOUS FELONY–MURDER VERDICT, IN LIEU OF THE NONUNANIMOUS PREMEDITATED MURDER VERDICT.

▪ 85. Appellant was charged with both premeditated murder and felony murder with respect to both PVT Fay and Mr. Sharbino. Prior to arraignment appellant moved to dismiss the felony-murder specifications (specifications 3 and 4 of Charge I) as multiplicious. The military judge ruled "that it would be premature" to dismiss any specifications at that time, without hearing all the evidence. After findings, the defense renewed their motion to dismiss the felony-murder specifications. The prosecution requested that the nonunanimous conviction of the premeditated murder of Christopher Fay (specification 1 of Charge I) be dismissed so that the court-martial would have the option of considering the unanimous conviction of the felony murder of Christopher Fay (speci-

fication 3 of Charge I) as an aggravating factor. The military judge granted the prosecution's request.

Appellant now argues that the military judge erred by refusing to dismiss the felony murder specification. We hold that the military judge did not err. Even before our decision in *United States v. Teters*, 37 MJ 370 (CMA 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 919, 127 L.Ed.2d 213 (1994), we held that "if the same homicide is the subject of findings of premeditated murder and felony murder, *one* should be set aside." *United States v. Hubbard*, 28 MJ 27, 34 (CMA 1989) (emphasis added), *cert. denied*, 493 U.S. 847, 110 S.Ct. 142, 107 L.Ed.2d 101 (1989). *See Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980). We need not decide whether this requirement was affected by *Teters*, since the military judge eliminated any possibility of multiplicity for findings by granting the prosecution's motion to dismiss. The military judge's decision to dismiss those findings left only the unanimous findings. By eliminating those findings about which one or more court members had a reasonable doubt, the military judge increased the reliability of the factors to be considered on sentencing. His ruling was well within the limits of his discretion.

## ISSUE XIV

WHETHER THE MILITARY JUDGE DENIED APPELLANT A FAIR SENTENCING PROCEEDING UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, AND ARTICLE 55, UCMJ, WHEN HE LIMITED APPELLANT'S ABILITY TO PRESENT RELEVANT EXTENUATION AND MITIGATION EVIDENCE AND ARGUMENT TO THE MEMBERS.

86. Appellant asserts that he was denied a fair sentencing proceeding because of the military judge's rulings on four specific issues, which we will now analyze separately.

A. *Whether the military judge erroneously ruled that Ms. Fisher's testimony was based upon hearsay and was not relevant to the proceedings.*

After being called as a defense witness, Ms. Pessina denied needing money or asking appellant for money. She testified that she was employed and regularly received between $200.00 and $250.00 per month from her father.

Appellant presented rebuttal from SGT Key, who testified that Ms. Pessina smoked hashish in his presence, offered him "a drag," shared the hashish with another person who was present, told SGT Key that she sold drugs and showed him bags of drugs and money, and showed SGT Key where she hid her drugs and money.

Defense counsel requested that Ms. Ana Fisher be called as a witness in further rebuttal of Ms. Pessina's testimony. Ms. Fisher's sworn statement was proffered as evidence of her expected testimony. In her statement Ms. Fisher's stated that she had "heard rumors" in the Noncommissioned Officers Club bar that Ms. Pessina was indebted to drug dealers and that appellant was trying to help her obtain money. When asked by SA Schnayerson, the CID interrogator, if she wished to add anything to her statement, Ms. Fisher said:

> I'm not for sure, what I heard, when I heard that LOVING could get death, I thought I might can help out about some rumors I heard, I don't know if there [sic] true or not, and because about the TV and remembering things, I could be wrong about what I heard, I don't want to testify to this, because I'm not sure, I didn't think it would be a big thing, I just thought I would come up and tell someone and that would be it, but I can't testify on something I'm not sure about.

After trial counsel objected that Ms. Fisher's testimony would be "hearsay ... on rumor," the military judge stated:

> I realize that the rules are relaxed and should be for a capital case, but that doesn't mean that the rules are completely thrown out. Ms. Fisher, from what I read in Appellate Exhibit CXLI ... has nothing at all to offer to this case.... Absolutely nothing, unless you want to bring her on to tell us that she knows Private Loving and that sometime apparently last year that he

was looking for money.... If there was something, anything, concrete here, I would allow it, but this is no good at all. After further argument the military judge asked if the defense wanted to call Ms. Fisher "to tell the court members anything about her involvement with Private Loving?" At that point defense counsel announced, "We don't ... need her testimony, so we would rest."

87. Appellant now argues that Ms. Fisher's proferred testimony would have been "very probative and extremely relevant." Final Brief at 247. He cites *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), in support of his argument.

We agree with government appellate counsel that *Green* is inapposite. That case involved testimony of a witness who heard the defendant's co-actor admit that he, and not the defendant, was the triggerman in a murder and rape. After the proferred testimony was excluded, the prosecutor argued that the defendant was the triggerman. The Supreme Court noted that the excluded testimony "was highly relevant ... and substantial reasons existed to assume its reliability." 442 U.S. at 97, 99 S.Ct. at 2151. The uncertain barroom rumor offered by the defense in appellant's case is a far cry from the testimony of an eyewitness to a co-actor's confession in *Green*.

■ Even in a capital sentencing hearing, the military judge has discretion to exclude evidence having little probative value if its admission would be a waste of time and the evidence is cumulative. Mil.R.Evid. 403. In this case the probative value of Ms. Fisher's testimony was nil and would have been cumulative. We hold that the military judge did not abuse his discretion.

B. *Whether the military judge erroneously refused to permit trial defense counsel to argue that the victim was rendered unconscious immediately and did not suffer as a result of his wound.*

88. This subissue misstates the record. The military judge refused to list Mr. Sharbino's lack of pain and suffering as a mitigating factor, but he expressly told defense counsel, "[Y]ou can certainly argue whatever you want to argue in that regard to the court members, but I'm not going to list that as a mitigating factor."

C. *Whether the military judge erroneously refused to allow testimony concerning appellant's susceptibility to manipulation by people he cared about.*

This subissue again misrepresents the record. The military judge excluded no evidence concerning appellant's susceptibility to manipulation. The portions of the record referenced in appellant's brief (at 249–50) pertain to a discussion of the military judge's instructions to the court members regarding mitigating factors. After some discussion about the evidence of manipulation, counsel for both sides agreed to the wording of the military judge's instruction, which told the court members that they could consider, as a factor in mitigation, that "during his early youth, the accused was a follower." We hold that the military judge did not err.

D. *Whether the military judge erroneously added a disclaimer to appellant's mitigating evidence concerning drug involvement.*

■ Appellant takes issue with the military judge's use of the words, "if any," after the ninth mitigating factor: "Drug involvement in any of these offenses that was demonstrated through the evidence, if any." We agree with government appellate counsel that the term "if any" is not a disclaimer but merely places the factfinding authority with the court members, where it belongs. Furthermore, since defense counsel did not object to the phrase, the issue was waived. RCM 1005(f).

ISSUE XV

WHETHER THE MILITARY JUDGE ERRED IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ, IN HIS FAILURE TO INSTRUCT THE PANEL MEMBERS THAT THE ONLY OFFENSES FOR WHICH APPELLANT COULD BE SENTENCED TO DIE WERE FELONY MURDER AND PREMEDITATED

MURDER AND THAT APPELLANT COULD NOT BE SENTENCED TO DIE ON THE BASIS OF THE CUMULATION OF ALL THE OFFENSES.

We resolve this issue against appellant for the reasons stated in our resolution of Issue III, subissue J, 41 MJ at 251–52 ¶¶ 46–47.

## ISSUE XVI

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR IN REFUSING TO INSTRUCT THE MEMBERS THAT RACE COULD NOT BE CONSIDERED AS A FACTOR IN ITS SENTENCING DELIBERATIONS.

 89. Appellant asserts that the military judge erred by refusing to instruct the court members not to consider race as a factor in their decision on sentence. He argues that the military judge should have given the instruction mandated by the Omnibus Drug Initiative Act [correctly titled the Anti–Drug Abuse Act, see 102 Stat. 4391, 4392] of 1988, Final Brief at 255, which requires an instruction that the jury "shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or the victim." The Act also requires that each member of the jury sign a certificate attesting that "race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision." 21 USC § 848(o)(1).

At the outset we note that defense counsel did not request the instruction mandated by the Anti–Drug Abuse Act of 1988. Instead, defense counsel requested that race be listed as a mitigating factor. The military judge asked, "Why would you want me to say anything about that to the court members?" Defense counsel responded:

Well, let me just state how I'm going to address that in my comments and see if you feel anything else needs to be said. I just am going to point out that it's an inescapable fact in this case that the accused is black and the victims were white and ask them to agree—or, do what both the government and the defense asks, not let that enter into their—not sway them

one way or the other, don't let it be a factor in their decision....

Trial counsel agreed that race is "a neutral fact, it's not a mitigating fact at all." The military judge then crossed off race as a mitigating factor. Neither side mentioned race during sentencing arguments.

We hold that the military judge did not err. The statute upon which appellant relies applies only to drug-related offenses tried in federal district courts. The statutorily mandated instruction upon which appellant relies contains requirements which, "however desirable they may be—are not constitutionally mandated." United States v. Curtis, 32 MJ at 268 (footnote omitted). Indeed the Supreme Court has observed that "[i]n our heterogeneous society policy as well as constitutional considerations militate against the divisive assumption—as a per se rule—that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion." Ristaino v. Ross, 424 U.S. 589, 596 n. 8, 96 S.Ct. 1017, 1021, 47 L.Ed.2d 258 (1976).

## ISSUE XVII

WHETHER THE MILITARY JUDGE IMPROPERLY MARSHALED THE EVIDENCE IN FAVOR OF THE GOVERNMENT WHEN HE SUMMARIZED THE GOVERNMENT WITNESSES' AGGRAVATION TESTIMONY, BUT DECLINED TO SUMMARIZE THE WITNESS TESTIMONY PRESENTED BY THE DEFENSE IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, AND ARTICLE 55, UCMJ.

 90. Appellant asserts that the military judge unfairly "summarize[d] the bulk of the testimony of government witnesses in aggravation, but declined to summarize the defense evidence in like fashion." Final Brief at 259–60. Appellant specifically points to the treatment of the testimony of CPT Bush and PVT Brown in support of his assertion.

With respect to the testimony of CPT Bush, the military judge read from the list of aggravating factors submitted by the prosecution and discussed them during an Article

39(a) session. Defense counsel did not object to the description of CPT Bush's testimony. The military judge listed seven aggravating circumstances, including "the testimony of Captain Bush that the accused is of average intelligence and has been counseled on occasions in an effort to make him a satisfactory duty performer and, in his opinion, has no rehabilitative potential."

Regarding the testimony of PVT Brown, listed as the last of seven aggravating circumstances proposed by the prosecution, the military judge instructed the members as follows:

Now, I'm going to leave it to you, the court members, to sift through all the evidence in this case and make determinations on those particular issues. I'm not going to try to pick out pieces of evidence and stick a label on it, whether it was remorse or lack of remorse. That's for you to decide. Those are the issues that you have to decide in this particular case.

But the seventh aggravating circumstance is the testimony of Private Brown that the accused told Private Brown that the first killing was to see if he could get away with it and, after that, it was for fun.

Apart from the list of 17 mitigating circumstances and 7 aggravating circumstances proposed by counsel, the military judge merely listed the witnesses by name and documents by exhibit number. With respect to evidence of aggravating circumstances, he instructed:

The United States, incidentally, presented some evidence during the sentencing phase of the trial and I'll get into that in just a few moments. Well, why don't I tell you now that they presented to you Captain Bush, obviously, I mentioned that just a few moments ago; Sergeant Uitenham, and Sergeant Kammon. They also presented certain documents during this presentencing phase of the trial. You may recall those were Prosecution Exhibits 96, 97, 99, 101, and 102....

91. With respect to defense evidence, the military judge read from the list of mitigating circumstances submitted by defense counsel, mentioned the duration of appel-

lant's pretrial confinement, his awards and decorations, and Defense Exhibits A through Y. Lastly, he called the court members' attention to "the witnesses that were presented by the defense during ... the sentencing phase of the trial." With respect to these witnesses, he instructed as follows:

I won't try to summarize the testimony of these witnesses, I'll leave it to you to recall that testimony. Remember, though, what I said, though, about problems in recalling any testimony of a witness, you can play it back—or I'll have it played back for you if you desire. But anyway, the witnesses during the pre-sentencing phase of the trial: Lucille Williams; Ronald Loving; Gwendolyn Black; Harold Loving, and that was presented through a stipulation of expected testimony; Joe Loving, Sr.; Jimmy Verna; Kenneth Wilson, also through a stipulation of expected testimony; you heard from Sergeant Key, actually, you heard from Sergeant Key during the findings phase of the trial as well as in the sentencing phase of the trial, actually you heard it three times, you heard Sergeant Key three times; you also heard Sergeant Sanchez and Sergeant Mercardo, both IDF guards; Mr. Johnson about the accused's boxing experiences, amongst other things; and you also heard from Specialist Hall, another soldier assigned to the IDF....

After explaining in detail how to use the sentence worksheet, the military judge concluded his instructions by telling the court members, "I want to make it clear, as I made clear, I hope, with the Findings Worksheet, that that shouldn't be somehow interpreted as an expression or opinion on my part, nor, for that matter, on counsel's part, as to what an appropriate sentence should be. That's your job and no one else's in this case." At the end of his instructions, the military judge asked, "Does counsel for either side have any objections to the instructions or requests not previously voiced?" Both sides responded in the negative.

We hold that the military judge did not err. After reviewing his instructions as a whole, we are satisfied that he carefully walked "the tightrope over which a trial

judge must tread." *United States v. Shackelford,* 2 MJ 17, 19 (CMA 1976).

## ISSUE XVIII

WHETHER THE MILITARY JUDGE ERRED IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ, IN FAILING TO INSTRUCT THE PANEL IN THE PRESENTENCING HEARING TO DISREGARD ANY COMMENTS, STATEMENTS, OR GESTURES MADE BY THE MILITARY JUDGE WHICH MIGHT INDICATE AN OPINION ON HIS PART THAT APPELLANT SHOULD BE SENTENCED TO DEATH.

■■■ 92. We hold that the military judge adequately instructed the court members against interpreting the military judge's words or actions as an expression of opinion regarding the sentence. As we noted in our analysis of Issue IV, subissue I, 41 MJ at 263 ¶ 68, the military judge offered to give an on-the-spot curative instruction after the clash with defense counsel over the question whether Ms. Pessina was a hostile witness. Defense counsel objected to a curative instruction on the ground that it would "red flag" the issue. The military judge instructed the members as follows after presentation of the prosecution and defense cases in the merits:

> You must disregard any comments, any statements, any gestures that I may have made throughout the course of this trial that would seem to indicate an opinion on my part as to the guilt or innocence of this accused. That is your job and no one else's job. It would be not only unlawful, but it's certainly inappropriate for a military judge to attempt to influence you in any way regarding those ultimate—or that ultimate issue, guilt or innocence....

After explaining the findings worksheet in detail, the military judge again cautioned the members that "this worksheet ... must not be interpreted in any way as an opinion by myself or counsel, for that matter, concerning any degree of guilt of the accused."

During his instructions on sentencing, as noted in our analysis of Issue XVII, 41 MJ at 275 ¶ 91, the military judge referred back to his earlier instructions regarding the findings worksheet and again cautioned them to ignore anything on the worksheet that could be interpreted as an expression of opinion by the military judge or counsel regarding the sentence. Counsel for both sides expressly stated that they had no objections to the instructions and did not request further instructions. We hold that no further instruction on the subject was required in the absence of a request for further elaboration or clarification. *See* RCM 920(f) (failure to object to instruction or omission of instruction constitutes waiver).

## ISSUE XIX

WHETHER APPELLANT'S DEATH SENTENCE VIOLATES THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, AND ARTICLE 55, UCMJ, IN THAT THE MILITARY JUDGE'S INSTRUCTIONS ON DEATH SENTENCING PROCEDURES WERE INADEQUATE AND ERRONEOUS.

Appellant asserts three instructional deficiencies, which we will analyze separately.

A. *The military judge erred in failing to explicitly instruct that even if the members unanimously found one or more aggravating factors and even if the members unanimously determined that the extenuating and mitigating circumstances were substantially outweighed by the aggravating factors, each member still had the absolute discretion to decline to impose the death sentence.*

93. In support of this assertion of error, appellant relies on our guidance to the Court of Military Review on remand in *United States v. Curtis,* 33 MJ at 107 n. 8. In that case we said that the Court of Military Review should consider whether there must "be an explicit instruction to the effect that, even if the members unanimously find one or more aggravating factors and even if the members unanimously determine that the extenuating or mitigating circumstances are substantially outweighed by the aggravating

factors, they still have the absolute discretion to decline to impose the death sentence[.]"

We agree with defense counsel that the military death penalty procedures give the court-martial the absolute discretion to decline to impose the death penalty even if all the gates toward death-penalty eligibility are passed. The question is whether the military judge adequately advised the members that they had such discretion. We hold that he did.

The sentence worksheet (see Appendix) clearly speaks in terms of a permissible rather than mandatory death sentence. With respect to the aggravating factors, the worksheet instructs, "If the court-martial fails to find unanimously that at least one of the aggravating factors exist, you *may* not adjudge a sentence of death." (Emphasis added.) In his explanation of the worksheet, the military judge explained, "If these votes result in a unanimous finding that one or more circumstance has been proven, you *may* then consider, *along with all—with other possible sentences,* a sentence of death." (Emphasis added.)

94. Under the heading, "BALANCING OF AGGRAVATING AND EXTENUATING AND MITIGATING FACTORS," the worksheet instructs, "If the court-martial fails to unanimously find that any extenuating and mitigating circumstances are substantially outweighed by any aggravating circumstances, including the factor(s) found as indicated in PART A, then you *may* not adjudge a sentence of death." (Emphasis added.)

The third part of the sentence worksheet provides for forfeitures of pay, confinement for life, a bad-conduct or a dishonorable discharge, and a death sentence. In connection with the third part, the military judge instructed as follows:

> I believe I've given you the maximum authorized punishment that you may adjudge in this case and that is, once again, a sentence to death, Dishonorable Discharge, forfeiture of all pay and allowances. I've also given you a mandatory minimum sentence and that would be life in prison. So, Colonel, when I get back the worksheet, I should see on the worksheet, *either a sen-*
> *tence to death or life in prison.* All right. Anyway, there is that maximum sentence that you can adjudge in this case.
>
> Obviously, it's a ceiling on your discretion, *you are at liberty to arrive at any lesser sentence based upon your own evaluation of the evidence that has been presented to you....*

(Emphasis added.)

The military judge instructed the members that the vote for a death sentence must be unanimous and that a sentence to life imprisonment must be agreed upon by a three-fourths majority. At the conclusion of his instructions the military judge asked the court members if they had any questions and received a negative indication. He then asked counsel for both sides if they had any objections or requests, and they both responded in the negative.

We hold that the court-martial was adequately instructed as to their absolute discretion regarding imposition of the death sentence. The sentence worksheet, combined with the military judge's instructions, made it clear that the death penalty was not mandatory but only permissible, even if all the gates toward death-penalty eligibility were passed by unanimous vote.

*B. The military judge erred in failing to define or describe the nature and purpose of "extenuation and mitigation" evidence.*

95. Appellant contends that the military judge should have instructed on "the meaning and function of mitigating circumstances"; that he did not define the "legalistic terms" of "mitigation," "extenuation," and "aggravation"; and that his failure to do so warrants reversal of his death sentence. Final Brief at 269–71. We hold that the military judge did not err by failing to provide further definition in the absence of a request.

When the sufficiency of instructions is attacked, "[t]he ultimate question is whether there is a reasonable possibility that the jury understood the instructions in an unconstitutional manner." *Peek v. Kemp,* 784 F.2d 1479, 1489 (11th Cir.1986) (en banc), *citing Francis v. Franklin,* 471 U.S. 307, 322–23 n. 8, 105 S.Ct. 1965, 1975–76 n. 8, 85

L.Ed.2d 344 (1985), *cert. denied* in *Peek,* 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986). We agree with appellant that there is a heightened need for reliability in capital punishment cases. *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991–92, 49 L.Ed.2d 944 (1976). The Constitution does not require "any particular words or phrases to define the concept of mitigation or the function of mitigating circumstances. It is sufficient from a constitutional standpoint if it is clear from the entire charge considered in context that a reasonable jury could not have misunderstood the meaning and function of mitigating circumstances." *Peek v. Kemp,* 784 F.2d at 1494.

In this case the military judge listed all the aggravating circumstances presented by the prosecution as well as all the mitigating circumstances presented by the defense. In addition, he instructed the members that they were permitted to consider evidence presented on the merits as well as the evidence in the sentencing hearing. He made it clear that aggravating factors and circumstances were presented by the prosecution in support of its request for the death penalty, and mitigating circumstances were presented by the defense in support of the lesser penalty of life imprisonment. While he did not furnish the members with technical legal definitions of "aggravation" and "mitigation," he made it clear what should be considered, by whom it was presented, for what purpose it was presented, and how aggravating circumstances and factors should be balanced against mitigating circumstances. In the absence of a specific request for clarification, no more was required.

C. *The military judge erred by failing to instruct the members as to the term "substantially outweighed" with regard to the relationship of mitigating circumstances to aggravating factors and circumstances.*

■ 96. The military judge instructed the court members that they were not permitted to adjudge a death sentence unless they unanimously found "that any and all extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances." This language is taken from RCM 1004(b)(4)(C), which provides that death may not be adjudged unless "[a]ll members concur that any extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances admissible under RCM 1001(b)(4), including the factors under subsection (c) of this rule." Appellant contends that the military judge's failure to define "substantially outweighed" was plain error.

■ The test was not designed to be "mechanical." Drafters' Analysis of RCM 1004, Manual, *supra* at A21–66 (Change 2). After the members have made findings on the aggravating factors and moved to the next step in the sentencing process, members are not required to make findings on aggravating and mitigating circumstances. Instead, they are required only to "consider" each circumstance and individually decide which circumstances are aggravating or mitigating and whether the aggravating circumstances, including those factors found unanimously, "substantially outweigh" the mitigating circumstances. Unlike findings of guilty or findings regarding aggravating factors under RCM 1004(c), "specific standards for balancing aggravating against mitigating circumstances are not constitutionally required." *Zant v. Stephens,* 462 U.S. at 876 n. 13, 103 S.Ct. at 2742 n. 13, *citing Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

The term "substantially outweighed" appears to have been taken from Mil.R.Evid. 403 and 609(b), Manual, *supra,* which use the same term with respect to the balance between probative value and prejudicial impact of evidence. Mil.R.Evid. 403 and 609(b) are identical to their counterpart Federal Rules of Evidence. In an evidentiary context, the term "substantially outweighed" is generally accepted as establishing a "slight presumption" to be applied in close cases. *See* S. Saltzburg & M. Martin, *Federal Rules of Evidence Manual* 160 (5th ed. 1990); S. Saltzburg, L. Schinasi, & D. Schlueter, *Military Rules of Evidence Manual* 435 (3d ed. 1991).

■ 97. In the context of aggravating and mitigating circumstances, a requirement

that aggravating factors and circumstances "substantially outweighed" mitigating circumstances merely requires court members to tip the balance against the death penalty in close cases. If the court members misunderstood the military judge's instruction and applied a higher standard such as proof beyond a reasonable doubt or by a preponderance of the evidence, such a mistake would inure to the benefit of appellant, since it would weight the balance more heavily against imposition of the death penalty. Accordingly, we hold that appellant was not prejudiced by the absence of a definition of the term "substantially outweighed."

## ISSUE XX

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION IN ALLOWING THE TESTIMONY OF MRS. SHARBINO, THE VICTIM'S WIFE, WHEN HER TESTIMONY WAS CUMULATIVE, DID NOT CORROBORATE ANYTHING AND PREJUDICED APPELLANT BY INTRODUCING VICTIM IMPACT EVIDENCE INTO THE MERITS PORTION OF THE PROCEEDINGS.

This issue was resolved against appellant in our disposition of Issue IV, subissue G, 41 MJ at 258–59 ¶¶ 58–59.

## ISSUES XXI, XXII, AND XXIII

WHETHER THE MILITARY JUDGE DENIED APPELLANT'S FIFTH AMENDMENT RIGHT TO DUE PROCESS AND A FAIR TRIAL WHEN HE TOLD THE PANEL THAT APPELLANT'S DEFENSE THEORY WAS "ABSOLUTELY RIDICULOUS" AND REFUSED TO GRANT A MISTRIAL.

WHETHER APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO CONFRONTATION WHEN THE MILITARY JUDGE DENIED TRIAL DEFENSE COUNSEL'S REQUEST TO TREAT NADIA PESSINA SIMMONS AS A HOSTILE WITNESS AND THEN RESTRICTED COUNSEL'S EXAMINATION OF HER CONCERNING HER ROLE IN THE CRIMES.

WHETHER THE MILITARY JUDGE'S REFUSAL TO PROVIDE AN ACCOMPLICE TESTIMONY INSTRUCTION TO THE MEMBERS REGARDING THE TESTIMONY OF NADIA PESSINA SIMMONS VIOLATED APPELLANT'S RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, AND ARTICLE 55, UCMJ.

These three issues were resolved against appellant in our resolution of Issue IV, subissues J and I, 41 MJ at 264 ¶ 70 and 260–64 ¶¶ 61–69.

## ISSUE XXIV

WHETHER THERE IS NO MEANINGFUL DISTINCTION BETWEEN PREMEDITATED AND UNPREMEDITATED MURDER ALLOWING DIFFERENTIAL TREATMENT AND SENTENCING DISPARITY IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ.

98. Appellant argues that there is no meaningful difference between premeditated murder and unpremeditated murder. Accordingly, he argues that the military sentencing scheme fails constitutional muster because it does not "genuinely narrow the class of persons eligible for the death penalty and ... reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988), *quoting Zant v. Stephens,* 462 U.S. at 877, 103 S.Ct. at 2742.

We hold that there is a meaningful distinction between premeditated and unpremeditated murder sufficient to pass constitutional muster. Premeditated murder requires proof of an additional element, "premeditated design to kill." Art. 118(1); para. 43b(1)(d), Part IV, Manual, *supra.* The phrase "premeditated design to kill" requires "consideration of the act intended." Para. 43c(2)(a). The Army Court of Military Review has described premeditated murder as a "killing ... committed after reflection by a cool mind." *United States v. Viola,* 26 MJ 822,

829, *citing* 2 *Wharton's Criminal Law* § 140 at 181 (C. Tortia, 14th ed. 1979), *aff'd*, 27 MJ 456 (CMA 1988). This Court has adopted the "cool mind" distinction. *United States v. Hoskins*, 36 MJ 343, 346 (1993). The Air Force Court of Military Review has observed, "'Premeditation' is a term of art commonly employed and universally understood in the law of homicide." *United States v. Mansfield*, 33 MJ 972, 988 (1991), *aff'd on other grounds*, 38 MJ 415 (CMA 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1610, 128 L.Ed.2d 338 (1994). This Court has observed that, "[t]he words 'consideration of the act intended to bring about death' ... have ordinary meanings and are readily understandable by court members." *United States v. Teeter*, 16 MJ 68, 72 (1983). We have no difficulty accepting the congressional determination that an intentional killing preceded by consideration of the fatal act with a "cool mind" is more serious and deserving of more severe punishment than an intentional killing without such consideration.

## ISSUE XXV

WHETHER THE MILITARY JUDGE'S INSTRUCTIONS BLURRED ANY DISTINCTION BETWEEN THE OFFENSES OF PREMEDITATED AND UNPREMEDITATED MURDER AND DELETED THE REQUIRED ELEMENT OF "PREMEDITATION" FROM THE OFFENSE OF PREMEDITATED MURDER IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ.

■ 99. In his instructions on the elements of the offenses, the military judge described the difference between premeditated and unpremeditated murder as follows: "[P]remeditated murder requires as an element that the accused have a 'premeditated design to kill.' Unpremeditated murder requires the specific intent to kill or inflict great bodily harm without premeditated—premeditation." After a court member asked whether premeditation must be "in the general sense" or "in the specific sense," the military judge instructed as follows:

"Premeditated design to kill" means the formation of a specific intent to kill and consideration of the act intended to bring about death. The "premeditated design to kill" does not have to exist for a measurable or particular length of time. The only requirement is that it must precede the killing.

The military judge asked the court member, "Does that help out?" The member responded in the affirmative. There was no objection by either party to the instruction and no requests for clarification from counsel for either side or any court member.

Appellant now argues that the military judge blurred the distinction between premeditated and unpremeditated murder by instructing the court members that both premeditation and intent to kill may be inferred from circumstantial evidence and that no lapse of time is required for either premeditation or intent to kill, and by failing to define premeditation beyond "consideration of the act intended."

We hold that the military judge's instructions were correct and did not require amplification. The words of this Court in *United States v. Teeter, supra*, bear repeating:

■ The words "consideration of the act intended to bring about death" are not terms of art. They have ordinary meanings and are readily understandable by court members. It does not appear that the court members had difficulty with the instruction since they did not request clarification. There is no requirement that length be substituted for clarity....

16 MJ at 72. Furthermore, since defense counsel did not request further definition of the terms "premeditated" and "unpremeditated," the issue was waived. RCM 920(f).

Finally, we note that the evidence in this case did not require a fine distinction between momentary premeditation and an intentional but unpremeditated killing. The evidence overwhelmingly established that appellant considered murdering the cab drivers well before he fired the fatal gunshots.

## ISSUE XXVI

WHETHER THE MILITARY JUDGE'S INSTRUCTIONS THAT ROBBERY REQUIRES A "CRIMINAL STATE OF MIND" WAS [SIC] IMPERMISSIBLY AMBIGUOUS AND LESSENED THE REQUIRED STANDARD IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ.

■■■ 100. In connection with the charge of felony murder of Christopher Fay, the military judge instructed the court members on the seven elements of robbery with a firearm, as described in paragraph 47b, Part IV, Manual, *supra*. He described the first element as being "that, at Fort Hood, Texas, on or about 12 December 1988, the accused wrongfully took money from the possession and in the presence of Christopher L. Fay." He described the sixth element as being "that the taking of the property by the accused was with the intent to permanently deprive Christopher L. Fay and the Yellow Cab Company of the use and benefit of that property, that is, the cash." The military judge then defined wrongful taking, a term within the first element, as follows: "A taking is wrongful only when done without the consent of the owner and accompanied by a criminal state of mind."

In response to a question from a court member about the meaning of "criminal state of mind," the military judge defined it as follows: "In other words, was it in the mind of the perpetrator to commit a crime ... as opposed to some legal justification or excuse...." The member indicated that he understood the definition. Counsel did not object to the definition or request further clarification.

Appellant now argues that the definition of wrongful taking in terms of a criminal state of mind rendered the element of specific intent in the sixth element ambiguous. We hold that the instruction was sufficient. On its face, the instruction distinguished between the specific intent to take the property and the criminal state of mind which makes the taking wrongful. In this case there was no issue of an innocent taking or a claim of

right. *See, e.g., United States v. Kachougian,* 7 USCMA 150, 156, 21 CMR 276, 282 (1956); para. 46c(1)(d), Part IV, Manual, *supra.*

## ISSUE XXVII

WHETHER THE INSTRUCTIONS TO THE COURT MEMBERS WHICH PURPORTED TO DEFINE REASONABLE DOUBT VIOLATED APPELLANT'S RIGHT TO DUE PROCESS OF LAW BY LESSENING THE GOVERNMENT'S BURDEN OF PROOF.

101. The military judge defined "reasonable doubt" as follows:

By "reasonable doubt" is not intended a fanciful or ingenious doubt or conjecture, but an honest, conscientious doubt suggested by the material evidence or lack of it in this case. It's an honest misgiving caused by insufficiency of proof of guilt. Proof beyond reasonable doubt means proof to a moral certainty, although not necessarily to an absolute or mathematical certainty. A "reasonable doubt" is a doubt which would cause a reasonably prudent person to hesitate to act in important and weighty personal affairs. The proof must be such as to exclude not every hypothesis or possibility of innocence, but every fair and rational hypothesis except that of guilt....

Appellant did not object to the instruction at trial, but now contends that the instructions "constitute a prejudicial error by suggesting a degree of guilt below the reasonable doubt standard necessary for a conviction." Final Brief at 310. Appellant cites *Cage v. Louisiana,* 498 U.S. 39, 41, 111 S.Ct. 328, 330, 112 L.Ed.2d 339 (1990) (per curiam), in support of his argument.

This Court has considered an identical instruction and has resolved the issue adversely to appellant. *United States v. Meeks,* 41 MJ 150 (1994). *See Victor v. Nebraska,* —— U.S. ——, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994).

## ISSUE XXVIII

WHETHER THE MILITARY JUDGE ERRONEOUSLY FAILED, *SUA SPONTE,* TO INSTRUCT THE PANEL MEMBERS IN BOTH PHASES OF THE COURT–MARTIAL THAT APPELLANT HAD THE RIGHT TO REMAIN SILENT AND HIS FAILURE TO TESTIFY COULD NOT BE CONSIDERED AGAINST HIM ADVERSELY.

██ 102. Appellant did not testify. He concedes that he did not request an instruction concerning his silence, but he argues that the military judge had a *sua sponte* duty to instruct because a court member questioned his silence. Final Brief at 318.

Appellant relies on a question from a court member concerning the distinction between direct and circumstantial evidence. The member asked, "The statements. He made a videotaped statement and said—is that direct evidence—" The military judge responded, "Is that direct evidence or circumstantial evidence? It's direct." The member still had questions, so the military judge told the members, "[D]on't get confused by the distinction . . . [T]he law really makes no distinctions between the two . . . You can use either direct evidence or circumstantial evidence to decide any issue in this case. Okay?" The member indicated that he understood.

The premise upon which appellant makes his argument is unsupported by the record. The court member did not question his silence, but was concerned only with whether appellant's videotaped confession was direct or circumstantial evidence. We hold that the military judge was not required to instruct *sua sponte* concerning appellant's failure to testify.

## ISSUE XXIX

WHETHER THE MILITARY JUDGE ERRED IN FAILING TO GRANT A DEFENSE MOTION FOR CHANGE OF VENUE OR FAILING TO SEQUESTER THE PANEL.

[100, 101] 103. As we noted in our disposition of Issue IV, subissue A, 41 MJ at 253–54 ¶ 50, an accused is entitled to a change of venue only when pretrial publicity creates "so great a prejudice against the accused that the accused cannot obtain a fair and impartial trial." RCM 906(b)(11) Discussion; *United States v. Gravitt,* 5 USCMA at 256, 17 CMR at 256. The military judge's ruling is reviewed for abuse of discretion. *Id.; United States v. Carter,* 9 USCMA 108, 112, 25 CMR 370, 374 (1958). We hold that the military judge did not abuse his discretion.

In an effort to minimize the effects of pretrial publicity, the convening authority detailed officers who had arrived at Fort Hood after January 1, 1989, or were assigned to commands outside Fort Hood. On January 31, 1989, the military judge issued an order directing trial counsel to inform all primary and alternate selectees "not to discuss with anyone the facts and circumstances of this case and further to refrain from intentionally listening [to] or reading any news or other accounts" pertaining to the charges against appellant. After individual *voir dire* and at the conclusion of each day's proceedings the military judge cautioned the members against discussing the case or intentionally exposing themselves to media coverage.

The military judge announced that he would be liberal in granting challenges for cause based on pretrial publicity. He invited the defense to renew the motion for change of venue if it appeared difficult to select an impartial panel.

After challenges by both sides, eight officers remained on the panel. COL Aylor, the president of the panel, was from Fort Sill, Oklahoma. The remaining seven officers were from Fort Hood. The *voir dire* of these eight officers revealed nothing to justify a change of venue. During general *voir dire,* no member indicated having obtained any information "through official channels" about the case. Six of the eight (MAJ Wilson, MAJ Napoli, CPT Weiss, CPT Williams, CW4 Giebner, and CW3 Hasenauer) indicated that they had heard about the case through the media. Two officers (MAJ Wilson and CPT Williams) had seen references to the case on television.

104. During individual *voir dire*, COL Aylor and MAJ Staples indicated having no media exposure to the case. The other six officers recalled some media coverage in general terms but could not remember specifics. The defense challenged none of the six for cause.

In light of the absence of any indication that the court members were influenced by pretrial publicity, the decision of defense counsel not to challenge any members for cause based on exposure to pretrial publicity, and the careful efforts of the convening authority and military judge to insulate court members from publicity about the case, we are satisfied that the military judge acted well within his discretion when he denied the motion for a change of venue and the request to sequester the court members.

## ISSUE XXX

WHETHER THE MILITARY JUDGE'S WRONGFUL RESTRICTION OF VOIR DIRE ON THE ISSUES OF BUMPER STICKERS, VOLUNTEER WORK, DIVORCE, COMBAT EXPERIENCE, AND BOXING, AND CATEGORIZATION OF TRIAL DEFENSE COUNSEL'S TACTICS AS A "WASTE OF TIME," CHILLED COUNSEL'S VOIR DIRE QUESTIONING AND DENIED APPELLANT A FAIR TRIAL UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, AND ARTICLE 55, UCMJ.

We resolve this issue against appellant for the reasons set out in our disposition of Issue IV, subissue E, 41 MJ at 255–57 ¶¶ 54–56.

## ISSUES XXXI AND XXXII

WHETHER THE CONVENING AUTHORITY WAS RACIALLY BIASED AGAINST APPELLANT AS SEEN BY HIS INSISTENCE ON HAVING RACIAL IDENTIFIERS IN THE JURY POOL SELECTION SHEETS, THE DISPROPORTIONATE PERCENTAGE OF BLACKS IN THE JURY POOL AS COMPARED TO THE POPULATION OF BLACKS AT FORT HOOD, AND THE ACTIONS TAKEN BY THE CONVENING AUTHORITY AFTER HE PICKED AN ALL WHITE JURY IN A BLACK–ON–WHITE CRIME WHERE APPELLANT IS BLACK.

WHETHER APPELLANT WAS DENIED HIS RIGHTS UNDER THE FIFTH AND SIXTH AMENDMENTS BECAUSE THE PANEL MEMBER SELECTION POOL DID NOT INCLUDE ANY FEMALES.

105. At trial appellant challenged the referral and member selection process, arguing that blacks and females were underrepresented. We hold that appellant has failed to make a *prima facie* showing of either racial or gender discrimination.

Appellant's case initially was referred to the general court-martial appointed by Court–Martial Convening Order (CMCO) 1. The senior officer on that order, COL Burch, is black. All the remaining court members, including the enlisted members, were white, except for MAJ Castro, reflected as "other." (Appellate Exhibit (App. Ex.) LII at 9–15.)

Although there were no female officers detailed as primary members of that panel, the evidence presented by the defense reflects that in January 1989, when the convening authority, Major General (MG) Streeter, selected panels for general courts-martial and special courts-martial, including the panel detailed on CMCO 1, there were 11 women nominated and 9 selected for court-martial duty. One officer (MAJ Nowack) was among 7 officers detailed to serve on BCD special courts-martial. Of the 30 officers detailed as alternate members for general courts-martial and special courts-martial, 4 were women: CPT Lutz, Alternate # 2; CPT Johnson, Alternate # 6; and First Lieutenant (1LT) Cruz, Alternate # 17; 1LT Thomas, Alternate # 22. Of the 20 enlisted soldiers detailed as alternate members for general courts-martial and special courts-martial, 4 were women: Specialist Jones, Alternate # 4; SGT Darymple, Alternate # 8; SSG Brownlow, Alternate # 12; and SGT Holiday, Alternate # 15.

On or about February 15, 1989, in order to minimize the impact of pretrial publicity, MG

Streeter withdrew appellant's case from the court-martial appointed by CMCO 1. The staff judge advocate (SJA) had prepared a pool of nominees, officer and enlisted, who had arrived at Fort Hood after January 1. (App. Ex. XLI at 11–12.) Because the pool of eligible nominees included so few senior officers, the SJA requested additional officer nominees in the grades of colonel and lieutenant colonel from commands outside Fort Hood. (R. 23) A new pool of 45 nominees composed of officers from both Fort Hood, Texas, and Fort Sill, Oklahoma, was prepared. In that pool were four black officers from Fort Hood: MAJ Staples, MAJ Taylor, CPT Austin, and Chief Warrant Officer 3 Mark. MAJ Staples and MAJ Taylor were selected as alternate members. All primary selectees were white males. (App. Ex. LXVIII at 10–12; CMCO 4.)

106. On February 21, 1989, appellant requested that enlisted members be detailed to his court-martial. That request was motivated in part to obtain "a more representative panel." In response to appellant's request for enlisted members, the SJA presented MG Streeter with a roster of all enlisted personnel who had arrived at Fort Hood after January 1, 1989. (App. Ex. XLVII at 3–14.)

If soldiers in pay grades E–1 and E–2 are excluded, there were 181 eligible nominees on the roster. *See United States v. Yager*, 7 MJ 171 (CMA 1979) (soldiers below pay grade E–3 unlikely to meet requirements of Article 25, UCMJ, 10 USC § 825). There were 158 males (87.3% of the total); and 23 females (12.7% of the total). There were 106 whites (58.6% of the total) and 57 blacks (31.5% of the total). MG Streeter selected 6 primary enlisted members, of whom 4 were black (66.7% of those selected), and 1 was female (16.7% of those selected).

MG Streeter also selected 11 alternate enlisted members of which 5 were black (45.5% of the total) and 2 were female (18.2% of the total). In the aggregate, of 17 enlisted soldiers selected for court-martial duty as either primary or alternate members, MG Streeter selected 9 blacks (53% of that total) and 3 females (17.6% of that total).

On March 23, 1989, appellant withdrew his request for enlisted members and requested an all-officer panel. On March 24, MG Streeter relieved the enlisted members and detailed 5 additional officers, including MAJ Staples, a black male. Five alternate members were designated, including MAJ Taylor, a black male. (App. Ex. LXVIII at 1–3; CMCO 8.)

Appellant attacks the selection process on three grounds. He asserts that he was denied his Sixth Amendment right to trial by a "jury" composed of a fair "cross-section of the community." He further asserts that blacks and females were systematically excluded in violation of the Due Process Clause of the Fifth Amendment and Article 25. Lastly, appellant suggests that his court-martial was "stacked" with white males to ensure that a death sentence would be adjudged. Final Brief at 347–48.

[102] 107. The Supreme Court addressed the Sixth Amendment "fair cross-section" requirement in *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), holding:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

439 U.S. at 364, 99 S.Ct. at 668. The "fair cross-section" requirement of the Sixth Amendment applies only to the pool of eligible jurors, not to the jury that was actually empaneled, "absent a pattern of systematic exclusion of a particular class." *United States v. Olson*, 846 F.2d 1103, 1117 n. 16 (7th Cir.1988).

In *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), the Supreme Court addressed a claim of systematic exclusion in the context of the Equal Protection Clause of the Fourteenth Amendment,

which applies to the United States through the Due Process Clause of the Fifth Amendment. *See Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The Supreme Court held that proof of systematic exclusion requires proof of the following:

> The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as [jurors], over a significant period of time.... Finally ... a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing....

430 U.S. at 494, 97 S.Ct. at 1280 (citations omitted). *See Morgan v. United States,* 696 F.2d 1239, 1240 (9th Cir.1983) ("claim of unconstitutionally selected jury implicates" Sixth Amendment as well as "the Fourteenth Amendment right to equal protection of the laws incorporated in the Due Process Clause of the Fifth Amendment").

▮▮▮▮▮ When a Fifth Amendment or Fourteenth Amendment violation is asserted, statistics may be used to prove discriminatory intent. *Alston v. Manson,* 791 F.2d 255, 257–59 (2d Cir.1986), *cert. denied,* 479 U.S. 1084, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987). A *prima facie* case of systematic exclusion is not established by the absence of minorities on a single panel. *See Castaneda v. Partida,* 430 U.S. at 494, 97 S.Ct. at 1280 (underrepresentation proved by comparing population "to the proportion called to serve ... over a significant period of time"); *Ramseur v. Beyer,* 983 F.2d 1215, 1235 (3d Cir.1992) (underrepresentation not proved where "length of time documented ... was only two years"); *Dobbs v. Kemp,* 809 F.2d 750, 752 (11th Cir.) (underrepresentation of women on a single jury list insufficient to make *prima facie* showing of discrimination), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2203, 95 L.Ed.2d 858 (1987).

▮▮▮▮ 108. Appellant points to inclusion of racial and gender identifiers on the lists of nominees in support of his assertion of racial and gender discrimination. We will not presume improper motives from inclusion of racial and gender identifiers on lists of nominees for court-martial duty. We observed in *United States v. Green,* 37 MJ 380, 384 (CMA 1993), that "a convening authority is not required to be race-ignorant; he or she is only required to be race-neutral." Race and gender identifiers are neutral; they are capable of being used for proper as well as improper reasons.

▮▮▮▮ Turning first to appellant's claim of a Sixth Amendment violation, we hold that appellant is not entitled to a "jury" composed of a fair cross-section of the community. The Sixth Amendment right to trial by a jury which is a fair cross-section of the community has long been recognized as inapplicable to trials by court-martial. *Ex Parte Quirin,* 317 U.S. 1, 39–41, 63 S.Ct. 2, 16–17, 87 L.Ed. 3 (1942); *Ex Parte Milligan,* 71 U.S. (4 Wall.) 2, 137–38, 18 L.Ed. 281 (1866). This Court has observed that "Article 25 of the Uniform Code, 10 USC § 825, contemplates that a court-martial panel will not be a representative cross-section of the military population." *United States v. Smith,* 27 MJ 242, 248 (CMA 1988), *quoting United States v. Santiago–Davila,* 26 MJ 380, 389 (CMA 1988).

Even assuming arguendo that appellant was entitled to a representative cross-section of the eligible military population on his court-martial, he has not made his case. The limited relevant evidence presented by the defense, *i.e.,* the roster of enlisted personnel who arrived at Fort Hood after January 1, 1989, shows that blacks (66.7% v. 31.5%), and women (16.7% v. 12.7%) (*see* 41 MJ at 284 ¶ 106), were overrepresented, not underrepresented, among the enlisted members detailed to sit on his case.

▮▮▮▮ Likewise, with respect to appellant's Fifth Amendment claim, we hold that appellant has failed to make a *prima facie* showing of systematic exclusion of eligible officers and enlisted soldiers. In support of the challenge to the court-martial selection process, defense counsel presented demo-

graphic data for Fort Hood and Fort Sill as of mid-February 1989, showing the population by gender as well as by race. (App. Ex. XLI at 63 & 64.) In rejecting the defense challenge, the military judge characterized the raw demographic data as "somewhat irrelevant."

109. We agree with the military judge's characterization of the population data submitted by the defense in support of their motion. The population figures merely show the racial, ethnic, and gender breakdown of the military population of Fort Hood and Fort Sill as of mid-February 1989. They do not reflect how many black officers and female officers arrived at Fort Hood after January 1, 1989. Furthermore, they do not reflect the numbers or percentages of officers ineligible for court-martial duty. *See* paras. 7–2 thru 7–6, Army Regulation 27–10, Legal Services: Military Justice (1 July 1984) (chaplains; medical, dental, and veterinary officers; Army nurses; Army Medical Specialist Corps officers; and inspectors general ineligible for court-martial duty). Finally, they do not reflect the numbers or percentages of enlisted personnel in the lowest pay grades, who are unlikely to meet the requirement that they be "best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." Art. 25(d)(2). *See United States v. Yager,* 7 MJ 171.

The defense presented no evidence of the number of black officers and female officers eligible for court-martial duty who arrived at Fort Hood between January 1 and February 15, 1989, the day the new panel was selected. Likewise, the defense presented no evidence that there were any black officers or female officers in the grades of colonel and lieutenant colonel at Fort Sill who were eligible and available for court-martial duty.

MG Streeter's reason for narrowing the pool of eligible court members was race-neutral and gender-neutral, as well as favorable to appellant. It was not challenged at trial or on appeal.

Trial counsel represented that MG Streeter routinely included blacks on courts-martial and on occasion even detailed blacks who were not nominated by their respective commands for court-martial duty. Defense counsel did not dispute trial counsel's assertion. To the contrary, defense counsel stated that he will "stipulate" that blacks "routinely" were included on courts-martial appointed by MG Streeter.

The selection of enlisted members is the only selection process for which accurate population data was made a part of the record. The evidence presented at trial by the defense (App. Ex. XLVII at 3–14) reflects that in the enlisted ranks, both blacks and females were detailed in numbers greater than their proportion of the eligible population. *See* 41 MJ at 285 ¶ 108.

110. Nevertheless, appellant asserts that the absence of blacks and females on the all-officer, all-white panel to which his case was referred establishes a constitutional violation. We reject his assertion for three reasons. First, as noted above, a *prima facie* claim of discrimination is not established by the absence of minorities on a single panel. Second, the panel about which appellant complains is not the panel that heard his case. Finally, when appellant objected to an all-white, all-male panel, the convening authority responded appropriately to his objection. He answered appellant's request for enlisted members by detailing blacks and females in numbers exceeding their proportionate share of the eligible population. The panel which actually heard the case included one black officer as a primary member; another black officer had been designated as an alternate. *See* 41 MJ at 284 ¶ 106. Appellant has presented no evidence of tokenism and no evidence that female officers or other black officers who were eligible and available were improperly excluded from consideration.

111. The final issue is whether there is evidence of court stacking. *See United States v. Hilow,* 32 MJ 439, 441 (CMA 1991) (court stacked with supporters of "hard discipline"); *United States v. Smith,* 27 MJ 242 (CMA 1988) (female member added in case involving indecent assault on female officer); *United States v. Hedges,* 11 USCMA 642, 29 CMR 458 (1960) (five of nine court members involved in law enforcement). Court stack-

ing in courts-martial can occur by systematic exclusion. *See United States v. McClain*, 22 MJ 124 (CMA 1986) (systematic exclusion of junior officers and NCOs below E–7 to prevent "unusual" sentences); *United States v. Daigle*, 1 MJ 139 (CMA 1975) (warrant officers and lieutenants excluded); *United States v. Greene*, 20 USCMA 232, 43 CMR 72 (1970) (court membership limited to senior officers). Where systematic exclusion is consistent with Article 25, it may be permissible. *See United States v. Yager*, 7 MJ 171 (systematic exclusion of personnel below pay grade E–3 permissible because those grades are unlikely to meet requirements of Article 25). Appellant has presented no evidence that court members were either added or excluded for reasons that violate the Constitution or Article 25.

On the record before us, we hold that appellant has failed to make a *prima facie* showing of noncompliance with Article 25 or the systematic exclusion of otherwise qualified court members based on race or gender. Among the officer population, he has not shown how many blacks or females were eligible and available, or that any eligible black or female officers were excluded from consideration. Among the enlisted population, the evidence produced by the defense showed that black and female soldiers were selected in numbers greater than their proportionate share of the eligible population. Since appellant failed to make a *prima facie* showing that blacks and females were improperly excluded from participation in his court-martial, the military judge properly rejected appellant's challenge to the process by which his court-martial was convened.

### ISSUE XXXIII

WHETHER APPELLANT WAS DENIED DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, AND ARTICLE 55, UCMJ, BECAUSE HE WAS TRIED IN A PEACETIME CAPITAL CASE BY A COURT–MARTIAL PANEL (I.E. JURY) COMPOSED OF LESS THAN TWELVE MEMBERS.

This issue was resolved against appellant in *United States v. Curtis*, 32 MJ at 267–68.

### ISSUE XXXIV

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE RULED THAT THE SPECIFICATIONS TO BOTH ROBBERY CHARGES COULD BE AMENDED AFTER ARRAIGNMENT WHEN THE EVIDENCE CLEARLY SHOWED THAT THE MODIFICATIONS CHANGED ESSENTIAL PORTIONS OF THE ELEMENTS TO THE OFFENSES AND THEREBY CONSTITUTED MAJOR CHANGES DEMANDING DISMISSAL OF THE CHARGES.

112. As originally drafted, specifications 1–3 of Charge III alleged that the money taken from the three cab drivers was the property of the individual drivers "and the Kelly Taxi Cab Company." After arraignment but before entry of pleas, trial counsel learned that the cab drivers worked for Yellow Cab Company, even though they drove Kelly cabs. Over defense objection, trial counsel amended the specifications to allege that the money was taken from the three individual cab drivers "and the Yellow Cab Company." Although defense argued that the change was major, the military judge ruled that it was not.

Minor changes may be made after arraignment; major changes may not be made without preferring charges anew. RCM 603(c) and (d). RCM 603(a) provides, "Minor changes in charges and specifications are any except those which add a party, offenses, or substantial matter not fairly included in those previously preferred, or which are likely to mislead the accused as to the offenses charged."

We hold that the changes were "minor." Pleading the name of the individual cab drivers' employers was unnecessary in this case; pleading the names of the individual drivers would have been sufficient. The focus of the case was on the individual drivers, not their employer. There is no possibility that appellant was misled.

## ISSUE XXXV

WHETHER THE COURT–MARTIAL LACKED JURISDICTION TO TRY APPELLANT BECAUSE THE PRETRIAL ADVICE WAS INITIALLY DEFECTIVE AND THEN CURED BY A NEW PRETRIAL ADVICE WITHOUT REREFERRAL OF CHARGES.

 113. On January 23, 1989, the staff judge advocate (SJA) prepared his pretrial advice to the convening authority as required by Article 34, UCMJ, 10 USC § 834. The case abstract attached to that advice contained several mistakes: it listed appellant's age as "0"; it indicated that he was "restricted" when in fact he was in pretrial confinement; and it omitted appellant's service awards.

On February 9, 1989, appellant asked the military judge to order a new pretrial advice. After trial counsel advised the military judge that the SJA intended to correct his pretrial advice, add a memorandum expressing appellant's concerns about the pretrial advice, and determine whether the convening authority desired to adhere to his previous decision, a corrected and expanded pretrial advice was submitted to the convening authority on February 14, 1989. In addition to correcting the errors in the original advice, the SJA identified which offenses were capital and advised the convening authority of the mitigating factors which appellant desired him to consider. The convening authority adhered to his previous decision to refer the charges to a general court-martial as a capital case.

Article 34(a) mandates, "Before directing the trial of any charge by general court-martial, the convening authority shall refer it to his staff judge advocate for consideration and advice." The SJA must state "in writing" whether each "specification alleges an offense," whether each "specification is warranted by the evidence," and whether "a court-martial would have jurisdiction over the accused and the offense," and must recommend the action to be taken. *See* RCM 406. The SJA need not set out his legal "analysis or rationale." There is no legal requirement to summarize the evidence, discuss aggravating or mitigating factors, or list

the recommendations of subordinate commanders. RCM 406, Discussion. Defects in the pretrial advice are not jurisdictional, but are tested for prejudice. Art. 59(a), UCMJ, 10 USC § 859(a); *United States v. Murray,* 25 MJ 445, 447 (CMA 1988).

We hold that the factual errors in the original pretrial advice were not jurisdictional, were corrected by the supplemental advice, and were not prejudicial to appellant.

## ISSUES XXXVI AND XXXVII

WHETHER THE STAFF JUDGE ADVOCATE WAS DISQUALIFIED FROM PARTICIPATING IN THE PROCEEDINGS AFTER THE INITIAL PRETRIAL ADVICE WAS CHALLENGED AS DEFECTIVE.

WHETHER THE CONVENING AUTHORITY WAS DISQUALIFIED FROM PARTICIPATING IN THE PROCEEDINGS AFTER THE INITIAL PRETRIAL ADVICE AND CAPITAL REFERRAL WERE CHALLENGED AS DEFECTIVE.

 114. Appellant contends that because the SJA's pretrial advice and the convening authority's action based on that advice were challenged at trial, based on the mistaken entries in the pretrial advice discussed in Issue XXXV, 41 MJ at 288 ¶ 113, both the SJA and the convening authority were disqualified. We hold that neither officer was disqualified.

Neither the SJA nor the convening authority was placed in the position of weighing their own credibility or resolving an issue regarding the correctness of their decisions. The SJA recognized that his original advice contained factual errors and he corrected those errors without being ordered to do so by the military judge. Thus, there were no legal or factual issues to be resolved. Accordingly, neither the SJA nor the convening authority was disqualified. *See United States v. Choice,* 23 USCMA 329, 331, 49 CMR 663, 665 (1975).

## ISSUE XXXVIII

WHETHER THE RECORD OF TRIAL MUST BE RETURNED TO THE CONVENING AUTHORITY FOR NEW RECOMMENDATION AND ACTION BECAUSE A SUBSTANTIAL PORTION OF THE FINDINGS INSTRUCTION WAS NOT AUTHENTICATED UNTIL MORE THAN TWO YEARS AFTER THE CONVENING AUTHORITY'S ACTION.

115. The record of trial was authenticated by Judge Saynisch on June 5, 1989. A member of the defense team, Captain Smart, acknowledged on June 6 that he had examined the record of trial. A copy of the SJA's post-trial recommendation was served on CPT Ibbotson, lead defense counsel on June 6. On June 19, CPT Ibbotson certified that he had read the post-trial recommendation and the authenticated record of trial, and he submitted matters for consideration by the convening authority in accordance with RCM 1105 and 1106. He did not challenge the accuracy or completeness of the record.

On November 15, 1991, the Clerk of Court, U.S. Army Court of Military Review, pointed out in a letter to the convening authority that page 1500 was missing from the record and requested the convening authority to correct the record. Judge Saynisch executed a certificate of correction which transcribed and inserted the contents of the missing page. Page 1500 was one of 38 pages of instructions on findings and contained some of the procedural instructions for deliberation and voting. Appellant now argues that the convening authority's action was based on an unauthenticated record and was therefore invalid. He cites an opinion of the Court of Military Review, *United States v. Batiste*, 35 MJ 742, 744 (ACMR 1992), in which "the substantive proceedings in their entirety" (guilty plea inquiry, findings, sentence hearing, and sentence) were not properly authenticated.

We hold that a new recommendation and action are not required. We regard the omission in this case as more akin to the minor omission in *United States v. Martinez*, 27 MJ 730 (ACMR 1988), rather than to the failure to authenticate most of the record, as

occurred in *Batiste*. The initial record of trial in appellant's case was properly authenticated, and the certificate of correction was properly authenticated. RCM 1104(d)(1) authorizes the return of an incorrect or incomplete record to the convening authority for correction. RCM 1104(d)(2) authorizes the military judge to execute a certificate of correction.

"The convening authority is not required to review the [record] for legal ... or factual sufficiency." RCM 1107(b)(1); *see* RCM 1107(c), Discussion. Defense counsel did not challenge the completeness of the record after examining it and did not contest the legal sufficiency of the instructions contained on the then-missing page. There is no reasonable possibility that that missing page affected the convening authority's decision. Accordingly, there is no reasonable possibility of prejudice. Art. 59(a).

## ISSUE XXXIX

WHETHER THE ARMY COURT OF MILITARY REVIEW ABUSED ITS DISCRETION BY REFUSING TO SIT *EN BANC* IN APPELLANT'S CASE.

116. Appellant's conviction and sentence were affirmed by the Court of Military Review on February 3, 1992. 34 MJ 956. On February 24 appellant filed a petition for reconsideration and suggestion for reconsideration *en banc*. On March 3, 1992, the suggestion was not adopted, and the petition was denied on April 15, 1992. 34 MJ 1065, 1066. Appellant now asserts that the Court of Military Review abused its discretion by refusing to hear his case *en banc*.

Article 66(a), UCMJ, 10 USC § 866(a), provides that a Court of Military Review "may sit in panels or as a whole in accordance with rules prescribed under subsection (f)," and that "[a]ny decision of a panel may be reconsidered by the court sitting as a whole." In accordance with subsection (f) the Judge Advocates General of all services have promulgated Joint Rules of Practice and Procedure. Courts of Military Review, Rules of Practice and Procedure, March 1,

1985. *See* 22 MJ CXXVII. Rule 17(a) of those Rules provides as follows:

> A majority of the judges present for duty may order that any appeal or other proceeding be considered or reconsidered, except as indicated in section (c) below, by the Court sitting as a whole. Such consideration or reconsideration ordinarily will not be ordered except (1) when consideration by the full Court is necessary to secure or maintain uniformity of decision, or (2) when the proceedings involve a question of exceptional importance, or (3) when a sentence being reviewed pursuant to Article 66 extends to death.

22 MJ at CXXXIII.

Appellant argues that he has been denied equal treatment because earlier capital cases were heard *en banc* but his was not. We find this "me, too" argument unpersuasive. The Joint Rules clearly contemplate that reconsideration is discretionary, not mandatory, and that reconsideration *en banc* is the exception rather than the rule.

117. At the time appellant filed his suggestion for reconsideration *en banc*, the Army Court of Military Review had already addressed many significant constitutional issues involved in capital cases in *United States v. Murphy*, 30 MJ 1040 (ACMR 1990) (en banc), *remanded*, 36 MJ 8 (CMA 1992), *record returned for mandatory review*, 38 MJ 184 (1993); *United States v. Dock*, 26 MJ 620 (ACMR 1988) (en banc); and *United States v. Matthews*, 13 MJ 501 (ACMR 1982) (en banc). The Army court also had the benefit of the Navy–Marine Corps Court of Military Review's wisdom in *United States v. Curtis*, 28 MJ 1074 (1989) (en banc), as well as the guidance from this Court in *United States v. Curtis*, 33 MJ 101; *United States v. Curtis*, 32 MJ 252; *United States v. Dock*, 28 MJ 117 (CMA 1989), *decision on further review*, 40 MJ 112 (CMA 1994); and *United States v. Matthews*, 16 MJ 354 (CMA 1983). We hold that the Court of Military Review did not abuse its discretion by not adopting the suggestion for reconsideration *en banc*.

## ISSUE XL

WHETHER THE ARMY COURT'S PROPORTIONALITY REVIEW IN THIS CASE WAS INSUFFICIENT AS A MATTER OF LAW.

 118. Appellant contends that the proportionality review by the court below in this case was flawed because it "fails to give any indication as to what criteria were examined or how those criteria were weighed." Final Brief at 374. Appellant argues that this Court should set up proportionality standards of review similar to those adopted by New Jersey. Final Brief at 375–79. Lastly, appellant conducts his own proportionality review, using military "death-eligible" cases tried within 3 years of appellant's case and asserts that appellant's sentence is disproportionate. Final Brief at 379–83.

The Supreme Court has held that a proportionality review is not required by the Eighth Amendment if the sentencing procedure sufficiently narrows the class of individuals subject to the death penalty. *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). In *United States v. Curtis*, 32 MJ 252, 270–71 (CMA), *cert. denied*, 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991), this Court held that proportionality review is not required by the Constitution but is required by Article 66(c). *But see United States v. Murphy*, 36 MJ 8, 9 (CMA 1992) (Crawford, J., dissenting). During our second review of *Curtis*, we gave the following general guidance: "[I]t would be fitting for the Court of Military Review to consider generally similar cases reviewed by the Supreme Court of the United States in which state courts have imposed the death penalty for like crimes on that basis." *United States v. Curtis*, 33 MJ at 109.

In appellant's case the Court of Military Review followed our *Curtis* guidance and used a computer search to examine cases reviewed by the Supreme Court since *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), concluding "that the sentence is generally proportional to those imposed by other jurisdictions in similar situations." 34 MJ at 969. The Court of Military Review specifically relied on five cases involving murder for pecuniary gain: *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190,

108 L.Ed.2d 316 (1990) (robbery and murder of 7–Eleven store clerk); *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (defendant robbed and murdered victim by shooting him in the head); *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) (defendant robbed and killed a pizza delivery man); *Blystone v. Pennsylvania,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990) (defendant robbed and killed a hitchhiker); and *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (murder in the course of a burglary).

119. We hold that the proportionality review conducted by the Court of Military Review complies with Article 66 and our guidance in *Curtis.*

## ISSUE XLI

WHETHER THE MILITARY DEATH PENALTY SCHEME IS INVALID DUE TO *FURMAN V. GEORGIA,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) AND THE SEPARATION OF POWERS DOCTRINE.

This issue was resolved against appellant in *United States v. Curtis,* 32 MJ at 260–67.

## ISSUE XLII

WHETHER THE DEATH PENALTY SENTENCING STANDARD REQUIRING AGGRAVATING FACTORS TO "SUBSTANTIALLY OUTWEIGH" EXTENUATING AND MITIGATION [SIC] CIRCUMSTANCES IS IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS IN THAT THE ONLY ACCEPTABLE STANDARD MUST BE "BEYOND A REASONABLE DOUBT." SEE ALSO ARTICLE 59(a), UCMJ.

We resolve this issue against appellant for the reasons set out in our resolution of Issue XIX, subissue C, 41 MJ at 278 ¶¶ 96–97. *See Zant v. Stephens,* 462 U.S. 862, 875 and n. 13, 103 S.Ct. 2733, 2742 and n. 13, 77 L.Ed.2d 235 (1983) (specific standards for balancing aggravating against mitigating circumstances not constitutionally required).

## ISSUE XLIII

WHETHER THE MILITARY JUDGE COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT THE MEMBERS ON SENTENCING AS TO THE TERM "SUBSTANTIALLY OUTWEIGHED" WITH REGARD TO THE RELATIONSHIP OF MITIGATING CIRCUMSTANCES TO AGGRAVATING FACTORS.

We resolve this issue against appellant for the reasons set out in our resolution of Issues XIX, subissue C, 41 MJ at 276 ¶¶ 96, 97, and Issue XLII, 41 MJ at 291 ¶ 119.

## ISSUE XLIV

WHETHER ARTICLE 18, UCMJ, 10 USC § 818 AND RCM 201(F)(1)(C), WHICH REQUIRE TRIAL BY MEMBERS IN A CAPITAL CASE, VIOLATE THE FIFTH AND EIGHTH AMENDMENT GUARANTEES OF DUE PROCESS AND A RELIABLE VERDICT.

We resolve this issue against appellant for the reasons set out in *Singer v. United States,* 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965), and *United States v. Matthews,* 16 MJ at 363.

## ISSUE XLV

APPELLANT HAS BEEN DENIED EQUAL PROTECTION OF THE LAW REGARDING APPOINTMENT OF LEAD APPELLATE DEFENSE COUNSEL.

120. Appellant contends that he has been denied equal protection of the law because "[t]he U.S. Army is the only branch of the armed forces that makes no concrete distinction in case assignments between appellate counsel assigned to death-penalty cases and counsel assigned to other cases." Appellant argues that he has been treated unfairly because other services provide appellate counsel for death penalty cases in the grade of major or lieutenant commander and reduce their workload.

We reject appellant's argument for the reasons set out by the court below. 34 MJ at

1066–67. In addition we note that the breadth and depth of the issues raised, briefed, and argued before this Court reflect a level of representation far above the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We note further that appellant's complaints about the military grade of his appellate counsel are belied by the signature blocks on his brief before this Court, which reflect his representation by a lieutenant colonel, a major, and two captains, and the signature blocks on his brief before the court below, which reflects representation by a colonel and two captains.

### ISSUE XLVI

WHETHER THE GOVERNMENT'S ATTEMPT TO RECONSTRUCT DEFENSE COUNSEL'S OPENING STATEMENT REGARDING PRESENTENCING (APP. EXH. CL) DUE TO THE COURT REPORTER'S FAILURE TO RETURN FROM A RECESS BEFORE THE COURT RECONVENED WAS INSUFFICIENT TO SATISFY THE REQUIREMENT THAT THE RECORD BE VERBATIM.

We resolve this issue against appellant for the reasons set out by the court below. 34 MJ at 966–67.

### ISSUE XLVII

WHETHER THE MILITARY JUDGE IMPROPERLY DENIED A DEFENSE MOTION TO HAVE THE MEMBERS IGNORE A PORTION OF THE GOVERNMENT'S SENTENCING ARGUMENT REQUESTING THAT THE MEMBERS VINDICATE SOCIETY'S VICTIMS.

 Trial counsel argued during presentencing that "Americans, members of society, need to know that they will be protected and that we will protect and we will vindicate society's victims." Defense counsel objected to the reference to vindicating victims. The military judge overruled the objection.

We hold that the military judge correctly overruled the objection. The thrust of the defense argument was that general deterrence is irrelevant in a capital context. However, this Court has held that general deterrence is a relevant factor in sentencing. *United States v. Lania*, 9 MJ 100 (CMA 1980). To the extent that the argument also invoked retribution and vindication of wrongs, we hold that the argument was proper. *See Gregg v. Georgia*, 428 U.S. 153, 183–84, 96 S.Ct. 2909, 2929–30, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) (retribution and vindication of wrongs are permissible sentencing objectives).

### ISSUE XLVIII

WHETHER THE MILITARY JUDGE ERRED IN ALLOWING TRIAL COUNSEL TO QUESTION WITNESSES REGARDING APPELLANT'S REMORSE OR LACK THEREOF AND ARGUE THAT APPELLANT LACKED REMORSE AND COMPOUNDED THE ERROR BY INSTRUCTING THAT LACK OF REMORSE COULD BE CONSIDERED AS AN AGGRAVATING FACTOR. *CF. UNITED STATES V. EDWARDS*, 35 MJ 351 (CMA 1992); *LESKO V. LEHMAN*, 925 F.2d 1527 (3d Cir.), *CERT. DENIED*, 502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 226 (1991).

121. Contrary to the suggestion, implied through the citations in the assignment of error, trial counsel did not expressly or impliedly comment on appellant's silence at trial. The propriety of trial counsel's presentation of evidence regarding appellant's lack of remorse is resolved in our discussion of Issue III, subissue I, 41 MJ at 251 ¶ 45 and Issue IV, subissue H, 41 MJ at 259 ¶ 60.

### ISSUE XLIX

WHETHER APPELLANT WAS DENIED THE POTENTIAL MITIGATION THAT A GUILTY PLEA WOULD HAVE AFFORDED HIM.

This issue was resolved against appellant in *United States v. Dock*, 28 MJ 117, and *United States v. Matthews*, 16 MJ 354.

## ISSUE L

WHETHER THE PRESIDENT EX-CEEDED HIS AUTHORITY UNDER THE CONSTITUTION AND ARTICLE 36, UCMJ, IN PROMULGATING RULE FOR COURTS–MARTIAL 1004.

This issue was resolved against appellant in *United States v. Curtis*, 32 MJ 252, and *United States v. Matthews*, 16 MJ 354.

## ISSUE LI

WHETHER THE DEATH PENALTY PROVISION OF ARTICLE 118, UCMJ, IS UNCONSTITUTIONAL AS IT RE-LATED TO TRADITIONAL COMMON LAW CRIMES THAT OCCUR IN THE UNITED STATES IN TIME OF PEACE.

We resolve this issue against appellant for the reasons stated in the decision of the court below. 34 MJ at 967. *See United States v. Schafer*, 13 USCMA 83, 85–86, 32 CMR 83, 85–86 (1962).

## ISSUE LII

WHETHER ARTICLE 118 FAILS TO COMPLY WITH THE REQUIRE-MENTS OF *FURMAN V. GEORGIA*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), IN THAT CONGRESS HAS NOT ENACTED ANY CHANGE TO ARTI-CLE 118, UCMJ, WHICH WOULD SUF-FICIENTLY NARROW THAT CLASS OF INDIVIDUALS THAT WARRANT A DEATH SENTENCE.

122. We resolve this issue on the basis of our decisions in *United States v. Matthews*, 16 MJ 354, and *United States v. Curtis*, 32 MJ 252. In *Matthews*, we held that either the President or Congress could remedy the defects in military capital sentencing proce-dures. 16 MJ at 380. In *Curtis* we exam-ined the procedures promulgated by the President in RCM 1004 and found them con-sistent with the Eighth Amendment. 32 MJ at 257–69.

## ISSUE LIII

WHETHER APPELLANT'S DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT BECAUSE THE CAPI-TAL REFERRAL SYSTEM OPERATES IN AN ARBITRARY AND CAPRICIOUS MANNER VIOLATING THE EIGHTH AMENDMENT'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT.

[117] Appellant argues that the capital referral system is arbitrary and capricious because each convening authority has abso-lute discretion to refer a case as capital or non-capital if the case involves an offense for which death is an authorized punishment. We resolve this issue against appellant for the reasons set out by the Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Referring to prose-cutorial discretion to seek the death penalty or to plea bargain, the Supreme Court stat-ed:

[118] The existence of these discretion-ary stages is not determinative of the is-sues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman*, in contrast, dealt with the decision to impose the death sen-tence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. *Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offend-ers, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defen-dant.

428 U.S. at 199, 96 S.Ct. at 2937. A conven-ing authority exercises prosecutorial discre-tion by deciding, with the advice of his or her

SJA, whether a case will be prosecuted and whether the death penalty will be authorized for a capital offense. *See United States v. Baker,* 14 MJ 361, 365 (CMA 1983) ("[T]he decision to prosecute ... is made by a convening authority with advice from his staff judge advocate ...."), *overruled on other grounds, United States v. Teters,* 37 MJ 370, 376 (CMA 1993), *cert. denied,* — U.S. —, 114 S.Ct. 919, 127 L.Ed.2d 213 (1994). In the absence of evidence of arbitrary or discriminatory exercise of prosecutorial authority in this case, we hold that the Eighth Amendment was not violated by referring appellant's case as capital.

### ISSUE LIV

WHETHER THE IMPOSITION OF THE DEATH PENALTY VIOLATED APPELLANT'S RIGHT TO EQUAL PROTECTION UNDER THE FIFTH AMENDMENT BECAUSE RULE FOR COURTS–MARTIAL 1004 SUBJECTED APPELLANT, AS A MEMBER OF THE ARMED FORCES, TO A PENALTY WHICH IS NOT OTHERWISE AVAILABLE UNDER THE CRIMINAL CODE OF THE UNITED STATES FOR IDENTICAL CRIMINAL CONDUCT.

[119] 123. Appellant argues that congressional failure to amend the criminal code of the United States deprives him of equal protection because it subjects him to the death penalty solely because of his military status. We reject appellant's argument for several reasons.

First, *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), did not hold that the death penalty was unconstitutional, but only that the capital sentencing procedures violated the Eighth Amendment. Second, civilians are subject to the death sentence in state courts (such as those in Texas) if the state courts follow constitutionally acceptable procedures. Third, Congress authorized the death penalty for certain drug-related offenses, including murder, when it enacted the Anti–Drug Abuse Act of 1988, Title VII, 102 Stat. 4387, 21 USC § 848(e). Accordingly, we hold that appellant has not been deprived of equal protec-

tion of the laws by virtue of his status as a member of the armed forces.

### ISSUE LV

WHETHER THE AGGRAVATING FACTORS ENUMERATED IN RCM 1004(c)(7)(I) FAIL TO SUFFICIENTLY CLARIFY THE FACTORS INVOLVED OR NARROW THE CLASS OF PERSONS ELIGIBLE FOR THE DEATH PENALTY AND THE RULE IS THEREFORE INVALID UNDER THE FIFTH AND EIGHTH AMENDMENTS.

We resolve this issue against appellant for the reasons set out in our decision in *United States v. Curtis,* 32 MJ at 260–67.

### ISSUE LVI

WHETHER THE PEREMPTORY CHALLENGE PROCEDURE IN THE MILITARY JUSTICE SYSTEM, WHICH ALLOWS THE GOVERNMENT TO REMOVE ANY ONE JUROR WITHOUT CAUSE, CONSTITUTES AN UNCONSTITUTIONAL VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS IN CAPITAL CASES, WHERE THE PROSECUTOR IS FREE TO REMOVE A MEMBER WHOSE MORAL BIAS AGAINST THE DEATH PENALTY DOES NOT JUSTIFY A CHALLENGE FOR CAUSE.

We resolve this issue against appellant on both legal and factual grounds. RCM 912(g) specifically authorizes one peremptory challenge by the prosecution and one by the defense. The Supreme Court has refused to strike down the peremptory challenge process. *See Batson v. Kentucky,* 476 U.S. 79, 98–99, 106 S.Ct. 1712, 1724, 90 L.Ed.2d 69 (1986) ("While we recognize ... that the peremptory challenge occupies an important position in our trial procedures, we do not agree that our decision today will undermine the contribution the challenge generally makes to the administration of justice."); 476 U.S. at 107, 106 S.Ct. at 1729 (Marshall, J., concurring) ("I would not find [banning prosecution peremptories entirely] an acceptable solution."); 476 U.S. at 133, 106 S.Ct. at 1742

(Burger, C.J., dissenting) ("An institution like the peremptory challenge that is part of the fabric of our jury system should not be casually cast aside...."); 476 U.S. at 137, 106 S.Ct. at 1744 (Rehnquist, J., dissenting) (peremptory challenge "has been described as 'a necessary part of trial by jury'").

124. As a matter of law, trial counsel would be entitled to challenge for cause a member who was likely, because of moral bias against the death penalty, to be unable "to give meaningful consideration to imposing a death penalty." *United States v. Curtis*, 33 MJ at 107, *citing Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). There is no legal impediment to trial counsel's challenging peremptorily a member who would be subject to challenge for cause.

Factually, appellant's contention is unsupported by the record. The prosecution exercised its peremptory challenge against Lieutenant Colonel Griffith, who indicated on *voir dire* that he could vote for the death penalty if the crime warranted it.

## ISSUE LVII

WHETHER DUE PROCESS REQUIRES THAT TRIAL AND INTERMEDIATE APPELLATE JUDGES IN A PEACETIME MILITARY DEATH PENALTY CASE HAVE THE PROTECTION OF A FIXED TERM OF OFFICE.

We resolve this issue against appellant for the reasons set out in *United States v. Graf*, 35 M.J. 450 (CMA 1992), *cert. denied,* — U.S. —, 114 S.Ct. 917, 127 L.Ed.2d 206 (1994).

## ISSUE LVIII

WHETHER THE SYSTEM WHEREBY THE JUDGE ADVOCATE GENERAL OF THE ARMY APPOINTS TRIAL AND APPELLATE JUDGES TO SERVE AT HIS PLEASURE IS UNCONSTITUTIONAL AS IT VIOLATES THE APPOINTMENTS CLAUSE OF THE CONSTITUTION. U.S. CONST. ART II, § 2, ¶ 2, CL. 2; *FREYTAG V. COMMISSIONER OF INTERNAL REVENUE*, 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). *BUT SEE UNITED STATES V. WEISS*, 36 MJ 224 (CMA 1992).

This issue was resolved against appellant in *Weiss v. United States*, — U.S. —, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994).

## ISSUE LIX

WHETHER ARTICLE 142(B)(2)'S LIMITATION OF COURT OF MILITARY APPEALS JUDGES TO TERMS OF OFFICE OF FIFTEEN YEARS VIOLATES ARTICLE III, SECTION 1, U.S. CONSTITUTION, WHICH GUARANTEES LIFE TERM OF OFFICE TO JUDGES OF INFERIOR COURTS AS THE CONGRESS MAY ESTABLISH.

We resolve this issue against appellant for the reasons set out in *Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973), and *United States v. Matthews*, 16 MJ at 365.

## ISSUE LX

WHETHER APPELLANT HAS BEEN DENIED EQUAL PROTECTION OF THE LAWS IN VIOLATION OF THE FIFTH AMENDMENT IN THAT ALL CIVILIANS IN THE UNITED STATES ARE AFFORDED THE OPPORTUNITY TO HAVE THEIR CASES REVIEWED BY AN ARTICLE III COURT, BUT MEMBERS OF THE UNITED STATES MILITARY BY VIRTUE OF THEIR STATUS AS SERVICEMEMBERS ARE NOT.

125. We reject appellant's argument on several grounds. First, in *Palmore v. United States, supra,* the Supreme Court recognized the authority of Congress to provide for criminal trials and criminal appeals in the District of Columbia before judges of Article I courts who do not have life tenure and salary. Second, in *Palmore*, the Supreme Court also recognized that state court judges also do not enjoy life tenure and salary. Finally, this appellant is entitled under Arti-

**296**

cle 67a, UCMJ, 10 USC § 867a, to seek review by an Article III court—the Supreme Court.

## ISSUE LXI

WHETHER THIS COURT LACKS THE JURISDICTION AND THE AUTHORITY TO REVIEW THE CONSTITUTIONALITY OF THE RULES FOR COURTS-MARTIAL AND THE UNIFORM CODE OF MILITARY JUSTICE BECAUSE THIS COURT IS AN ARTICLE I COURT, NOT AN ARTICLE III COURT WHICH HAS THE POWER OF CHECKING CONGRESS AND THE EXECUTIVE BRANCHES UNDER *MARBURY V. MADISON*, 5 U.S. (1 CRANCH) 137, 2 L.Ed. 60 (1803). *SEE ALSO COOPER V. AARON*, 358 U.S. 1, 18, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5 (1958) (THE POWER TO STRIKE DOWN UNCONSTITUTIONAL STATUTES OR EXECUTIVE ORDERS IS THE EXCLUSIVE CHECK OF THE ARTICLE III JUDICIARY.).

We resolved this issue against appellant in *United States v. Matthews*, 16 MJ at 364–68.

## ISSUE LXII

WHETHER MILITARY DUE PROCESS AND FUNDAMENTAL NOTIONS OF FAIRNESS REQUIRE THAT EACH MEMBER OF THE COURT–MARTIAL SIGN HIS OR HER NAME TO THE DEATH–SENTENCE WORKSHEET OR THAT THE CONDEMNED ACCUSED BE AFFORDED THE RIGHT AND OPPORTUNITY TO POLL THE MEMBERS. *SEE UNITED STATES V. CURTIS (CURTIS II )*, 33 MJ at 110 (COX, J., CONCURRING). *BUT SEE* RCM 922(e).

 RCM 922(e) prohibits polling members about their vote on findings; RCM 1007(c) prohibits polling about the sentence. The drafters believed that polling would be contrary to Article 39(b), UCMJ, 10 USC § 839(b), and 51(a), UCMJ, 10 USC § 851(a), which protect the secrecy of deliberations and provide for voting by secret written ballot. Drafter's Analysis of RCM 922(e) and 1007(c), Manual, *supra* at A21–61 and A21–68.1 (Change 2). Where a less than unani-

mous vote is involved, we share the concerns of the drafters about potential command influence on junior members who would be compelled to reveal their votes if polling were permitted. Where the vote is unanimous, those concerns about command influence would appear to be unfounded.

In appellant's case, defense counsel did not ask to poll the members on either findings or sentence. Therefore, we hold that any issue regarding polling the members was waived.

## ISSUE LXIII

WHETHER THE ROLE OF THE CONVENING AUTHORITY IN THE MILITARY JUSTICE SYSTEM DENIED APPELLANT A FAIR AND IMPARTIAL TRIAL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS AND ARTICLE 55, UCMJ, BY ALLOWING THE CONVENING AUTHORITY TO ACT AS A GRAND JURY IN REFERRING CRIMINAL CASES (CAPITAL CASES) TO TRIAL, PERSONALLY APPOINTING JURORS OF HIS CHOICE, HOLDING THE ULTIMATE LAW ENFORCEMENT FUNCTION WITHIN HIS COMMAND, AND ACTING AS THE FIRST LEVEL OF APPEAL, THUS CREATING AN APPEARANCE OF IMPROPRIETY IN A PERCEPTION THAT HE ACTS AS PROSECUTOR, JUDGE, AND JURY. *SEE UNITED STATES V. JOBSON*, 31 MJ 117 (CMA 1990) (COURTS–MARTIAL SHOULD BE "FREE FROM SUBSTANTIAL DOUBT AS TO LEGALITY, FAIRNESS, AND IMPARTIALITY.").

126. Appellant makes a broad-based attack on virtually every aspect of the convening authority's role without briefing the issue. Final Brief at 423. We will briefly address each aspect of his attack.

### A. Grand Jury

The Fifth Amendment expressly excludes "cases arising in the land or naval forces" from the requirement for indictment by grand jury. Nevertheless, Article 32, UCMJ, 10 USC § 832, was intended to pro-

vide a substitute for the grand jury. In many respects, Article 32 confers rights on an accused which are denied a civilian before a grand jury. For example, an accused is entitled to appear at the Article 32 hearing, have appointed counsel, cross-examine the witnesses against him, examine the evidence against him, and present matters in defense, extenuation, or mitigation if he desires. See Art. 32(b); RCM 405(f). Contrary to appellant's assertion, the Article 32 investigating officer, not the convening authority, acts as a "grand jury."

### B. Appointment of Court Members

The convening authority appoints officers, and if requested by the accused, enlisted persons "who in the opinion of the convening authority are best qualified for the duty by reason of their age, education, training, experience, length of service, and judicial temperament." See RCM 502(a)(1); Art. 25(d)(2), UCMJ, 10 USC § 825(d)(2). As discussed in our resolution of Issues XXXI and XXXII, 41 MJ at 286 ¶ 111, any attempts at court stacking are grounds for reversal of the conviction or sentence. Article 37(a) prohibits any attempts to influence the court members, and Article 98, UCMJ, 10 USC § 898, makes it a criminal offense to do so.

### C. Law Enforcement Authority

[123] Although he or she is responsible as commander for maintaining discipline within the command, a convening authority who attempts to influence a court-martial is criminally liable, as noted above. In addition, any attempt to intimidate or dissuade witnesses from testifying, influence court members, influence the recommendations of subordinates regarding disposition of charges, or to chill a vigorous defense, will furnish grounds for reversal of the findings and sentence. See, e.g., United States v. Thomas, 22 MJ 388 (CMA 1986), cert. denied, 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987).

### D. First Level of Appeal

127. The action of the convening authority is more accurately described as a review rather than an appeal. "The convening authority is not required to review a case for

... legal sufficiency." RCM 1107(b). The process is a "one-way street" for an accused because the convening authority may set aside a conviction or reduce a sentence for any reason, but may not direct reconsideration of an acquittal or increase the sentence. Art. 60(e)(2), UCMJ, 10 USC § 860(e)(2) (1983); RCM 1107.

### E. Conclusion

The military justice system has withstood Constitutional attack on several occasions, most recently in Weiss v. United States, —— U.S. ——, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994), and Solorio v. United States, 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987). Appellant has provided no legal basis for his broad based attack on the convening authority's role in the system, and we reject it for the reasons stated above.

### ISSUE LXIV

WHETHER THE CAPITAL SENTENCING PROCEDURE IN THE MILITARY IS UNCONSTITUTIONAL BECAUSE THE MILITARY JUDGE DOES NOT HAVE THE POWER TO ADJUST OR SUSPEND A SENTENCE OF DEATH THAT IS IMPROPERLY IMPOSED.

 We resolve this issue against appellant for the following reasons. First, although a military judge may not adjust or suspend a sentence, he may declare a mistrial under RCM 915. Second, the convening authority may set aside or reduce the sentence for any reason. RCM 1107(d)(1) and 1108(b). Third, the Court of Military Review, exercising its plenary de novo review authority pursuant to Article 66(c), may set aside an unlawful sentence or reduce a sentence it deems inappropriate. See RCM 1203.

### ISSUE LXV

WHETHER COURT–MARTIAL ORDER NO. 19 IS DEFECTIVE IN THAT THE DATE FOR CHARGE II AND ITS SPECIFICATION (VIOLATION OF ARTICLE 80, UCMJ, 10 USC § 880 ATTEMPTED MURDER) IS INCORRECT

AND SHOULD INSTEAD REFLECT 13 DECEMBER 1988 AS THE DATE OF THE OFFENSE, FOR MR. HARRISON DID NOT PICK UP APPELLANT AND MS. PESSINA FROM THE NUBIA TEMPLE UNTIL 1 A.M. ON THE 13TH (R. 929.)

We decline to act on this issue which asserts no legal error. *See* R. 1426.

### ISSUE LXVI

WHETHER APPELLANT, AN INDIGENT ACCUSED, WAS DENIED EQUAL PROTECTION OF THE LAWS AND A FAIR TRIAL AS MANDATED BY THE FIFTH AMENDMENT WHEN HE WAS REFUSED AN EXPERT OF HIS OWN CHOOSING, DR. WISE, TO ASSIST HIM IN HIS DEFENSE FOR PURPOSES OF MEDICAL ANALYSIS, JURY SELECTION AND SENTENCING, WHILE THE GOVERNMENT WAS ABLE TO FORUM SHOP FOR ITS OWN FORENSIC EXPERTS THAT IT WANTED. *SEE AKE V. OKLAHOMA,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); *GRIFFIN V. ILLINOIS,* 351 U.S. 12, 17–18, 76 S.Ct. 585, 589–90, 100 L.Ed. 891 (1956); *CALDWELL V. MISSISSIPPI,* 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985); AND *WYGANT V. JACKSON BOARD OF EDUCATION,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986).

We resolve this issue against appellant for the reasons set out in our disposition of Issue II, 41 MJ at 240–41 ¶¶ 21–23.

### ISSUE LXVII

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN HE REFUSED TO ALLOW TRIAL DEFENSE COUNSEL TO STIPULATE TO THE ROBBERIES TO FORCE THE GOVERNMENT TO MAKE THEIR ELECTION PRETRIAL ON WHICH CHARGES THEY WOULD PRESENT TO THE PANEL. *SEE UNITED STATES V. DOCK,* 28 MJ 117, 118 (CMA 1989) (ACCEPTABLE PRACTICE IN CAPITAL CASE TO STIPULATE TO LESSER INCLUDED OFFENSES); *UNITED STATES V. MOBLEY,* 28 MJ 1024 (AFCMR 1989), *REMANDED,* 31 MJ 273 (CMA 1990), *AFF'D,* 36 MJ 34 (CMA 1992).

[125] 128. Appellant suggested a stipulation to the robbery offenses, but trial counsel refused to stipulate. A stipulation may not be received unless all parties agree to its admission. RCM 811(c). Since trial counsel did not desire to stipulate, the military judge could not require him to do so. We hold that the military judge did not abuse his discretion.

### ISSUE LXVIII

WHETHER THE SYSTEM OF APPOINTING CAPITAL DEFENSE COUNSEL IN THE MILITARY IS INADEQUATE TO SERVE THE NEEDS OF A DEATH SENTENCED ACCUSED SUCH AS APPELLANT IN THAT THE MILITARY SYSTEM CANNOT PROVIDE ADEQUATE CONTINUITY OF COUNSEL OR ENSURE CONFLICT FREE COUNSEL AS IS EVIDENCED IN THIS CASE.

In a broad-based attack on the manner in which military counsel are appointed for both trial and appeal, appellant asserts multiple problems relating to the workload and experience of counsel, continuity problems caused by reassignments and departures from active duty, and potential conflicts of interest.

Turning first to appellant's counsel at the court-martial, we held with respect to Issues II, 41 MJ at 239–41 ¶¶ 19–23; and III, 41 MJ at 241–52 ¶¶ 24–47, that appellant was competently represented. With respect to the experience level of trial defense counsel, we note the recitals of each defense counsel on the record at the beginning of *voir dire.*

At the time of appellant's court-martial, Major Hayden, individual military counsel, had been on active duty as an officer over 12 years. He had been a lawyer for over 4 years, had spent 3 years as a prosecutor, had spent 1 year in graduate-level legal edu-

cation, and was currently serving as senior defense counsel at Fort Hood.

129. Captain Ibbotson had served "several years" as a field artillery officer, had previously served as a prosecutor at Fort Bragg, North Carolina, and was currently serving as the senior defense counsel for the 1st Cavalry Division at Fort Hood.

CPT Smart had engaged in the civilian practice of law, joined the Army Judge Advocate General's Corps in January, 1988, and had been serving as a defense counsel for about 8 months.

Turning to the appellate counsel in this case, we note that appellant was represented by four military counsel before the Court of Military Review, including Colonel Robert B. Kirby. 34 MJ at 958. COL Kirby had previous experience in appellate litigation of capital cases, having been one of the appellate counsel in *United States v. Murphy*, 30 MJ at 1045. Before this Court appellant was represented by four military counsel, including a major and a lieutenant colonel. *See* Issue XLV, 41 MJ at 292 ¶ 120. We accept as common knowledge the fact that a lieutenant colonel in the Judge Advocate General's Corps will have been admitted to practice and have litigation experience in excess of the minimums prescribed by the ABA Guidelines. *See* Issue LXX, 41 MJ at 300 ¶¶ 131–33.

To the extent that appellate counsel have lacked experience or suffered from lack of continuity, the impact has been on the efficiency of judicial administration rather than the quality of representation. Appellant's court-martial concluded on April 3, 1989. The case was argued before the Court of Military Review on December 9, 1991, and that Court issued its initial decision on February 3, 1992. 34 MJ 956. *See* decision denying petition for reconsideration on April 15, 1992. 34 MJ 1065. Oral argument before this Court was on September 30, 1993, almost 4½ years after the trial and almost 18 months since the final decision of the Court of Military Review.

130. Recognizing the potential inefficiencies noted above, both the court below and this Court have liberally granted extensions of time and allowed filing of supplemental pleadings and citations of authority even after oral argument. This Court has considered issues not raised before the court below. Although we have declined to apply the principle of *in favorem vitae* (Issue VI, 41 MJ at 266 ¶ 74), we have accommodated counsel to the maximum extent possible to ensure that all issues are considered. Defense appellate counsel concede that their pleadings have been voluminous, with overlapping and redundant assignments of error. Final Brief at 436 n. 152. We are satisfied that every conceivable legal and factual issue has been raised and briefed.

Turning to appellant's argument regarding potential conflicts of interest, we note that appellant concedes that potential conflicts of interest by appellate counsel were resolved in his case before they ripened into actual conflicts of interest. Appellant has alleged no conflicts of interest among trial defense counsel, and we have found none. On the basis of the record before us, we hold that appellant has been afforded conflict-free counsel.

### ISSUE LXIX

WHETHER APPELLATE DEFENSE COUNSEL AT THE ARMY COURT WERE INEFFECTIVE AND DENIED APPELLANT HIS RIGHT TO COMPETENT COUNSEL UNDER THE SIXTH AMENDMENT WHEN EACH FAILED TO DO AN ADEQUATE INVESTIGATION AND FAILED TO RAISE A GREAT NUMBER OF VIABLE ISSUES IN THIS CASE.

131. Appellate counsel raised this same issue unsuccessfully before the Court of Military Review. As they did before the court below, they have not identified in what particulars the investigation was inadequate or what additional issues should have been raised. Implied in this assertion is a claim that appellate counsel cannot, because of their inexpertise, identify what else they should have done.

We find this assertion of ineffectiveness unsupported by the record and the contrary well established. The purpose of appellate

review is not to retry the case, but to review the trial for compliance with the law. Nevertheless, under the umbrella of an exhaustive assignment of errors, appellate counsel have virtually relitigated the entire case. As we noted in our discussion of Issue LXVIII, 41 MJ at 299 ¶ 130, counsel have raised, albeit sometimes redundantly and sometimes belatedly, an exhaustive array of factual, evidentiary, procedural, and constitutional issues.

## ISSUE LXX

WHETHER DUE PROCESS REQUIRES THAT THIS COURT ESTABLISH MINIMUM STANDARDS FOR TRIAL AND APPELLATE DEFENSE COUNSEL IN CAPITAL CASES.

 Appellant advocates that this Court mandate compliance with the *American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (ABA Guidelines) (Feb.1989). We decline to do so. Those Guidelines expressly provide "for such exceptions to the Guidelines as may be appropriate in the military." ABA Guidelines, Introduction at ii. The Guidelines further recognize that the limited resources and the general experience level of an office might require modification of the qualifications, stating as follows:

> For example, the resources and experience of the office might justify allowing an otherwise qualified attorney within that office to act as lead counsel after somewhat less than five years of personal litigation experience (Guideline 5.1.1.A(ii)) but could not justify allowing an attorney within that office to act as death penalty counsel after only minimal personal criminal litigation experience.

Commentary, Guideline 5.1 at 63. As we noted in our discussion of Issue LXVIII, 41 MJ at 298–99 ¶¶ 128–30, appellant was provided with two seasoned trial lawyers at his court-martial and several experienced appellate lawyers before the Court of Military Review and this Court.

132. Appellate defense counsel have repeatedly invited this Court to involve itself in the internal personnel management of the military services, and we have repeatedly declined the invitation. *See United States v. Weiss,* 36 MJ 224 (CMA 1992), *aff'd,* —— U.S. ——, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994) (appointment of military judges); *United States v. Graf,* 35 MJ 450 (CMA 1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 917, 127 L.Ed.2d 206 (1994) (*aff'd sub nom. Weiss v. United States,* —— U.S. at —— – ——, 114 S.Ct. at 760–63)) (terms of office for military judges); *United States v. Mitchell,* 39 MJ 131 (CMA), *cert. denied,* —— U.S. ——, 115 S.Ct. 200, 130 L.Ed.2d 131 (1994) (officer-fitness reports for appellate military judges).

The Supreme Court has held that limited experience does not raise a presumption of ineffectiveness. *United States v. Cronic,* 466 U.S. 648, 665, 104 S.Ct. 2039, 2050, 80 L.Ed.2d 657 (1984). The quality of representation compelled by the Constitution is determined by reference to *Strickland v. Washington, supra.* In our resolution of Issue II, 41 MJ at 239–41 ¶¶ 19–23; and Issue III, 41 MJ at 241–52 ¶¶ 24–47, we have determined that the constitutional standard was met at the trial level in this case.

133. For the foregoing reasons, we decline to mandate minimum standards based on years of practice or numbers of cases tried. We hold that appellant was represented with a degree of competence well above the constitutional minimums at his court-martial, before the Court of Military Review, and before this Court. Accordingly, we further hold that appellant has not been denied due process by the absence of formal standards for trial and appellate defense counsel.

## DECISION

The decision of the United States Army Court of Military Review (34 MJ 956, *recon. denied,* 34 MJ 1065) is affirmed.

Judges COX and CRAWFORD concur.

## APPENDIX

```
U N I T E D S T A T E S )
 )
 vs )
 ) SENTENCE WORKSHEET
LOVING, DWIGHT J. )
PV1, US Army )
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 )
B Btry, 1st Bn, 82nd FA )
1st Cavalry Division )
Fort Hood, Texas 76545-5126 )
```

### AGGRAVATING FACTORS

NOTE: If the court adjudges a death sentence, the President shall indicate which aggravating factor(s) have been proven, and strike out any not proven. If a death sentence is not adjudged, the aggravating factors portion of this document should be nullified by marking a large "X" across it.

### PART A

### AGGRAVATING FACTORS

Private E-1 Dwight J. Loving, this court-martial unanimously finds, beyond a reasonable doubt, that the following aggravating factor(s) (has)(have) been proven:

 YES NO

1. ( X ) ( ) The premeditated murder of Bobby Gene
 Sharbino was committed while the accused
 was engaged in the commission or attempted
 commission of a robbery.

2. ( X ) ( ) Having been found guilty of the felony
 murder of Christopher Fay as set forth in
 specification 3 of Charge I, the accused
 was the actual perpetrator of the killing.

3. ( X ) ( ) Having been found guilty of premeditated
 murder of Bobby Gene Sharbino, the accused
 was also found guilty of another violation
 of Article 118, UCMJ, in the same case.

(If the court-martial fails to find unanimously that at least one of the aggravating factors exist, you may not adjudge a sentence of death.)

Page 1 of 2 pages

APPELLATE EX CXL

## PART B

### BALANCING OF AGGRAVATING *AND EXTENUATING* AND MITIGATING FACTORS

Announce: The court-martial unanimously finds any extenuating and mitigating circumstances are substantially outweighed by any aggravating circumstances, including the factor(s) found as indicated in PART A.

Yes ___X ass___ No _____

(If the court-martial fails to unanimously find that any extenuating and mitigating circumstances are substantially outweighed by any aggravating circumstances, including the factor(s) found as indicated in PART A, then you may not adjudge a sentence of death.)

### PART C

### SENTENCE

NOTE: After the court has reached a sentence, the President shall circle the punishment(s) selected and accomplish any necessary filling in or crossing out within the punishment(s) selected.

Private E-1 Dwight J. Loving, this court-martial sentences you:

### FORFEITURES

To forfeit #_____ pay per month for _____ months.

To forfeit all pay and allowances ℓ⅃⅍

### CONFINEMENT

To be confined for your natural life.

### PUNITIVE DISCHARGE

~~To be discharged from~~ the service with a (bad conduct discharge) (dishonorable discharge).

### DEATH

To be put to death.

Note: A court-martial has no authority to suspend a sentence or any part of a sentence.

_____
(Signature of President)

Page 2 of 2 pages

SULLIVAN, Chief Judge (concurring in part and in the result):

134. I agree with the majority opinion on all of the issues in this case except Issues XXXI and XXXII. I concur, however, in the result on those issues. Before discussing them, however, I think some further comment on Issue I is warranted.

### ISSUE I

WHETHER APPELLANT'S SENTENCE OF DEATH MUST BE SET ASIDE AND ONLY A LIFE SENTENCE AFFIRMED BECAUSE THE PANEL MEMBERS FOLLOWED IMPROPER VOTING PROCEDURES DURING THE SENTENCING DELIBERATIONS.

Appellant uses affidavits from three members of his court-martial to raise concern whether his panel disregarded the military judge's instructions for imposing a sentence. *See United States v. Bourchier*, 5 USCMA 15, 26–27, 17 CMR 15, 26–27 (1954); *United States v. Higdon*, 2 MJ 445, 455 (ACMR 1975). I note that several state courts have recently considered the propriety of raising such an issue by means of post-trial questioning of jurors and have resolved it against defendants, even in capital cases. *People v. Towns*, 157 Ill.2d 90, 191 Ill.Dec. 24, 35–36, 623 N.E.2d 269, 279–80 (1993); *Colvin-el v. State*, 332 Md. 144, 630 A.2d 725, 745 (1993); *Johnson v. State*, 593 So.2d 206, 210 (Fla. 1992); *People v. Morris*, 53 Cal.3d 152, 279 Cal.Rptr. 720, 807 P.2d 949, 997–98 (1991); *State v. Russell*, 733 P.2d 162, 164 (Utah 1987). While one of those jurisdictions might approve such a practice, even it recognizes that Fed.R.Evid. 606(b) does not allow impeachment of a verdict on this basis. *See People v. Perez*, 4 Cal.App. 4th 893, 908 n. 13, 6 Cal.Rptr.2d 141, 149 n. 13 (4th Dist. Div. 1 1992). As noted by the majority, Mil.R.Evid. 606(b), Manual for Courts–Martial, United States, 1984, is based on Fed.R.Evid. 606(b).

The critical question thus becomes whether these juror affidavits establish that influence of rank was employed in the deliberations to achieve imposition of the death sentence. *See* Mil.R.Evid. 606(b). I think not

for several reasons. *First*, these affidavits were solicited by appellate defense counsel on the general procedures followed in deliberations. They were not instigated by any member complaining of unlawful influence of rank. *Second*, none of these affidavits expressly alleged unlawful influence of rank by the court-martial president. *Third*, despite Judge Wiss' argument to the contrary (¶ 155), none of the affidavits reasonably implied use of rank by the president to impose sentence-deliberation rules new or different from those given by the judge. In light of the role of the president of a court-martial, Judge Wiss' argument could be made in any case where a member says sentencing instructions were not followed in deliberations. The bottom line is that the Mil.R.Evid. 606(b) exception has not been shown to be applicable in this case.

### Issue XXXI

The above issue states:

WHETHER THE CONVENING AUTHORITY WAS RACIALLY BIASED AGAINST APPELLANT AS SEEN BY HIS INSISTENCE ON HAVING RACIAL IDENTIFIERS IN THE JURY POOL SELECTION SHEETS, THE DISPROPORTIONATE PERCENTAGE OF BLACKS IN THE JURY POOL AS COMPARED TO THE POPULATION OF BLACKS AT FORT HOOD, AND THE ACTIONS TAKEN BY THE CONVENING AUTHORITY AFTER HE PICKED AN ALL WHITE JURY IN A BLACK–ON–WHITE CRIME WHERE APPELLANT IS BLACK.

### Appellant's Claim

135. Appellant in his brief complains that the judge improperly ignored "the specter of racism" raised in this case with respect to the convening authority's selection of soldiers to sit as members of his court-martial. Final Brief at 336. He generally references the decision of this Court in *United States v. Smith*, 27 MJ 242 (1988). He then asks that this case be remanded for a hearing so the convening authority can explain his purpose in using racial identifiers in the member

selection process. He again refers to decisions of this Court in *United States v. Du-Bay,* 17 USCMA 147, 37 CMR 411 (1967); *United States v. Moore,* 28 MJ 366 (1989); and *United States v. Santiago–Davila,* 26 MJ 380 (1988).

### Legal Nature of Appellant's Claim

My starting point in addressing Issue XXXI is its particular wording. Unlike Issue XXXII, it does not assert that the convening authority purposefully excluded a cognizable group (blacks) from sitting on appellant's court-martial in violation of the Fifth and Sixth Amendments to the Constitution. Instead, it asserts that certain conduct by the convening authority evidenced racism on his part and appellant's brief further asserts that *the military judge erred by not calling him into court to provide an explanation for this conduct.* The asserted legal basis for this judicial error is our summary decisions on use of racial identifiers in the military justice system (*e.g., United States v. Brannon,* 33 MJ 179 (CMA 1991). *See generally United States v. Green,* 37 MJ 380 (CMA 1993)) and Supreme Court cases applying the Due Process Clause of the Fifth Amendment or the Fourteenth Amendment's Equal Protection Clause to prohibit purposeful exclusion of minority persons from grand and petit juries. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). *See generally United States v. Greene,* 36 MJ 274 (CMA 1993).

### Elements of Appellant's Claim

136. Appellant cites no test from our case law which determines when a convening authority must be called as a witness to explain his member selection process and decisions. *Cf. United States v. Moore, supra* (trial counsel's use of peremptory challenges). Instead appellant heavily relies on the Supreme Court decision in *Hernandez v. Texas, supra,* to argue that the convening authority should have been called as a witness by the judge in this case. He asserts that *Hernandez* requires the prosecution to produce evidence providing a race-neutral explanation for jury selection procedures when a prima facie case of racial discrimination has been established. He further asserts that a *prima facie* case is made when

> *first,* ... the accused is in a recognizable group, *second,* ... there is statistical underrepresentation in the jury pool, and *third,* ... this discrimination is due to either intentional acts or a system which is by its very nature susceptible to potential abuse by intentional acts. *See also Castaneda,* 430 U.S. at 494 [97 S.Ct. at 1280]; *Batson,* 476 U.S. at 79 [106 S.Ct. at 1713].

Final Brief at 333.

In this case, it was well established at trial that appellant was black and blacks are "a recognizable group" within the meaning of *Hernandez v. Texas* and *Castaneda v. Partida,* both *supra. See Batson v. Kentucky, supra; Whitus v. Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). Accordingly, at issue, are the remaining two prongs of appellant's *Hernandez/Castaneda* test for establishing a *prima facie* case of purposeful discrimination under the Fifth Amendment. *See generally Ramseur v. Beyer,* 983 F.2d 1215, 1226–27 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993).

### System Susceptible to Intentional Abuse

137. The first question I will address is whether the convening authority's use of racial identifiers in the member selection process satisfied the third requirement of *Castaneda v. Partida, supra.* In other words, did evidence of that fact show a system susceptible to abuse by intentional acts of discrimination? As pointed out in the majority opinion (41 MJ at 285 ¶ 108), the convening authority in the military justice system "is not required to be race-ignorant: he or she is only required to be race-neutral." *United States v. Green,* 37 MJ at 384. Former Chief Judge Everett in *United States v. Smith,* 27 MJ at 249, went further and opined for this Court that racial identifiers could be used by a convening authority to ensure that a "court-martial panel is representative of the

military population." *See Ramseur v. Beyer,* 983 F.2d at 1228–29. Thus, the mere fact that racial identifiers were used by the convening authority or his subordinates in this unique military context did not itself show intentional discrimination. *United States v. Green,* 37 MJ at 384 ("The standards of proof and burdens of proof are set out in RCM 905(c)(1) and (2)."). *Cf. United States v. Greene,* 36 MJ at 278 (footnote omitted) ("principles of *Batson* apply to peremptory challenges ... at courts-martial"). Nevertheless, use of racial identifiers on the jury pool selection sheets coupled with the broad discretion afforded a convening authority in selecting court-martial panels clearly constitute a system which by its very nature is susceptible to abuse by intentional acts of discrimination. *See Castaneda v. Partida,* 430 U.S. at 497–98, 97 S.Ct. at 1281–82; *United States v. Smith,* 27 MJ at 249; *Ramseur v. Beyer,* 983 F.2d at 1227; *Johnson v. Puckett,* 929 F.2d 1067, 1072 (5th Cir.), *cert. denied,* 502 U.S. 898, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991).

### Substantial Underrepresentation

138. The next question which I will address concerns the second prong of appellant's *Hernandez–Castaneda* test, *i.e.,* whether a statistical underrepresentation was shown. Appellant in this issue asserts that "the disproportionate percentage of blacks in the jury pool as compared to the population of blacks at Fort Hood" indicates that the convening authority was racially biased. Final Brief at 332. His assigned issue, albeit indirectly, suggests that the relevant jury pool is the panel actually detailed by the

convening authority to sit in this case, rather than the jury pool selection sheets from which this panel was taken.[1] In any event, appellant has not persuaded me that blacks were "substantially" underrepresented *either* in the jury pool selection sheets or in the panels actually detailed by the convening authority to sit in this case.

### Statistics

As a starting point, I note that the convening authority issued four orders detailing members to appellant's court-martial. Court–Martial Convening Order (CMCO) 1 had 9 officers or 5 officers and 4 enlisted members detailed, one of whom was black (11.1%). CMCO # 4 was subsequently issued which had 12 officer members detailed, none of whom were black (0.0%). CMCO # 7 had 7 officers and 6 enlisted members, 4 of the enlisted being black (30.8%). Finally, CMCO # 8 detailed 12 officer members, 1 of whom was black (8.3%).

I also note that the record evidences several jury pool selection sheets used in this case. The selection sheets for CMCO # 1 reflect 62 officers (13 blacks and 4 other) and 41 enlisted (13 blacks and 1 other). Appellate Exhibit (App. Ex.) LII at 9–15. The selection sheets for CMCO # 4, composed only of officers, included 45 officers, 4 of whom were black (8.9%). App. Ex. XLI at 18–20. The selection sheets for CMCO # 7 consisted of 282 enlisted persons and 45 officers, 327 persons total, 97 of whom were black (29.7%). App. Ex. XLVII at 3–14. Finally the selection sheets for CMCO # 8, composed only of officers, was the same as that used for CMCO # 4 (8.9% black). Defense statistics

---

1. Appellant in his brief (at 334) suggests that the pool of members from which the all-white officer panel was designated by the convening authority was the 45 officers listed on the panel selection sheets submitted by the staff judge advocate to the convening authority. (R. 243) This so-called jury pool, as identified by appellant, has neither a statutory nor a regulatory origin. Pursuant to Article 25(a), Uniform Code of Military Justice, 10 USC § 825(a), all officers, commissioned and warrant, were eligible to serve on appellant's court-martial. Although the staff judge advocate submitted a roster of 45 officers, the decision paper to the convening authority expressly informed the convening authority that he was not

limited to the list and could designate any officer under his command in accordance with Article 25. As such, the "pool" of potential members could be the entire officer populations on Forts Hood and Sill. The officers detailed by the convening authority pursuant to written court-martial convening orders, RCM 504(d), Manual for Courts–Martial, United States, 1984, are equivalent to the civilian venire from which peremptory challenges and challenges for cause are made. A more appropriate statistical analysis would compare the percentage of black officers in the entire officer populations with the percentage of black officers detailed to serve on the court-martial.

show that 37,998 officers and enlisted were at Fort Hood and 11,982 were black (31.5%). They also show that 425 of 2932 officers at Fort Hood were black (14.5%). App. Ex. XLI at 63.

## Analysis

139. I find appellant's statistical argument on Issue XXXI to be unpersuasive for several reasons. Initially, however, I must note that it is couched in terms of his purported Sixth Amendment right to a jury panel drawn from a representative cross-section of the population. However, as noted by former Chief Judge Everett, "No corresponding right exists in a court-martial; and, indeed, Article 25 of the Uniform Code of Military Justice, 10 USC § 825, contemplates that a court-martial panel will not be a representative cross-section of the military population." *United States v. Santiago–Davila*, 26 MJ at 389. I reject appellant's implied invitation to declare Article 25 unconstitutional.

In any event, this Court has held that a military accused does have a Fifth Amendment "equal protection right to be tried by a [panel] from which no 'cognizable racial group' has been [purposefully] excluded." 26 MJ at 389–90. *See United States v. Moore*, 28 MJ 366 (CMA 1989); *cf.: United States v. Smith*, 27 MJ at 249. Moreover, appellant has cited equal protection cases (applicable to the U.S. through the Due Process Clause of the Fifth Amendment, *see Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954)) at trial and on this appeal. *See Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). Finally, the thrust of appellant's argument is that purposeful discrimination, not a denial of cross-representation, was evi-

denced in this case. In this regard, he asserts:

> The statistics show that anywhere from 15–30% of soldiers on Fort Hood were black (App. Exh. XLI), but the cross sectional pool from which the convening authority chose was only 9% black.

Final Brief at 334. Accordingly, I will construe appellant's statistical argument as a Fifth Amendment claim that the military judge erred by not requiring the convening authority to provide a race-neutral reason for his apparent exclusion of blacks from his court-martial panel. *See Castaneda v. Partida, supra.*

140. To establish a *prima facie* case of "an equal protection violation" in a "jury selection process," a civilian accused must show *inter alia* that it

> (1) resulted in a *substantial* underrepresentation of a suspect class to which the accused belongs . . . ;

*United States v. Warren*, 16 F.3d 247, 252 (8th Cir.1994) (emphasis added), *citing Castaneda v. Partida*, 430 U.S. at 494, 97 S.Ct. at 1280; *see Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954).[2] The burden to show a "substantial" underrepresentation is on the accused. *Whitus v. Georgia*, 385 U.S. at 550, 87 S.Ct. at 646; *United States v. Horne*, 4 F.3d 579, 588 (8th Cir. 1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1121, 127 L.Ed.2d 430 (1994). Here, appellant's own figures do not show a substantial disparity between the percentage of blacks eligible for duty on his court-martial and the percentage of blacks nominated for duty from which the convening authority detailed members to his court-martial or the percentage of blacks actually detailed by the convening authority. *Cf. Vasquez v. Hillery*, 474 U.S. 254, 260, 106 S.Ct. 617, 621, 88 L.Ed.2d 598 (1986) (appellant's own figures and analysis show exclusion not by chance).

In developing the "relevant statistical pool" for purposes of determining whether a

---

2. A question arises concerning the second prong of the *Hernandez/Castaneda* test after the decision of the Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The *Castaneda* test requires a degree of underrepresentation "over a significant period of time," 430 U.S. 482, 494, 97 S.Ct. 1272, 1279, 1280, 51 L.Ed.2d 498 (1977), but *Batson* permits a showing of underrepresentation in defendant's case alone, 476 U.S. at 95–96, 106 S.Ct. at 1722–23. At least two circuits have expressly held that the *Castaneda* test has also been so modified. *Ramseur v. Beyer*, 983 F.2d 1215, 1226 (3d Cir. 1992); *Jefferson v. Morgan*, 962 F.2d 1185 (6th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 297, 121 L.Ed.2d 221 (1992); *cf. Dobbs v. Kemp*, 809 F.2d 750, 751 (11th Cir.), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2203, 95 L.Ed.2d 858 (1987).

substantial underrepresentation exists, consideration of the special skills or qualifications for service is required. *See generally Peightal v. Metropolitan Dade County*, 26 F.3d 1545, 1553–55 (11th Cir.1994). In the present case, appellant generally compares the composition of jury pool selection sheets for his detailed panel to the percentage of black officer and enlisted soldiers at Fort Hood (9% black to 15–30% black). App. Ex. XLI at 63. Such a comparison, however, ignores the fact that appellant was tried by a panel of officers at his own request. Moreover, when he earlier requested trial by officer and enlisted members, additional jury pool selection sheets were utilized and a different detail of members made. Appellant's failure to shape his argument based on relevant and available eligible population figures seriously undermines its appeal. *United States ex rel. Barksdale v. Blackburn*, 639 F.2d 1115, 1123 (5th Cir.), *cert. denied*, 454 U.S. 1056, 102 S.Ct. 603, 70 L.Ed.2d 593 (1981); *see United States v. Douglas*, 837 F.Supp. 817, 823 n. 7 (N.D.Tex.1993); *Hillery v. Pulley*, 563 F.Supp. 1228, 1245 (E.D. Cal.1983), *aff'd*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986). *See also United States v. Greene*, 995 F.2d 793, 795 (8th Cir.1993).

141. In addition, review of the appropriate jury selection sheets used in the present case does not establish a *prima facie* case of purposeful exclusion of blacks as contended by appellant. *See also United States v. Sanchez–Lopez*, 879 F.2d 541, 547 (9th Cir.1989). Of the 62 officers considered for selection to CMCO # 1, 13 were black (21%). Of the 103 officers and enlisted considered for selection on CMCO # 1, 26 were black (25.2%). Of the 45 officers nominated for selection to CMCO # 4 by the convening authority, 4 were black or approximately 9%. Under appellant's own figures, 15% of the total officers at Fort Hood were black. A 6% differential in terms of absolute disparity is not substantial underrepresentation as a matter of law. *United States v. Horne*, 4 F.3d at 588; *Floyd v. Garrison*, 996 F.2d 947, 950 (8th Cir.1993); *United States v. Clifford*, 640 F.2d 150, 155

(8th Cir.1980). *See generally United States v. Irurita–Ramirez*, 838 F.Supp. 1385, 1389 (C.D. Cal.1993). *Cf. United States v. Douglas*, 837 F.Supp. at 823. Of the 327 officers and enlisted nominated for selection on CMCO # 7, 97 were black or 30%. In view of appellant's own figures, 31% of total officers and enlisted at Fort Hood were black. *See* 41 MJ at 305 ¶ 138. A 1% underrepresentation occurred in absolute disparity terms. *See United States v. Pion*, 25 F.3d 18, 22–24 (1st Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 326, 130 L.Ed.2d 286 (1994). Accordingly, appellant's argument is not supported by the jury pool selection sheets evidenced in this case. *See generally Ramseur v. Beyer*, 983 F.2d at 1232.

Also, a statistical review of the actual detail actions taken by the convening authority do not establish or support a *prima-facie* case of purposeful discrimination in the member selection process in this case. *See Hillery v. Pulley*, 563 F.Supp. at 1246. Appellant suggests that appointment of 4 black enlisted members in CMCO # 7 and 1 black officer in CMCO # 8 was "mere tokenism" in light of his previously detailed all-white panel of CMCO # 4. He offers evidence of the belatedness of these actions to buttress his statistical showing of the convening authority's intent to discriminate in his case. *Id.* at 1246–48. I find this showing inadequate to raise a *prima facie* case of intentional racial discrimination.

142. CMCO # 8, the final detail order in this case, had approximately 9% black officers which substantially corresponds to the 15% of black officers at Fort Hood. CMCO # 7, the preceding detail order containing officers and enlisted, had approximately 30% blacks which corresponds to the 31% blacks at Fort Hood. No *prima facie* case is shown by an absolute disparity of 6% or 1%. *See Floyd v. Garrison, supra.*

Admittedly, CMCO # 4, the second detail order in this case, had 0% black officers and a 15% disparity has borderline significance to show intentional discrimination.[3] *Ramseur*

---

**3.** Appellant's arguments at trial and on appeal are based on "absolute disparity" analysis (the

difference between the percentage of blacks detailed to his court-martial and the percentage of

*v. Beyer*, 983 F.2d at 1232. However, any implication of intentional discrimination resulting from statistical underrepresentation must be evaluated in light of circumstances of a particular case. *Id.* at 1233. Here, the final panels actually detailed to this case, CMCO # 7 and CMCO # 8, had no substantial underrepresentation of black officers or officers and enlisted. *Id.* at 1228. Moreover, the very evidence introduced by the defense to show underrepresentation provided a race-neutral reason for the convening authority's decision on CMCO # 4 (to avoid having officers exposed to pretrial publicity). *Id.* at 1229. Finally, the record shows that the panels in CMCO # 7 and # 8 were detailed because of appellant's request for enlisted members (# 7) and his later request to return to an all officer court panel after some officers previously detailed became unavailable (# 8). *See Ramseur v. Beyer, supra* at 1228. *Cf. Hillery v. Pulley, supra* at 1246–48.

The bottom line on this issue is that appellant did not meet his burden of establishing a *prima facie* case that the convening authority purposefully excluded blacks when he selected the panel members for his case. *See cf. Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); *Whitus v. Georgia*, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). Thus, the military judge did not err when he failed to call the convening authority to articulate a race neutral reason

for his selection decisions. *Cf. Batson v. Kentucky, supra; United States v. Moore*, 28 MJ at 369. Here, we can presume that the military judge knew that racial identifiers have been approved by our Court when used to insure a cross-representative panel for a military accused. *See United States v. Smith*, 27 MJ at 249. Moreover, appellant's statistical arguments are misleading on their face or fail on closer examination. Finally, it was conceded at trial that there was no proof that the convening authority had a history of purposeful discrimination in his court selection actions. (R. 258.) *See Ramseur v. Beyer, supra* at 1233. *Cf. Hillery v. Pulley, supra*. In this context, the military judge was not obliged by constitutional or military law to call the convening authority to explain his selection process and decisions.

## *ISSUE XXXII*

WHETHER APPELLANT WAS DENIED HIS RIGHTS UNDER THE FIFTH AND SIXTH AMENDMENTS BECAUSE THE PANEL MEMBER SELECTION POOL DID NOT INCLUDE ANY FEMALES.

143. On appeal before this Court, appellant argues that the convening authority in this case deliberately selected a panel without woman in violation of the Fifth and Sixth Amendments. He asserts that 11% of the

---

blacks in the Fort Hood population). *See United States v. Pion*, 25 F.3d 18, 23 n. 5 (1st Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 326, 130 L.Ed.2d 286 (1994); *United States v. Irurita–Ramirez*, 838 F.Supp 1385, 1389 (C.D.Cal.1993). However, the gross statistics presented by appellant at trial were rudimentary at best. Moreover, appellant did not present expert testimony explaining the statistics. *See Hillery v. Pulley*, 563 F.Supp. 1228, 1241 (E.D.Cal 1983), *aff'd*, 733 F.2d 644 (9th Cir.1984), *aff'd*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986). Even if this Court were to apply the statistical probability analysis used in *Castaneda v. Partida*, 430 U.S. 482, 496–97 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977), appellant has not demonstrated substantial underrepresentation.

In *Castaneda*, the Supreme Court applied a statistical probability model to determine whether the underrepresentation was random. Essentially, "if the difference between the expected value and the observed number is greater than

two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." *Id.* at 497, 97 S.Ct. at 1282. In the case *sub judice*, applying the simple methodology used in *Castaneda*, the standard deviation is 1.2%. This figure is derived as follows: the square root of the product of the total number of officers in the sample (here 12) times the probability of selecting a black officer [ (425 + 192)/(2932 + 1613) App. Ex. XLI at 63–64] (0.136) times the probability of selecting a non-black officer (0.864). *See* 430 U.S. at 497 n. 17, 97 S.Ct. at 1281 n. 17. The expected value of black officers among the 12 officers selected was approximately 2; the observed number was 1. The difference between the expected value of black officers designated to appellant's panel and the observed number of black officer designated to the panel was 1. This difference is less than two or three standard deviations and, therefore, is considered a statistically-random result. *Id.*

soldier population at Fort Hood were women; nevertheless, he notes that none of these women were in the selection pool sheets of officers from Fort Hood; no women were in the supplemental selection pool sheets from Fort Sill; only one woman was in the selection pool sheets for officers and enlisted from Fort Hood (App. Ex. XLVII); and no women were on his detailed panel (CMCO # 8). He further asserts that stacking appellant's court-martial panel with males to achieve a particular result violates this Court's holding in *United States v. McClain*, 22 MJ 124 (1986).

Turning first to appellant's Sixth Amendment argument, I find it is unsupported as a matter of law. Appellant implies that Article 25(d) is unconstitutional and that a soldier is entitled to a representative cross-section of the population in the court-martial panel which tried him. This Court resolved this issue against appellant in *United States v. Smith*, 27 MJ at 248; and *United States v. Santiago–Davila*, 26 MJ at 389. *See also United States v. Moore*, 28 MJ at 367–68 n. 3. Accordingly, the mere fact that appellant's court-martial panel had no women on it did not establish a Sixth Amendment violation.

Turning to appellant's Fifth Amendment argument, I note that its attractiveness has increased since the recent decision of the Supreme Court in *J.E.B. v. Alabama ex rel T.B.*, —— U.S. ——, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). *See also Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). Moreover, here, the percentage of women in the officer population of Fort Hood and Fort Sill was approximately 11% as maintained by appellant. Also, the number of women detailed was 0, suggesting an absolute disparity of eleven. At trial, however, appellant mentioned the absence of women from CMCO # 4 almost as an afterthought. (R. 243, 249, 259). He then questioned the presence of a woman on CMCO # 7 (R. 260) and failed to make any objection whatsoever to CMCO # 8 on this basis. (R. 333–34.) *See Ramseur v. Beyer*, 983 F.2d at 1229 n. 12. In this context, I would apply a plain error analysis to this question and resolve it against appellant.[4] *Id.* at 1232 n. 18. *See generally United States v. Chandler*, 12 F.3d 1427, 1431–32 (7th Cir.1994); *Dobbs v. Kemp*, 809 F.2d 750 (11th Cir.1987).

144. My final concern is appellant's argument based on *United States v. McClain*, 22 MJ 124. I agree with Judge Gierke that there is no evidence of court-packing in this case.

*Conclusion*

Outside of the above reservations, I would affirm this case. Appellant received a fair trial and has been properly convicted. Under the Constitution and present laws of this land, I find that the death penalty has been properly adjudged and see no reason why

---

**4.** Appellant's argument on appeal is based on absolute disparity analysis (the difference between the percentage of women detailed to his court-martial and the percentage of women in the Fort Hood and Sill populations). *See United States v. Pion*, 25 F.3d at 23 n. 5; *United States v. Irurita–Ramirez*, 838 F.Supp. at 1389. However, the statistics presented by appellant at trial were rudimentary, at best. Moreover, appellant did not present expert testimony explaining the statistics. *See Hillery v. Pulley*, 563 F.Supp. at 1241. If this Court were to apply the statistical probability analysis used in *Castaneda v. Partida*, 430 U.S. at 496–97 n. 17, 97 S.Ct. at 1281 n. 17, appellant has not demonstrated substantial underrepresentation.

In *Castaneda*, the Supreme Court applied a statistical probability model to determine whether the underrepresentation was random. Essentially, "if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." *Id.* at 497, 97 S.Ct. at 1282. In the case *sub judice*, applying the simple methodology used in *Castaneda*, the standard deviation is 1.1%. This figure is derived as follows: the square root of the product of the total number of officers in the sample (here 12) times the probability of selecting a female officer [312 + 169)/(2932 + 1612) App. Ex. XLI at 63–64] (0.106) times the probability of selecting a male officer (0.894). The expected value of female officers among the 12 officers selected was approximately 1; the observed number was 0. The difference between the expected value of female officers designated to appellant's panel and the observed number of female officer designated to the panel was 1. This difference is less than two or three standard deviations and, therefore, is considered a statistically-random result. *Id.*

appellant should not be executed for the crimes he committed.

I only add one further thought: my continuing concern that servicemembers be treated fairly in capital cases. As I stated in my concurring opinion in *United States v. Curtis, supra:*

> It is my personal view, however, that, in peacetime, a servicemember in a capital case should be tried by a 12–member court-martial. The value of a soldier's life is surely equal to the value of the life of his fellow citizens. *Cf. Williams v. Florida,* 399 U.S. 78, 103, 90 S.Ct. 1893, 1907, 26 L.Ed.2d 446 (1970). Nevertheless, neither the Constitution itself, nor Congress in legislation, nor the President by regulation has mandated a 12–member panel in a military capital case. *See generally* Van Loan, *The Jury, The Court–Martial,* and *The Constitution,* 57 Cornell L.Rev. 363, 384 n. 118 (1972). Moreover, it is the duty of this Court to apply the law of the land, not to legislate by judicial fiat, and therefore, it is beyond our power to mandate such a procedure. Finally, appellant himself, by use of his challenges, reduced in part the number of court members detailed to this case from 15 to 9. Moreover, he did not particularly object to trial by 9 members at this court-martial or request the detail of additional members. I could not find reversible error in these circumstances even if appellant was somehow entitled to a 12–member panel.

32 MJ at 271.

In the present case twelve members were detailed to sit in this case. Three members were challenged by the defense and one member was challenged by the prosecution. Appellant did not particularly object to trial by eight members or request detail of additional members. Thus, appellant was tried by that court-martial fairly and in accordance with the law. Its verdict must stand unless set aside by appropriate executive authority or by mandate of further judicial review.

WISS, Judge (dissenting):

145. I am not comfortable with the majority's treatment of several of the assigned issues; I believe that a more penetrating analysis would be helpful in some instances and that the discussion's focus is somewhat off the mark in others.

On three of the issues, however, I part company with the majority in two areas that relate to the bedrock for ensuring the fairness of a trial like this—a trial that ultimately may serve as the basis for executing this appellant: selection of and deliberations by court members. The first (Issue I—at 238 ¶ 15) raises the cancerous possibility that command influence inside the members' deliberation room during their consideration of a sentence so skewed the legally required voting procedures that it undermined the fundamental fairness of those proceedings; two other issues raise the specter of the insidious possibility of racial (Issue XXXI) and gender (Issue XXXII), both at 283 ¶¶ 105–11, discrimination infecting the convening authority's selection of the court-members who ultimately tried appellant.

The majority refuses to penetrate the protective curtain of the members' deliberations and, so, fails even to analyze much less redress the prejudice from the first flaw. As to the process by which the members who ultimately tried appellant were selected, the majority omits to consider all the facts of record surrounding that process and, so, does not recognize either the precise nature or quality of appellant's grievance.

146. As to each of these issues, therefore, I am compelled to dissent from the majority opinion. In addition, although my views of either of these matters would dispose of this appeal, I am pressed to pause and to offer substantially more comment than the majority does relating to two other issues of special importance in capital litigation: proportionality review (Issue XL—at 290 ¶¶ 118–19) and continuity of appellate counsel (Issue LXVII—at 298 ¶¶ 129–30).

I

Any possibility of arbitrary imposition of rank in the military justice system—regardless of intent or motivation—that undercuts procedures that are crafted and structured to protect substantial rights of an accused must be rooted out and, if uncovered, purged.

The majority consciously refuses to recognize that possibility in this case and, therefore, has covered its ears to appellant's complaint of it. I do not agree with the majority's view of the circumstances.

Accordingly, I conclude that appellant may have been denied the protections of the sentencing mechanism established by the President in RCM 1004 and 1006, Manual for Courts–Martial, United States, 1984, as well as due process in imposition of his sentence to death and his Eighth Amendment right to a reliable determination of a death sentence. I would order a limited hearing to gather all of the available evidence on the question so, on that basis, the Court could determine with confidence whether appellant's sentence was lawfully imposed.

A

147. "[T]he imposition of death by public authority is ... profoundly different from all other penalties...." *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978). The heightened concern in a capital case derives from the finality of the result and the risk that the proceedings are vulnerable to the influence of impermissible considerations. Because of this fundamental distinction between the death penalty and other punishments, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).

"[T]he Eighth Amendment requires a different treatment of death-penalty cases." *United States v. Curtis*, 32 MJ 252, 255 (CMA), *cert. denied*, 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991). Considerations of due process and the prohibition against cruel and unusual punishment require "fair procedure in the capital sentencing context." *Lankford v. Idaho*, 500 U.S. 110, 125, 111 S.Ct. 1723, 1732, 114 L.Ed.2d 173 (1991). One of the special requirements of the capital sentencing context is that the sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983). *Accord Blystone v. Pennsylvania*, 494 U.S. 299, 308, 110 S.Ct. 1078, 1084, 108 L.Ed.2d 255 (1990)(fundamental principle of death-penalty jurisprudence that "the State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet" "a required threshold below which the death penalty cannot be imposed," *quoting McCleskey v. Kemp*, 481 U.S. 279, 305, 107 S.Ct. 1756, 1774, 95 L.Ed.2d 262 (1987)). This narrowing process may be accomplished in the trial itself or in a sentencing scheme that relies on aggravating factors. *Lowenfield v. Phelps*, 484 U.S. 231, 244–46, 108 S.Ct. 546, 554–55, 98 L.Ed.2d 568 (1988); *Proffitt v. Florida*, 428 U.S. 242, 248–50, 96 S.Ct. 2960, 2965, 49 L.Ed.2d 913 (1976); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

148. This Court first considered whether the sentencing scheme for capital cases in the military justice system passed constitutional muster in *United States v. Matthews*, 16 MJ 354 (1983). The Court concluded that, while the scheme did reflect many of the then-apparent constitutionally required safeguards, one important omission was a "require[ment] that the court members make specific findings as to individualized aggravating circumstances—findings which can, in turn, be reviewed factually and legally." 16 MJ at 380. The Court suggested that either Congress or the President could lawfully remedy this defect. *Id.* at 380–81.

In response, the President promulgated a new death-penalty procedure by Executive Order No. 12,460, 49 Fed.Reg. 3169, in January 1984. That procedure became RCM 1004, Manual, *supra*. *United States v. Curtis*, 32 MJ at 257. *See also* Art. 106a(b) and (c), Uniform Code of Military Justice, 10 USC § 906a(b) and (c) (procedures required by Congress for imposition of death penalty for espionage in violation of Article 106a(a)).

Constitutional challenge to those procedures first arose in *United States v. Curtis*, 32 MJ 252. In the Court's opinion there, RCM 1004 was set out in full in order to

plainly reveal the carefully interlocking structure of procedural safeguards that preserve a capital defendant's Fifth and Eighth Amendment rights. 32 MJ at 257–60. Making particular reference to the requirement that court "members must unanimously find at least one of the" delineated "aggravating factors" and to the requirement that the members must unanimously " 'concur that any extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances,' " *see* RCM 1004(b)(4)(C), 32 MJ at 268, the Court concluded that RCM 1004 "not only complies with due process requirements but also probably goes further than most state statutes in providing safeguards for the accused." 32 MJ at 269.

### B

149. RCM 1004 (Change 2), together with RCM 1006, require the following orchestrated procedure of interrelated stepping stones toward a sentence of death:

- The accused must have been convicted of a death-authorized offense "by the concurrence of all the members of the court-martial present at the time the vote was taken." RCM 1004(a)(2).
- Ordinarily prior to arraignment, trial counsel must "give the defense written notice of which aggravating factors" listed in RCM 1004(c) "the prosecution intends to prove" as a means of narrowing the field of death-eligible accused. RCM 1004(b)(1).
- During presentence procedure, "[t]rial counsel may present evidence ... tending to establish one or more of the aggravating factors," and "[t]he accused shall be given broad latitude to present evidence in extenuation and mitigation." RCM 1004(b)(2) and (3).
- "Death may not be adjudged unless" all of the following are found by the court members based on evidence introduced either on the merits or during presentencing:
 - ●● "[A]t least one of the aggravating factors" listed elsewhere in the rule existed;
 - ●● "The required notice was given to the defense by trial counsel, and "all members concur in the finding with respect to" any given aggravating factor; and
 - ●● "All members concur that any extenuating or mitigating circumstances are substantially outweighed by any aggravating circumstances...."

RCM 1004(b)(4) and (5).

- A vote on a proposed sentence that includes death may not occur until the members "vote by secret written ballot separately on each aggravating factor ... on which they have been instructed" and unless they unanimously agree beyond a reasonable doubt that a particular factor or factors exist in the case. RCM 1004(b)(7) and (c). Only if this threshold requirement is met is an accused death-eligible (that is, liable to imposition of the death penalty), and only then can the members proceed to deliberate and to vote on proposed sentences under the procedure applicable to all courts-martial that is set out in RCM 1006. RCM 1004(b)(7).

150. ● During those deliberations, "[s]uperiority in rank shall not be used in any manner to control the independence of members in the exercise of their judgment." RCM 1006(a).

- During deliberations, "[a]ny member may propose a sentence. Each sentence shall be in writing and shall contain the complete sentence proposed. The junior member shall collect the proposed sentences and submit them to the president" of the court-martial. RCM 1006(c).
- Voting is by secret written ballot. RCM 1006(d)(2).
- Voting is on "each proposed sentence in its entirety beginning with the least severe and continuing, as necessary, with the next least severe, until a sentence is adopted by the" necessary concurrence—in death, unanimous. RCM 1006(d)(3)(A) and (4)(A).
- The junior member of the court-martial collects and counts the votes, and the president checks the count and informs everyone else of the result. RCM 1006(d)(3)(B).

(This is not a quotation.)

Thus, compliance with RCM 1004 and 1006 attains two fundamental goals: First, it nar-

rows the group of accused persons who can be death-eligible by requiring the members unanimously to find at least one specific aggravating factor and to find that the totality of aggravating circumstances substantially outweighs the extenuating and mitigating circumstances. Second, in consideration of what sentence should be adjudged, it implements procedures that maximize the unfettered and conscientious participation of each member in a manner that assures a moderating approach to the task and that assures that the weighty responsibilities inherent in this duty are not at all affected by differences in rank among the members.

## C

151. Regrettably, the specter has been raised that this carefully designed structure of procedures broke down in this case—and critically, that it did so entirely because the superior-ranking member of the court unilaterally imposed his own short-cut toward a sentence rather than follow the clear path carefully mapped out for the court by the military judge.

As the majority opinion indicates, appellant has filed with this Court the post-trial affidavits of Colonel Ayler, who was the president of the court-martial, and Major Napoli and Captain Williams, who were two of the other members of the court-martial. I have attached all three affidavits as appendices to this opinion so that all may see exactly what these members say. *See* Appendices A, B, and C.

The majority opinion characterizes these affidavits as "ambiguous at best." 41 MJ at 235 ¶ 10. I think they more accurately are ambiguous at *least.* All three purport to state the procedures that were followed during sentence deliberations and are in no way inconsistent with each other. Together, I believe that they, at minimum, *suggest* that the following occurred:

152. • The members did not vote at all during sentence deliberations on any of the aggravating factors relied upon by the prosecution to narrow the field of death-eligible accuseds. *See Lowenfield v. Phelps,* 484 U.S. at 244 [108 S.Ct. at 554].

Possibly, the president was content to skip that narrowing exercise and rely on the fact that they earlier had returned findings that reflected one or more such factors (*i.e.,* multiple murder, *see* RCM 1004(c)(7)(J)). RCM 1004 nowhere expressly contemplates this procedural merger of findings and sentencing votes; and the notion that the sentencing stage of a proceeding involves a deliberative process of factual and moral overtones and dynamics that is entirely distinct from the consideration of guilt would not seem to support the validity of this self-indulgence. *Cf. United States v. Shroeder,* 27 MJ 87, 90–91 (CMA 1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989). In any event, for whatever reason, this vote was not taken, as the military judge had directed them to do as part of the carefully interlocking procedural structure.

• There was no vote at all on whether the aggravating circumstances outweighed the extenuating and mitigating circumstances—at least, none of the three affidavits, which otherwise appear to fully set out the procedure that was followed, even mentions this critical step.

• Rather than the members formally writing proposed sentences in their entirety, the president had them proceed directly to a vote between the "two options" of life imprisonment and death. There is no mention of the remaining elements of the sentence at that point; and this method of choosing between the two statutorily authorized "options" theoretically begs the question whether any member would propose death under correct procedures.

• Rather than the junior member collecting and counting the ballots, the junior member instead merely passed the folded pieces of paper to the president, who himself unfolded and tallied them—another shortcut through the procedural checks in the rules. This first vote was 7 for death and 1 for life.

153. • Even if this first "vote" could somehow be construed under the rules as a written proposal of sentences to be consid-

ered, the members did not then proceed, as required, to vote on the lightest sentence "option" first—life. *See United States v. Johnson,* 18 USCMA 436, 40 CMR 148 (1969); *United States v. Jackson,* 34 MJ 1145, 1149 (ACMR 1992); *see also United States v. Fisher,* 21 MJ 327 (CMA 1986)(failure to instruct members to vote on the proposed sentences "beginning with the lightest"). Instead, they took a second vote between the "options" of life imprisonment and death, thereby making them equally available alternatives at that point in time. Where only one vote for life imprisonment is necessary to thwart a death sentence, the requirement for distinct votes—beginning with life, proceeding to death, then over again if the required concurrence is not mustered at any point—cannot reasonably be seen as a mere technicality. Again there is no mention about consideration of the other elements of the sentence.

● As before, contrary to the military judge's instructions, the junior member merely collected and passed to the president the folded pieces of paper, who himself unfolded and counted them. He announced that, this time, the vote was all 8 for death, bad-conduct [sic] discharge, total forfeitures, and reduction to E–1.

(This is not a quotation.)

154. RCM 1004 and 1006 require a careful voting process: first, to determine if an accused is eligible for a death sentence (*i.e.* commission of a capital offense, presence of one aggravating factor, and aggravating circumstances substantially outweigh extenuating and mitigating circumstances); and, second, to determine whether death is the appropriate sentence (after voting on and rejecting all lesser proposed sentences). These procedures are essential to ensure that the death penalty is not inflicted in an arbitrary and capricious manner.

As the earlier comparison graphically demonstrates, if the members actually trampled along the procedural shortcuts that are suggested by the affidavits, in the process they crushed the thoughtful and delicate balance in the procedural structure mandated by RCM 1004 and 1006. Moreover, if these shortcuts occurred, they occurred as a result of the unilateral imposition by the senior-ranking member of the court-martial of a procedure that differed markedly from the procedure that was plotted for the panel in the military judge's painstaking instructions.

Assuredly, the senior-ranking member of the court-martial has the responsibility to preside in the fullest sense. I do not quarrel with the majority that "Colonel Aylor was the president of the court-martial and, as such, had certain administrative duties and discretion in the performance of those duties." 41 MJ at 238 ¶ 15. *See United States v. Accordino,* 20 MJ 102, 105 (CMA 1985). It is not within his authority or discretion, however, to divine his own personally preferred procedural path toward a death sentence, in substantial disregard of the one that has been clearly prescribed by the President of the United States in the Manual for Courts–Martial and, in some instances, in substantial disregard as well of checkpoints along the way that are required by the Fifth and Eight Amendments.

155. Unlawful command influence? I think so. These affidavits seem to suggest much more than what the majority concludes was "no more than Colonel Aylor's proper exercise of authority as president to preside over the deliberations." 41 MJ at 238 ¶ 15. Instead, they seem to portray a scenario in which the senior-ranking member, solely by virtue of his rank, successfully imposed a procedure that was unlawful and that, in the process, destroyed the lawful procedural structure that would have substantially assured a fair and reliable sentence. By any definition, that scenario is unlawful command influence.[1] *Cf. United States v. Accordino,*

1. The majority contends that no issue of unlawful command influence is before this Court because "[t]here is absolutely no suggestion in the affidavits that Colonel Aylor exercised unlawful command influence." 41 MJ at 238 ¶ 15. Defiantly denying the true color of the cloud created by these affidavits, however, does nothing to alter their dreary tone. To prove the point, I simply pose this question: Can it be more than rhetorical to ask whether anyone except the most senior ranking person on the court could have unilaterally imposed on all of the other, presumably

*supra* at 104 ("use of rank by a court member to pervert military justice"); *United States v. Carr,* 18 MJ 297, 302 (CMA 1984) ("unlawful command influence" exception to Mil.R.Evid. 606(b), Manual, *supra,* includes allegation that court-martial's president used rank to pressure other members during deliberations).

The majority attempts to sidestep this command-influence issue by stating, "Appellant has not alleged that Colonel Aylor exercised unlawful command influence during the deliberations." 41 MJ at 237 ¶ 14. Although appellant did not make this claim in the brief, appellate defense counsel at oral argument repeatedly raised and argued the command-influence issue. At the very outset of oral argument, counsel argued that the voting procedures were designed to prevent command influence and urged that the affidavits permit an inference of command influence. Again in rebuttal argument, appellate defense counsel explicitly asserted that the issue of command influence justified an evidentiary hearing. Accordingly, there can be no dispute that the command-influence issue is squarely before this Court.

Nothing reeks like the odor of unlawful command influence; these affidavits have a distinctly disconcerting aroma emanating from them. I cannot legally or morally join in affirming this sentence to death without further proceedings to assure myself, appel-

lant, and the community as a whole that appellant's substantial rights were not critically undermined by the unlawful exercise of the power of rank behind the closed doors of the members' deliberations. *See* Mil.R.Evid. 606(b).

## II

156. Through Issues XXXI and XXXII, 41 MJ at 283 ¶¶ 105–11, appellant pursues his trial assault on the court-martial panel-selection process that he complains resulted in African–Americans and women unlawfully being excluded initially and underrepresented ultimately on the panel that tried him. The majority opinion attempts to minimize the absence of both racial and sexual diversity in *one* officer panel that appellant objected to trying him. The majority relies on the post-objection attempts of the convening authority to provide for some diversity as sufficient damage control to moot this issue. I do not agree with the majority's casting of this issue, and I do not agree, either, with its conclusion that appellant has not carried the appropriate burden to trigger further inquiry.

## A

Appellant is an African–American male who faced charges of murder, attempted murder, and robbery. His murder victims were two white males, and the victim of his attempted murder also was a white male; all of his alleged robbery victims were white

intelligent, officer members a procedure of his own handiwork that was in marked deviation from that which clearly and in detail was prescribed by the military judge? I am not so naive as to believe that a second lieutenant (or a chief warrant officer 3, the rank of the junior member on appellant's panel) could have been so possessed of natural leadership that he so effectively could have led astray a whole panel of his colleagues. I am reminded of Justice Felix Frankfurter's admonition, "And there comes a point where this Court should not be ignorant as judges of what we know as men." *Watts v. Indiana,* 338 U.S. 49, 52, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801 (1949). Secure in the assumption that a junior-grade officer could not have accomplished what this colonel did, and in light of the fact that the procedure devised by Colonel Aylor in several important respects was at odds with the carefully crafted procedure mandated by the President of the United States, how can Colonel

Aylor's role in this transgression be described as anything but "unlawful command influence"?

I am especially perplexed by the vote and separate comments of Chief Judge Sullivan on this issue. By himself, the Chief Judge merely seems to agree with the majority's view that these affidavits—which I believe raise the possibility that the influence of rank was used to implement unlawful procedures in lieu of those that were carefully constructed to protect an accused's substantive and procedural due process rights—simply does not present an issue of unlawful command influence. I confess, however, that I am unable to reconcile this view with the Chief Judge's separate opinion in *United States v. Greene,* 41 MJ 57, 59 (CMA 1994)—a case in which he forthrightly recognized that failure to follow important voting procedures in the deliberation room opens the door to unlawful command influence during those deliberations.

males and females; and one of the important prosecution witnesses was a married white woman with whom appellant was involved in a sexual affair at the time of his crimes and upon whom appellant in his defense attempted to place a good deal of the onus for his actions.

157. Understandably, then, the defense team in this capital case had heightened sensitivity to any possible injection of racial discrimination into the proceedings. Certainly, a principal focus of this sensitivity, as well as to a somewhat lesser extent to gender discrimination,[2] related to the composition of the court-martial panel. In order to fully evaluate the legal issues inherent in appellant's complaint, a rather extensive recitation is necessary relating to the evolution of the panel that finally tried appellant.

### Court-Martial Convening Order Numbers 1 and 4

The first panel of officers was selected under Court–Martial Convening Order (CMCO) # 1, dated January 20, 1989. The senior member of this panel was African–American, and the rest were Caucasian; none was a woman. Appellate Exhibit (App. Ex.) LII at 9.

In a memorandum to the convening authority of February 14, the staff judge advocate (SJA) pointed to the substantial local publicity surrounding the offenses .and the upcoming trial; "[i]n order to insure a completely fair and impartial court-martial panel," he recommended that the convening authority "detail, for this case only, a panel composed of soldiers who have arrived at Fort Hood on or after 1 January 1989, or who are presently assigned to commands outside Fort Hood."

158. The SJA attached to his memorandum a list of officers nominated by the various commands at Fort Hood and officers made available from Fort Sill. Of the 45 officers on the list, 41 were white and 4 were

African–American; none was female. The SJA recommended that the convening authority "select 12 officers to serve as court members," who "should be designated by placing numbers 1 thru 12 next to their names." Additionally, he recommended that the convening authority "select 15 officers to serve on the above panel" as alternates in the event that "approved absences or challenges cause the number of members available to fall below prescribed limits." These alternates, he suggested, "should be designated by placing numbers 13 thru 27 to signify the order in which they should serve on the court-martial panel."

The member-selection list given to the convening authority contained each officer's name, rank, social security number, unit, race, and sex, as well as a blank line on the left margin next to each nominee's name for the convening authority to indicate his selections. Every one of the nominees next to which the convening authority placed numbers 1 through 12 was a white male. Of the 15 officers next to whom he placed numbers 13 through 27, two were African–American: Major Taylor was numbered 14, and Major Staples was numbered 17.

159. Implementing the SJA's recommendation and the convening authority's selections, the latter promulgated CMCO # 4 on February 14. Through this order, the convening authority withdrew appellant's case from a racially mixed court-martial panel of all men (CMCO # 1) and referred it to an all-white, all-male panel of 12 officers. App. Ex. XLI at 18–20.

### Court-Martial Convening Order Numbers 7 and 8

On February 21, at a session convened under Article 39(a), UCMJ, 10 USC § 839(a), defense counsel highlighted the fact that all 12 of the panel members were white males. In that light, he expressed concern that the

---

**2.** Counsel's less-intensive focus on apparent unlawful exclusion of women from the court-martial panel is understandable in light of the absence of any authoritative caselaw at that time that definitively put gender discrimination in this context on a par of unlawfulness with racial

discrimination. Only recently has the Supreme Court held that the former is as legally reprehensible as the latter. *See J.E.B. v. Alabama ex rel. T.B.,* — U.S. —, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

only information on the selection sheets—other than innocuous data of names, ranks, social security numbers, and units—was racial and gender identifiers. Based on the uniform composition of the panel and on the nearly uniform composition of the list of nominees from which the convening authority selected the panel—made further suspect by the pointed inclusion of the racial and gender identifiers on the selection sheets—counsel advised that the defense "would probably have a motion" relating to the lawfulness of the selection process, both as to "the people given to the General to select" and as to "the people selected by the General."

At the same session, appellant requested enlisted members on his panel. Defense counsel made clear at the time that his client felt compelled to make such a request in the hope of getting a better cross-representation;[3] that the request was not the result of any real desire by appellant for enlisted members; and that the defense felt that the only way they could learn the race and gender of the enlisted members that the convening authority would appoint would be to request such members. He indicated, however, that appellant might well withdraw that request later and that, in any event, appellant was entitled to a lawfully selected officer panel, without regard to whether appellant did or did not want enlisted members.

160. The next day, on February 22, the convening authority provided 6 enlisted members. This action later was effected by CMCO # 7, published on March 24, in which the convening authority relieved 5 of the original white male members: COL Webb, LTC Hardie, MAJ Napoli, CPT Williams, and CW3 Hasenhauer—numbered 1, 4, 9, 10, and 11 on the member-selection list. App. Ex. XLI at 18–20. In their stead, the con-

vening authority detailed six enlisted members, three of whom were African–American males and one of whom was an African–American female (the other two were white males). The selection sheets used for this panel (App. Ex. XLVII at 3–14), like those in use for the panel detailed under CMCO # 4 (App. Ex. XLI at 18–20), contained racial and gender identifiers.

True to his promise of February 21, defense counsel submitted a written motion on March 13 that was captioned, "MOTION FOR APPROPRIATE RELIEF: CHALLENGE TO VALIDITY OF REFERRAL DUE TO ERRORS IN PANEL SELECTION PROCESS." Therein, counsel claimed that "the process for selection of panel members in this case has resulted in a violation of the accused's right to Due Process and Equal Protection under the Fifth Amendment." App. Ex. XLI at 1. He relied principally on such cases as *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); and *United States v. Smith*, 27 MJ 242 (CMA 1988). Counsel's trial brief made clear that the "scope" of the requested

inquiry is broad. It should involve every aspect of the panel selection and referral process, to include both the persons selected for duty and the nominees not selected, the staffing of the action, the decisionmaking process of the convening authority, the population from which the selection was made, and the personal attitudes and motivations of the people involved in the selection process. . . .

161. Counsel acknowledged in that brief that the defense had the burden to make a

---

**3.** It might be argued that counsel's use of such phrases as better cross-representation and cross-section of the community sounds like an objection lodged under the Sixth Amendment right to trial by a jury of peers, which is inapplicable to courts-martial, rather one under the Fifth Amendment rights to equal protection and due process, which are applicable. *See United States v. Santiago–Davila*, 26 MJ 380, 389–90 (CMA 1988). It was abundantly clear, however, both in defense counsel's written motion and brief and in his advocacy in the courtroom that appellant's

objection to the selection process included the Fifth Amendment grounds. In any event, even if counsel's bases had not been so clear, I would be unwilling to invoke waiver under these circumstances. Addressing such a possibility in *Santiago–Davila* the Court declined "to apply the doctrine of waiver so strictly—especially when we are dealing with a fundamental constitutional right not to be the victim of purposeful racial discrimination and when the defense has asserted a closely-related constitutional claim." *Id.* at 390.

"*prima facie*" showing of denial of equal protection "in order to shift the burden to the Government to disprove" that showing. *Castaneda v. Partida,* 430 U.S. at 495, 97 S.Ct. at 1280. Thereafter, at some length, the defense sought to make this *prima facie* case by showing: 1) that "the defendant is a member of a recognizable group singled out for different treatment," *citing Hernandez v. Texas,* 347 U.S. 475, 478–79, 74 S.Ct. 667, 670–71, 98 L.Ed. 866 (1954); 2) that there is "underrepresentation of his group on the panel" by making statistical comparisons of the numbers of African–Americans and women on the panel with the numbers among the local military population; and 3) that "the underrepresentation may be due to unconstitutional activity." App. Ex. XLI at 5.

After extensive argument on these points, counsel then urged that, the *prima facie* showing having been made, "[t]he Government has the burden of proof to 'explain adequately the racial exclusion.' *Batson,* 476 U.S. at 94 [106 S.Ct. at 1721]." Ultimately, counsel urged that the remedy requested was for the military judge to "strike down the referral of this case as violative of the accused's right to Due Process and Equal Protection under the Fifth Amendment ... and return the case to the convening authority. The defense also requests the military judge strictly scrutinize all actions by the command with regard to this trial in light of the developments in this case."

While discussing this motion at an Article 39(a) session, defense counsel reiterated that their earlier request for enlisted members had been conditional and with the express understanding that it might be withdrawn later. Counsel explained that the request was an effort to try to get "a more representative panel" than the "all-white, all-male panel" of officers detailed under CMCO # 4. When the military judge queried whether the convening authority had not done exactly what appellant wanted—that is, given him members of his race on the panel in the form of enlisted membership—the defense responded:

> [W]e feel like we shouldn't have to be made to make some kind of election, in order to try and get a panel that's not in

violation of the Equal Protection Act [sic]—it puts an unnecessary burden on the defense. We'd like to have the problem with the officer panel solved, before—instead of putting the burden on us, to cure the Government's error, in this case. And, all we're saying is that they—that we have established a prima facie case—that it's up to them to rebut; they need to present evidence to rebut this prima facie case....

162. On March 23, the military judge denied appellant's motion for a new officer panel. He explained his decision as follows:

> In my view, there aren't any factual issues to be resolved. There is no per se right to have minority representation on a court-martial panel. None of the officer court members listed on the convening order is black. Numerous black enlisted soldiers have been designated to sit. The accused, initially, as I understand, elected to be tried by a panel of officers and enlisted soldiers. Now, I've been told, however, that that's not the case; that the accused wishes to be tried by officer-members only. Black officers have been designated as alternate court members. The pool of officers from which to choose was somewhat limited, in that the Convening Authority, in this case, wanted individuals arriving at Fort Hood after 1 January 1989, and officers nominated from Fort Sill, Oklahoma. This was done to allay defense concerns about pretrial publicity. Because of these self-imposed limitations, the number of black officers from which to choose shrank significantly. I agree with the trial counsel that, consequently, presenting demographic statistics for all of Fort Hood and the racial breakdown of officer/enlisted members becomes somewhat irrelevant. Other than raw statistics, the defense has not presented evidence or made offers of proof to cause me to conclude that blacks have been arbitrarily excluded from the officer-panel selection process, or that the Convening Authority was racially-biased in his selection process. The defense has conceded that, in the past, this Convening Authority has appointed senior and junior

black officers to sit on panels. In reviewing the documents concerning the selection of enlisted soldiers, it is clear that the Convening Authority had a far greater pool of minority soldiers from which to choose. He chose several black enlisted soldiers to sit on this panel. Again, earlier in the trial, the accused indicated that he wished to be tried by officers and enlisted—that's not now the case—but, the fact that several black NCOs were selected to sit, by the Convening Authority, is strong circumstantial evidence, in my view, that the selection of the officer panel was done without racial animus and without any sinister motives. If the Convening Authority was trying to manipulate the system, surely black NCOs or black enlisted soldiers would have also been excluded. The Convening Authority—or, the selection of the officer-panel members was done in accordance with law and regulation. The selection process violated none of the rights of the accused.

On March 23, appellant formally withdrew his request for enlisted members and asked for an all-officer panel. By memorandum dated March 24, the SJA recommended that the convening authority "appoint an additional 5 officers to the 7 previously selected to sit as court members in this case [CMCO # 7]." He advised the convening authority that those 5 could be 1) the same 5 earlier relieved when appellant had "requested enlisted members"; 2) "[t]he next 5 alternate officer members previously selected"; or 3) "[a]ny other alternate officer member previously selected or any officer of your command who, in your opinion, meets the requirements of Article 25 . . . ." The SJA furnished the convening authority with member-selection sheets that contained all of the officers on the prior selection sheet including the seven who remained on the panel pursuant to CMCO # 7.

163. The same day, the convening authority published CMCO # 8 by which he relieved the six enlisted members and detailed five additional officers. Of these, three had been among the five officers relieved when appellant had requested enlisted members: MAJ Napoli, CPT Williams, and CW3 Ha-

senhauer. The other two who had been relieved—COL Webb and LTC Hardie—in the meantime had undertaken conflicting obligations that they were unable to reconcile on such "short notice."

The two new faces were MAJ Staples, an African–American male who had been numbered 17 on the original selection sheet, and LTC Dobbs, a white male who had been numbered 16 on that sheet. There is no explanation why the convening authority skipped over the officers that earlier he had numbered 13, 14 (MAJ Taylor, an African–American male), or 15; this, notwithstanding the SJA's advice in his memorandum accompanying the original selection sheet that the convening authority should number his selections for alternates "13 thru 27 to signify the *order in which they should serve* on the court-martial panel" if needed. (Emphasis added.)

Ultimately, then, the final panel selected (CMCO # 8) by the convening authority consisted of 11 white male officers and 1 African–American male officer; of the 5 alternates, 2 were African–American males, and none was a woman. App. Ex. LXVIII at 1–3. The single African–American detailed as a primary member was not challenged and did sit as one of the eight members who convicted and sentenced appellant to death.

### B

### *Constitutional Character of Appellant's Complaint*

164. In the recent opinion of the Supreme Court in *J.E.B. v. Alabama ex rel. T.B.*, —— U.S. ——, ——, 114 S.Ct. 1419, 1421, 128 L.Ed.2d 89 (1994), Justice Blackmun began the Opinion of the Court as follows:

In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), this Court held that the Equal Protection Clause of the Fourteenth Amendment governs the exercise of peremptory challenges by a prosecutor in a criminal trial. The Court explained that *although a defendant has "no right to a 'petit jury composed in whole or in part of persons of his own race,' " id.* at 85, 106 S.Ct., at 1717, quoting

*Strauder v. West Virginia,* 100 U.S. 303, 305, 25 L.Ed. 664 (1880), *the "defendant does have the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." Id.,* 476 U.S. at 85–86, 106 S.Ct. at 1717. Since *Batson,* we have reaffirmed repeatedly our commitment to jury selection procedures that are fair and nondiscriminatory. We have recognized that whether the trial is criminal or civil, potential jurors, as well as litigants, have an equal protection right to jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice. *See Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); *Georgia v. McCollum,* 505 U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).

(Emphasis added.) This is what appellant's complaint is all about; and the majority's attempt to gloss over this constitutional argument is unpersuasive.

The majority's truncated treatment of appellant's constitutional challenge implicitly relies upon three, stepped, fall-back positions: 1) Because a military accused is not entitled constitutionally to a trial by his peers, *Batson* and *J.E.B.* somehow apply differently to racial and gender discrimination in courts-martial than they do in civilian trials; 2) even if they do apply fully to courts-martial, they apply only to such discrimination as it is manifest in peremptory challenges in the courtroom, not to the same discrimination that might be manifest at other stages in the jury-selection process; and 3) even if they apply to courts-martial and even if they apply to the entirety of the jury-selection process, Article 25, UCMJ, 10 USC § 825, somehow permits different application to the stage of the process at which the convening authority selects the members. Each of these arguments may be quickly joined and rejected.

165. First, appellant's lack of a right to be tried by a jury of his peers does not translate into lack of a right to have the factfinders selected without regard to racial or gender stereotypes. In *United States v. Santiago–Davila,* 26 MJ 380 (CMA 1988), this Court foursquare applied *Batson*'s constitutional veto of racial discrimination against civilian jurors to identical discrimination against members of courts-martial. We reaffirmed that unwavering commitment as recently as last term in *United States v. Greene,* 36 MJ 274 (CMA 1993). I assume that the majority does not intend to sound retreat from those cases, but I cannot reconcile the majority opinion here with them.

Second, the majority cannot escape the inescapable by any hint that *Batson*'s constitutional sword is unsheathed only in the courtroom and only to protect against litigants' challenges. The Supreme Court long ago recognized the extended swath cut by such a sword in search of stereotype class discrimination in *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), where the Court struck down a gender-discriminatory jury registration requirement as a violation of the Sixth Amendment. In *J.E.B. v. Alabama, supra,* the Court made clear that, while *"Taylor* relied on Sixth Amendment principles, ... the opinion's approach is consistent with the heightened equal protection scrutiny afforded gender-based classifications." —— U.S. at ——, 114 S.Ct. at 1424. Indeed, the *Batson* Court itself made specific reference to examination of the various stages of the selection process in search of unlawful discrimination. 476 U.S. at 87–88, 106 S.Ct. at 1718.

Finally, the majority cannot scramble for refuge behind the shield of Article 25 in order to insulate the member-selection process and to isolate application of *Batson* and *J.E.B* to peremptory challenges. This statute, without any parallel in civilian justice systems, permits the convening authority to handpick members for a court-martial panel who are "best qualified for the duty," Art. 25(d)(2), from among those "eligible" to serve, *see* Art. 25(a), (b), (c)(1), and (d)(1). Even in the context of such unique power of subjective discretion, however, I would think it would be clear from *Batson* and *J.E.B.* (but perhaps it needs to be bluntly asserted): "White male" is not a proxy for "best quali-

fied," either constitutionally or logically. It is precisely such short-hand equation of group stereotypes with competence that the Supreme Court rebuked in *Batson* and *J.E.B.*

166. Accordingly, it should be clear from these cases that racial and gender discrimination at any stage of the selection process violates the Fifth Amendment. The majority's slight-of-hand that seeks to divert attention by calling such perniciousness "court stacking" changes nothing.[4] "Court stacking" discrimination on the basis of race or gender violates not only Article 25, but also the Fifth Amendment. Changing the name of the evil changes neither the nature of the evil, the standards and the burdens for measuring it, nor its constitutionally required remedy. Fifth Amendment law applies here,[5] not Article 25 law.

### Invoking the Right: Who Does What and When

Prior to the *Batson* decision, a criminal defendant who complained of denial of equal protection from racially discriminatory exclusion of jurors had to prove systematic exclusion of members of a certain race. *See Batson v. Kentucky*, 476 U.S. at 82 n. 1, 106 S.Ct. at 1715 n. 1; *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). A defendant seeking to do so was faced with a presumption, otherwise, that no such pur-

poseful exclusion had occurred. *Id.* at 221–22, 85 S.Ct. at 836–37. Over time, lower Federal courts "reasoned that proof of repeated striking of [members of a particular race] over a number of cases was necessary to establish a violation of the Equal Protection Clause." *Batson v. Kentucky*, 476 U.S. at 92, 106 S.Ct. at 1720.

The *Batson* Court, however, "reject[ed] this evidentiary formulation as inconsistent with standards that have been developed since *Swain* for assessing a prima facie case under the Equal Protection Clause." 476 U.S. at 93, 106 S.Ct. at 1721. While the defendant continues to carry the burden of persuasion on the issue, now "[c]ircumstantial evidence of invidious intent may include proof of disproportionate impact." 476 U.S. at 93, 106 S.Ct. at 1721. The "totality of the relevant facts" may give "rise to an inference" of purposeful discrimination sufficient to make the required *prima facie* showing. 476 U.S. at 94, 106 S.Ct. at 1721. One recognized means of doing so is to prove "that members of the defendant's race were substantially underrepresented on the venire from which his jury was drawn, and that the venire was selected under a practice providing 'the opportunity for discrimination.' " 476 U.S. at 95, 106 S.Ct. at 1722. In short, to carry the burden of persuasion successfully, a complaining defendant need not show

---

4. The implicit diminution of the seriousness of the discrimination by calling it simply "court stacking" is akin to an argument addressed by the Supreme Court in *J.E.B. V. Alabama*, —— U.S. at —— n. 14, 114 S.Ct. at 1428 n. 14:

The popular refrain is that *all* peremptory challenges are based on stereotypes of some kind, expressing various intuitive and frequently erroneous biases. But where peremptory challenges are made on the basis of group characteristics other than race or gender (like occupation, for example), they do not reinforce the same stereotypes about the group's competence or predispositions that have been used to prevent them from voting, participating on juries, pursuing their chosen professions, or otherwise contributing to civic life. *See* B. Babcock, A Place in the Palladium, Women's Rights and Jury Service, 61 U.Cinn.L.Rev. 1139, 1173 (1993).
(Citation omitted.)

5. In *Davis v. United States*, —— U.S. ——, —— n. *, 114 S.Ct. 2350, 2354 n. *, 129 L.Ed.2d 362

(1994), the Supreme Court noted that it "never had occasion to consider whether the Fifth Amendment privilege against self incrimination, or the attendant right to counsel during custodial interrogation, applies of its own force to the military...." Noting that the President through the Manual for Courts–Martial and this Court through its opinions has fully applied the Supreme Court's cases in that area to courts-martial, the Court "proceed[ed] on the assumption" that its cases applied "to courts-martial just as they apply to state and federal criminal prosecutions." Similarly, as to the Fifth Amendment provisions that protect against racial and gender discrimination in jury selection, this Court in *Santiago–Davila* and *Greene* has fully applied Supreme Court cases to courts-martial. Unless and until the majority of this Court forthrightly holds otherwise, then, and in the absence of any indication from the Supreme Court to the contrary, I will proceed on the basis of our precedent that fully applies this Fifth Amendment protection to courts-martial.

systemic discrimination over time but may rely, instead, on facts relating to the selection of jurors solely in *his* case.

167. Once a defendant makes a *prima facie* showing of purposeful discrimination based on the totality of the circumstances, the Government is required to come forward and articulate a neutral explanation for its actions relating to the particular case then at trial. Mere denial of "discriminatory motive" or assurance of "good faith" will not suffice. 476 U.S. at 98, 106 S.Ct. at 1723–24. Thereafter, the judge has "the duty to determine if the defendant has established purposeful discrimination." 476 U.S. at 98, 106 S.Ct. at 1724. This finding concerning discrimination is one of fact. 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21.

The Court in *J.E.B.* made clear that resolution of a claimed discrimination by gender follows the same process. Justice Blackmun explained:

> As with race-based *Batson* claims, a party alleging gender discrimination must make a prima facie showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723. When an explanation is required, it need not rise to the level of a "for cause" challenge; rather, it merely must be based on a juror characteristic other than gender, and the proffered explanation may not be pretextual. *See Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

—— U.S. at ——–——, 114 S.Ct. at 1429–30.

### C

At the outset of considering how the events leading to selection of appellant's court-martial panel measure against the legal principles just set forth, I should plainly state that the issue as I see it is not whether the convening authority did in fact violate appellant's Fifth Amendment right to equal protection; rather, it is whether the military judge correctly analyzed and disposed of appellant's claims under *Batson* and *J.E.B.* that the convening authority did so.

In several respects, I believe that the military judge did not. In discussing appellant's claims and the military judge's response to them, I will follow the analytical construct of *Batson, J.E.B.,* and *Greene,* 36 MJ at 278 n. 2.

### Step 1: Prima Facie Showing of Purposeful Discrimination

168. Appellant met his initial burden of making a *prima facie* showing of purposeful discrimination in selection of the court members. Actually, he did so as to three distinct Fifth Amendment violations.

First, when the convening authority withdrew appellant's case from the racially mixed panel of members detailed in CMCO # 1 and referred it to the all-white panel of members in CMCO # 4, and when the defense complained of this, there was a *prima facie* showing of a *Batson* violation. This Court stated in *United States v. Greene,* 36 MJ at 278, that a *prima facie* showing is made "when a trial counsel exercises a peremptory challenge to exclude 'a member of a cognizable racial group,' 476 U.S. at 96, 106 S.Ct. at 1723, from membership on a court-martial and the challenged member is also of the same race as the accused." I fully agree with the practical view of the world expressed by Judge Cox in his separate opinion in *United States v. Carter,* 25 MJ 471, 478 (CMA 1988), that the convening authority's decision not to choose some of the nominees for court-martial service is "the functional equivalent of an unlimited number of peremptory challenges." Thus, when the convening authority withdrew appellant's case from a racially mixed panel and referred it to an all-white panel, his action was akin to a prosecutor exercising peremptory challenges against the members of the racially-mixed panel. That is enough, under *Greene,* to establish a *prima facie* showing of purposeful discrimination which, in turn, triggers the Government's responsibility to offer a race-neutral explanation.

Second, appellant demonstrated "that members of the defendant's race were substantially underrepresented on the venire from which his jury was drawn, and that the

venire was selected under a practice providing 'the opportunity for discrimination.'" *Batson v. Kentucky*, 476 U.S. at 95, 106 S.Ct. at 1722. Of the list of 45 officer nominees sent to the convening authority from which he selected the members subsequently detailed on CMCO # 4, only 4 were African–American (less than 9%). From this list, the convening authority selected 12 officers as members; none was African–American (0%). These figures compare adversely to the statistical data furnished by the defense relative to the African–American officer population at Fort Hood (15%) and at Fort Sill (12%). App. Ex. XLI at 63 (Hood), at 64 (Sill).

169. I recognize that the convening authority also selected 15 other officers as alternates, of which 2 were African–American (13%). App. Ex. XLI at 18–20. Of course, selection of alternates—*possible* members of the court-martial—conceptually does nothing to vitiate the prima facie case of discrimination in choosing the *actual* members. This conclusion has real force, as well, given the practical unlikelihood that, in the absence of some unforeseen circumstance, any alternate actually would be detailed when there were 12 primary members.

Related to use of alternates, one other matter is worth at least momentary pause. Interestingly, in this case, the SJA appeared to suggest early-on a mechanism for determining which alternates would be detailed as members if ever they were needed (by recommending that the convening authority, in selecting members for CMCO # 4, number the alternates 13 through 27 "to signify the order in which they should serve on the court-martial panel"), and the convening authority apparently accepted that recommendation. Nonetheless, the moment that the opportunity actually arose to detail alternates, the convening authority abandoned that mechanism without so much as a tip of his hat—detailing numbers 16 and 17, rather than 13 and 14.

Appellant having shown statistical underrepresentation of African–Americans during the selection process, the second prong required of this showing scarcely can be disputed: The members were "selected under a practice providing 'the opportunity for discrimination.'" *Batson v. Kentucky*, 476 U.S. at 95, 106 S.Ct. at 1722. Members of the convening authority's subordinate commands were entirely free to nominate any officer for selection that they deemed appropriate, their discretion being fettered only by Article 25. As to the selection by the convening authority, this Court often has acknowledged the convening authority's sole discretion in this regard under Article 25. *See, e.g., United States v. Greene*, 20 USCMA 232, 238, 43 CMR 72, 78 (1970). *Cf. Castaneda v. Partida, supra* ("key-man" system for selecting grand jury members—where state judge chose commissioners who, in turn, selected prospective grand jurors based on certain statutory criteria such as citizenship, literacy, sound mind, moral character, and lack of criminal record, 430 U.S. at 484–85, 97 S.Ct. at 1275—was "highly subjective" since commissioners used own discretion and was susceptible of abuse since Hispanic surnames were obvious from the jury rolls). 430 U.S. at 497, 97 S.Ct. at 1281.

170. Just as surely as it is within a prosecutor's private and sole discretion to decide whom to challenge peremptorily, so is it within a commander's discretion whom to nominate and within a convening authority's discretion whom to select. Equally, the authority is subject to abuse. Thus, just as surely as a prosecutor's peremptory challenge triggers a duty to explain when proper objection is made, a similar duty arises in the face of substantial underrepresentation of a race or gender among the nominees or selectees. Neither the fact that Article 25 states neutral selection criteria nor any "presumption that the officials discharged their sworn duties" will rebut a *prima facie* case of discrimination. *See Castaneda v. Partida*, 430 U.S. at 498 n. 19, 97 S.Ct. at 1282 n. 19.

Further, in this case, the only personal information on the nominees reflected on the nomination sheets were their race and gender. While such identifiers in themselves may not constitute an evil, *see United States v. Green*, 37 MJ 380 (CMA 1993), their pointed inclusion here certainly heightened "'the

opportunity for discrimination.'" *See Castaneda v. Partida, supra.*

The third distinct *prima facie* showing of a Fifth Amendment violation concerns exclusion of women. *No* woman was on the officer panel in CMCO # 1; *no* woman was on the officer panel in CMCO # 4; only *1* woman was on the enlisted group detailed to the panel in CMCO # 7; and, once appellant withdrew his request for enlisted members which occasioned relieving that sole woman and detailing additional officers, *no* woman was on the panel ultimately detailed to try appellant. Overlaying the preceding analysis on these facts, surely a *prima facie* case of gender discrimination was made: The female gender statistically was grossly underrepresented, and the members were selected under a system that provided "opportunity for discrimination." That is all that is required by *J.E.B.*

171. Finally, regarding appellant's *prima facie* showing of discrimination, I am unpersuaded by the majority's reliance on the convening authority's post-objection action of detailing African–Americans and one woman as enlisted members. The heterogeneity of the enlisted representation on the panel is in stark contrast to homogeneous officer representation on this same panel. This contrast between the officer and enlisted communities of the panel only raises more questions than it answers about the circumstance of detailing members in this case and, if anything, supports appellant's *prima facie* showing of discrimination.

### Step 2: Race-neutral Explanation

As to each of these three distinct *prima facie* showings of purposeful discrimination, the burden shifted to the Government to offer a race-neutral explanation. In the usual case, in which the apparent discrimination is in the form of a prosecutor's peremptory challenge, this explanation might well take the form of an oral representation by the prosecutor as to his motivation for the challenge. After all, the alleged offending official is present in the courtroom, and his explanation might be viewed as an offer of proof or,

in a way, as evidence itself for this limited purpose.

When the official is the convening authority (as to his selection of the members) or his subordinate commanders (as to their nomination of potential members), however, that is not the case. Trial counsel has no first-hand "evidence" to offer by way of explanation—indeed, he likely has no dreamy idea why those officers acted as they did. In this context, then, it would seem logical that the only way in which the Government can meet its burden to come forward with a race-neutral explanation for the apparent purposeful discrimination is actually to offer *evidence. Compare Batson v. Kentucky, supra* (counsel needed only to offer oral explanation for his exercise of a peremptory challenge), *with Castaneda v. Partida,* 430 U.S. at 498, 97 S.Ct. at 1282 (Court remarked on absence of evidence to explain commissioner's out-of-court alleged discrimination).

172. In this case, no evidentiary hearing was held by which the Government could offer a race-neutral explanation for the three instances of apparent purposeful discrimination noted earlier. In light of the fact that the alleged offenders were not in the courtroom and never were called to the courtroom, and given the highly personal and subjective decisions that are in question (that is, nominating and selecting officers "best qualified" for service), it would seem beyond question that any "explanation" divined by the military judge here was speculation, no more and no less. That is inadequate.

Moreover, even the speculation seems to fall short. For instance, regarding the withdrawal of appellant's case from CMCO. # 1, the military judge suggested, "This was done to allay defense concerns about pretrial publicity." Of course, assuming such defense concern, it in no way inevitably justified an abrupt withdrawal of the case from a panel that had not been subject to any *voir dire* regarding the impact of publicity on their ability to serve. Neither does it in any way whatsoever explain why the replacements were all-white.

The military judge did touch upon this latter concern when he made reference to the

convening authority's "self-imposed limitations" of restricting the eligible pool of officers at Fort Hood to those who had arrived on or after January 1, 1989 (only 1½ months earlier). Finding—on the basis of what, I am unsure—that this decision "shrank significantly" "the number of black officers from which to choose," the military judge essentially dismissed the defense's statistical data that showed substantial underrepresentation of African–Americans. Apart from any evidentiary basis for this conclusion, I have to wonder at the illogic of justifying an apparently discriminatory action by one's own intentional prior decision that would make such discriminatory effect virtually inevitable.

As to the *prima facie* showing of gender discrimination, there does not appear anywhere even a fainthearted effort to offer any gender-neutral explanation.

*Step 3: Factfinding as to Discrimination*

173. The final step in resolving *Batson* and *J.E.B.* issues is for the trial judge to decide whether the objecting party has carried his burden of showing purposeful discrimination. This is a factfinding exercise, *Batson v. Kentucky,* 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21, and the military judge's curious view that "there aren't any factual issues to be resolved" reflects a serious abdication of his responsibility.

Moreover, he simply was dead wrong when he stated, "The accused, initially, as I understand, elected to be tried by a panel of officers and enlisted soldiers." The defense made abundantly clear that its request for enlisted members was a tactical move in the hope of avoiding the all-white officer panel and in order to learn the race and gender of the enlisted members who would be detailed. In no way, either initially or ultimately, did appellant indicate a wish actually to be tried by other than a panel of officers; he simply sought a panel the selection of which was not apparently infected by purposeful racial and gender discrimination. He may not be forced to abandon his statutory right to an officer panel and to add enlisted members in order to get what the Constitution guarantees him. *See United States v. McClain,* 22 MJ 124 (CMA 1986).

I could spend a good deal of time discussing—literally sentence by sentence—the flaws in the military judge's rationale for denying the defense motion. For instance, his reference to the convening authority's detailing African–American members to other courts-martial as a factor to defeat appellant's *prima facie* claim flies in the face of the fact that, since *Batson,* it no longer is required as it was under *Swain* to show a *pattern* of purposeful discrimination over time. Little would be gained, however, from such further dissection. Suffice to note here that the military judge for the most part did not engage in the required factfinding and, when he did seem to do so, acted on the basis of guesswork instead of evidence.

D

174. In sum, then, I believe that the majority opinion falls far short of the mark of reflecting an adequate treatment and resolution of appellant's persistent claims of purposeful race and gender discrimination in the selection process that culminated in the panel that finally tried him. Just as troublesome, I am convinced that a proper analysis under *Batson* and *J.E.B.* and related Supreme Court cases, as well as *Santiago–Davila* and *Greene* from this Court's precedent, ineluctably leads to this conclusion: The military judge apparently did not understand the analytical construct for resolving claims of purposeful discrimination in court-member selection and did not fulfill his responsibility in that construct.

Accordingly, I would return the record to the convening authority for an appropriate evidentiary hearing and for a proper analysis and resolution of appellant's claims based on the resulting evidence. Anything short of such action tolerates not only a conviction but likely an execution of a human being under an unresolved cloud of suggested purposeful racial and gender discrimination.

III

As the majority acknowledges, 41 MJ at 290, ¶ 118, this Court held in *United States v. Cur-*

*tis*, 32 MJ 252, 270–71 (CMA), *cert. denied*, 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991), that proportionality review of an adjudged death sentence is required by Article 66(c), UCMJ, 10 USC § 866(c). The second time that case came before this Court, we suggested: "[I]t would be fitting for the Court of Military Review to consider generally similar cases reviewed by the Supreme Court of the United States in which state courts have imposed the death penalty for like crimes on that basis." *United States v. Curtis*, 33 MJ 101, 109 (CMA 1991) (*Curtis II* ), *cert. denied*, 502 U.S. 1097, 112 S.Ct. 1177, 117 L.Ed.2d 421 (1992). This suggests a possible *universe* of cases against which to compare appellant's case for proportionality, but it does not address the equally troublesome question of which *factors* or *points of identity* will be used for comparison against cases in that universe.

175. I read appellant's contention in this Court (Issue XL—at 290 ¶ 118) to focus primarily on the latter, but the majority opinion, like the court below, ignores the latter and finds comfort in its resolution of the former. I am unable to understand how the majority can satisfy itself that the statutorily required comparison was made without coming to grips with the question regarding on what bases that comparison must be made.

The universe of cases that was suggested in *Curtis II* —that apparently was followed by the Court of Military Review in this case and that apparently satisfies the majority here—is relatively clear: It includes cases 1) reaching the Supreme Court from all of the state jurisdictions 2) where the death penalty actually has been adjudged 3) for like crimes. While the question of an appropriate universe is incredibly complex, I have no particular quarrel with this definition.

Within this universe, the Court of Military Review found the five cases cited by the majority, *see* 41 MJ at 290 ¶ 118, although it is not at all clear that the Court of Military Review considered only those five cases, *see* 34 MJ 956, 969 n. 18 (1992) ("Among the cases examined were . . ."). After examining those cases, the court "concluded that the sentence is generally proportional to those

imposed by other jurisdictions in similar situations." 34 MJ at 969. The only indication of points of comparison is in the very general phrase, "in similar situations."

In light of the majority's avoidance of the issue, I do not believe that it is appropriate for me, now, to offer a view of appropriate points of comparison. One approach that certainly suggests itself is a comparison of aggravating factors and of aggravating and mitigating circumstances; a rather complex scheme for implementing this approach was discussed in *State v. Marshall*, 130 N.J. 109, 613 A.2d 1059, 1075–76 (1992). Others might reasonably be suggested and found suitable.

176. For now, I shall limit myself simply to saying this: Selecting an appropriate universe of cases against which to conduct a proportionality review is useless unless the Court of Military Review, having defined the universe, knows what points of comparison it will look for. The Court of Military Review in this case did not define those points of comparison; appellant has complained of that; but the majority here shuffles his complaint off into a discussion of universe, instead. That is a *non sequitur*. An appellant facing execution deserves more. So does the rest of society.

### IV

In Issue LXVIII, appellant asks, in part, "whether the system of appointing capital defense counsel in the military is inadequate . . . in that the military system cannot provide adequate continuity of counsel. . . ." I am persuaded that the "military system" *can* "provide adequate continuity of counsel." Regrettably, however, generally it has not done so, and I take this opportunity to express at least this Judge's growing concern over the failure of the pattern of assignment of appellate counsel to provide continuity in death-penalty cases—continuity that assures the client competent representation and that assures the system of appellate judicial review that it can proceed with some modicum of efficiency and effectiveness.

The majority writes: "To the extent that appellate counsel have lacked experience or suffered from lack of continuity, the impact

has been on the efficiency of judicial administration rather than the quality of representation." 41 MJ at 299 ¶ 129. Describing the bend-over-backward approach that has been followed in an effort to avoid harm to appellant from lack of continuity of appellate representation, the majority recites:

> Recognizing the potential inefficiencies noted above, both the court below and this Court have liberally granted extensions of time and allowed filing of supplemental pleadings and citations of authority even after oral argument. This Court has considered issues not raised before the court below.... [W]e have accommodated counsel to the maximum extent possible to ensure that all issues are considered. Defense appellate counsel concede that their pleadings have been voluminous, with overlapping and redundant assignments of error.

41 MJ at 299 ¶ 130. That is no way to run a ship!

### The Ungoverned Revolving Door of Defense Counsel

177. Seven appellate counsel represented appellant in the Court of Military Review; five others represented him in this Court.[6] It is unclear at times who was the lead counsel in the Court of Military Review because counsel is not required by that court's Rules of Practice and Procedure or by the court's internal operating procedure (*see* Rule 26, Court of Military Review Rules of Practice and Procedure, 22 MJ CXXXVIII) to file a motion for leave to withdraw if the reason for withdrawal was reassignment outside the Defense Appellate Division and if the chief of that division assigns new counsel from within the division. *See* para. 2–2, USACMR Internal Operating Procedure, 1986; Rule 13.1(b)(2), USACMR Internal Rules of Practice and Procedure (1992). *Compare* Rule 16(b), Rules of Practice and

Procedure, United States Court of Military Appeals, 38 MJ LXXXIV. No expression of concern appears anywhere for even informing the client of an impending change in representation, much less seeking the client's views. *See* Standard 5–5.3, ABA Standards for Criminal Justice, Providing Defense Services (2d ed. 1986); Rule 16(b), USCMA Rules, *supra;* Rule 1.16(d), AR 27–26, Professional Conduct for Lawyers (1992).

The confusion is so pervasive that even opposing counsel demonstrated confoundment: In a notice of appearance filed on June 24, 1991, the lawyer who apparently, but not clearly, was appellant's third lead counsel in the Court of Military Review observed in a footnote that a government motion for extension of time filed 3 days earlier had asserted: "Appellate defense counsel, Captain Michael Coughlin, does not oppose this motion." Appellant's counsel continued by noting, however: "Captain Coughlin was released from this case several weeks ago by the Chief, Defense Appellate Division, as he was pending reassignment to a commissioner's position with this Court."

178. Moreover, without even scratching the surface, it is clear from various pleadings in this case that lack of continuity and accountability of counsel directly caused substantial inefficiencies at both appellate levels. For example: This same lawyer revealed in an affidavit that he was asked to assume lead chair representing appellant in June 1991 because Captain Coughlin had been reassigned, over objection of the Chief, Defense Appellate Division; this lawyer, of course, found that assuming this responsibility on top of his other cases (he was not relieved of his normal workload) was extraordinarily burdensome; these pressures precluded him from attending any educational seminar on capital litigation (he "had no experience or specialized training in the field of capital litigation") or to meet with appellant until

---

6. In the Court of Military Review, the following counsel represented appellant at one time or another during the barely more than 1½ years this case was pending there: Captain Ralph Gonzalez (lead); Captain James K. Lovejoy; Captain Timothy Riley; Colonel Robert Kirby; Captain Michael Coughlin (lead); Captain Emmett Wells

(lead); and Captain James Heaton. The following counsel have entered appearances in this Court: Captain Teresa Norris (lead); Captain David Thomas; Major Fran Walterhouse; Lieutenant Colonel James Weise; and Captain Roy Hewitt.

after oral argument or to engage in any "extra-record investigation"; and that, when he was approached by a commissioner of the Court of Military Review in November 1991 about scheduling oral argument, the lawyer "had not even completed reading the record of trial." Notwithstanding his expression of a wish for a date in January 1992, oral argument was set for December 9, 1991. Def.App. Ex. A. A motion to reschedule oral argument was denied on December 4, 1991.

Another example: So hard pressed was this lawyer to prepare for oral argument that he "had overlooked prior to oral argument" what he considered to be an important issue, which caused him to file—after oral argument—a motion to submit a Supplemental Assignment of Error. During this same post-argument time frame, he had the opportunity, for the first time, to do some investigation into appellant's medical records (other than those in the record of trial) and into the interpretation of some of those records and tests. This investigation ultimately persuaded him to file a motion to submit yet a *second* Supplemental Assignment of Error—this time, via a motion for reconsideration *after* the Court of Military Review had issued its decision in this case.

179. It is plainly evident, then, the mischief created in the Court of Military Review from lack of continuity of representation there of appellant: This lawyer found himself so far behind the time curve that, 1 month before argument, he had not even completed reading the transcript and that, after oral argument, he was forced to file two motions to draw additional issues to the court's attention. This is a far cry from traditional concepts of efficient or effective appellate review!

· The chaos continued in this Court. The Judge Advocate General forwarded this case to this Court on May 8, 1992, for our mandatory review, *see* Art. 67(a)(1), UCMJ, 10 USC § 867(a)(1) (1989). On June 24, yet *another* lead counsel for appellant (apparently, the *fourth*) filed a Notice of Appearance and Motion to Hold Case in Abeyance. Therein, she reported that her predecessor, referred to above, had departed the Defense Appel-

late Division on reassignment to Panama on May 22 and that this "departure was sudden and presents grave problems in regard to the continuity of representation of appellant." She and two other associate appellate counsel had not been detailed to represent appellant until May 11—a scant 11 days before her predecessor's departure. She reported in detail about a variety of events and problems that precluded any of the three from any meaningful discussion at all with her predecessor. "Therefore, the undersigned were left with a 1½ page memorandum from [her predecessor] discussing what he thought were the best issues in the case and two large boxes of disorganized files with a good luck note attached thereto."

The motion represents, as well, that all three of these newly appointed counsel were "woefully underqualified to represent an accused in a capital case." Counsel offered a detailed professional résumé of the experience and education of each of the three, which tended to support counsel's assessment. Indeed, appellant's lead counsel in this Court had no legal experience prior to entering the Army; was assigned directly out of the JAG basic class to the Defense Appellate Division; and little more than 1 year later was assigned as lead appellate counsel in this capital case, without having the benefit of trying a single case in a civilian or military courtroom. Ruefully, the backgrounds of the other two are no more substantial. The disadvantage to which this lack of training and experience put this defense team—brand new, with no continuity at all from prior counsel—is palpable.

180. This Court granted a number of motions for enlargement of time within which to file a defense assignment of errors and brief; each was pursuant to a detailed accounting by defense counsel of their efforts in preparing to represent appellant in this Court as well as to meet their legal and ethical responsibilities to their other clients. Finally, we denied a similar request for more time on October 9. 37 MJ 16. Less than 1 week later, appellant's lead counsel and one of her associate counsel by separate motions sought this Court's permission to withdraw from this

case. In both instances, counsel included a detailed averment of what they already had done to prepare to represent appellant and what they believed yet needed to be done if their legal and ethical responsibilities in this capacity were to be met. In both instances, too, counsel concluded that these tasks were impossible to accomplish within the time permitted by this Court and, so, felt absolutely compelled to ask to be relieved from this dilemma. The supervising attorneys of both these counsel also moved to withdraw.

Ultimately, of course, as the majority opinion implies, competing pressures were worked out, and appellant's appeal proceeded. What I have sought to offer, however, is just some flavor of the professional consternation caused to appellate counsel of good intentions and general competence but of limited experience and special training; of the acute problems with efficient and orderly processing of this case through the course of appellant's statutorily guaranteed appellate review; and of the untoward picture of our appellate system that all this inevitably portrays.[7]

### Governing the Resolving Door

181. It is time to fix what is broken.

I am not alone in expressing frustration of this Court at the delays and inefficiencies in capital litigation that are the direct result of lack of continuity of appellate counsel. For instance, on December 20, 1993, in the appeal of the capital case of *United States v. Gray,*

39 MJ 351, we published an order in which we expressed the Court's "concern[ ] about the management and continuity of appellate representation in this case." We proceeded to direct each counsel of record before this Court in that case to file an affidavit directed at his entry into and departure from active representation of Gray; what counsel had done during his representation; what counsel had done to assure a smooth transition to subsequent counsel when he was reassigned; what had been done to advise Gray about counsel's intended withdrawal and Gray's reaction if any; and why withdrawing counsel had not complied with this Court's Rule 16 by filing a motion to withdraw.

Additionally, as recently as June 17, 1994, in the appeal of yet another capital case—*United States v. Murphy*—this Court published an order that: reflected counsel's assurance "that the withdrawal requirements of Rule 1.16, Rules of Professional Conduct for Lawyers, Army Regulation 27–26 (Legal Services, 1 May 1992), have been satisfied"; granted "the defense motion to extend its final briefing time until September 30, 1994"; and established a briefing schedule for the Government's answer and any defense reply. 40 MJ 288.

182. Importantly, Judge Cox, joined by Chief Judge Sullivan, dissented from further extension of briefing time, noting that the briefs under our rules had been due on Sep-

---

7. Doubts about adequate continuity of counsel and related matters involving the level of defense services in military death-penalty cases recently was the subject of congressional attention. In a letter to the Secretary of Defense, attached to this opinion as Appendix D, the Chairman of the Subcommittee on Civil and Constitutional Rights, House Committee on the Judiciary, expressed concern that

(1) defense counsel in military death penalty cases need not have the level of experience required of their civilian counterparts, *cf.* 21 U.S.C. § 48(q)(5)—(6) (setting substantial minimum experience requirements for appointed counsel in federal death penalty trial and post-trial proceedings),

(2) no procedures are in place—such as a presumptive right to appointment and compensation of qualified *civilian* co-counsel—to provide continuity of representation,

(3) the military justice system may have failed to recognize the necessity of providing the defense with independent and highly qualified investigative and expert services in capital cases at the trial and post-conviction levels.

Highlighting these concerns was intended "to ensure that in proceedings where life itself is at stake, no American serviceman or servicewoman is denied the essential tools of an adequate defense." For an excellent general discussion of related problems in connection with defense counsel in trial and appellate litigation of capital cases, *see McFarland v. Scott,* —— U.S. ——, 114 S.Ct. 2785, 129 L.Ed.2d 896 (Blackmun, J., dissenting from denial of petition for a writ of certiorari), and sources cited therein; D. Sullivan, *The Last Line of Defense: Federal Habeas Review of Military Death Penalty Cases,* 144 Mil. L.Rev. 1 (1994).

tember 20, 1993. The reasoning supporting this dissent is telling:

> Extensive briefs were filed in the Court of Military Review. There have been no material changes in the law; the record of trial has not changed; and there have been no other reasons advanced to justify further delay....

> Justice delayed is not justice.

40 MJ 288.

My brothers were right: None of these things had changed. Only one thing had changed: Appellate counsel for Murphy—and they had changed over and over! The problem in *Murphy* was not the current lawyers taking more time than necessary to file their brief, and I voted for the order because nothing is gained and much is lost by forcing lawyers into court before they adequately are prepared to be there. Rather, the problem was turnover of appellate counsel that effectively put the case on a virtual treadmill.

My brothers were right about one other thing, too: Justice delayed is not justice—not to the accused and not to society. It is time to resolve the continuity of counsel problem in order to preclude future delays of justice in this regard.

## APPENDIX A

## AFFIDAVIT

I CORTEZ CROFTON AYLOR III, [SSN] wish to make the following statement under oath. I was the president of the jury for the court martial of PVT Dwight Loving at Fort Hood, Texas in 1989. As I recall, the jury was responsible for findings and sentencing after hearing all of the testimony. I allowed no discussion of the case between members of the jury outside of the courtroom based on instructions from the judge. No one was allowed to watch local television or read any of the local newspapers. To the best of my knowledge no one on the jury violated this trust. Captain David Thomas of the Defense Appellate Division in Falls Church, VA, contacted me on 23 February 1993 and asked me to outline briefly how I handled the sentencing phase of the trial. The jury received instructions from the judge on sentencing and then we went into the jury room. I explained to the other members of the jury what we were supposed to do and how we would do it. I also reminded everyone that the minimum sentence was life imprisonment as explained to me by the judge. We did not re-vote and aggravating factors during the sentencing procedure. After I was satisfied that everyone understood the rules of evidence and their ramifications and was ready to vote, they would write down the sentence on a blank piece of paper, fold it up and pass it to the junior member of the jury. The junior member would give me the folded pieces of paper and I would read each one aloud to the jury. I was very cautious to avoid any influence on the jury; we all had equal votes in this process. The first vote resulted in the following: 7 votes of; reduce to E1, forfeiture of all pay and allowances, bad conduct discharge and death; 1 vote of reduce to E1, forfeiture of all pay and allowances, bad conduct discharge and life imprisonment. The judge had explained before we adjourned that the death penalty required a unanimous vote. I questioned no one about their vote, it was to be secret. I reviewed the rules of evidence, for everyone, as explained to me by the judge and we all reviewed the evidence in the jury room again. After another 1 1/2 hours of review, I asked if everyone was prepared to vote again. They said they were. We again wrote our sentences on blank pieces of paper, folded and gave them to the junior member of the jury. He gave them to me and I read them aloud to all of the members of the jury. The second vote resulted in the following: 8 votes of; reduce to E1, forfeiture of all pay and allowances, bad conduct discharge and death. I then informed the judge that we had reached a unanimous decision on the sentence. He reconvened the court, officially reviewed our findings and gave them back to me to read to the accused. I read the sentence to PVT Loving. The judge released the jury. END OF STATEMENT

SWORN BEFORE ME ON _____

CORTEZ C. AYLOR III
Colonel, Engineer
United States Army

State of Kansas
County of Leavenworth

Signed or attested before me
on February 24, 1993, by
Cortez C. Aylor III
*Wanda R. Faircloth*
Notary Public
My commission expires: 14 Oct 95

## APPENDIX B

I, Major John C. Napoli, Jr., SSN . '. ... affirm that the following is a true and correct statement of what occurred to the best of my recollection during the voting on the sentence of death in the case of Private Dwight J. Loving.

1. As a panel member in the case, I heard all of the evidence during the sentencing portion of the trial.

2. Following the closing arguments and instructions from the military judge, we adjourned to deliberate.

3. Colonel Aylor was the president of the panel and he took charge in leading the discussions. We discussed the facts and evidence in the case.

4. Following Colonel Aylor's remarks, we voted by secret written ballot. Colonel Aylor counted the ballots.

5. Since there was not a consensus, we discussed the facts and evidence in the case again. Afterwhich, Colonel Aylor instructed us to vote again. This vote resulted in an unanimous sentence to death, the voting ceased and the results were marked on the sentencing worksheet.

6. Following these voting procedures, we returned to the courtroom and sentenced Private Loving to death.

JOHN C. NAPOLI, JR.

State of Texas )

County of DALLAS )

SWORN AND SUBSCRIBED TO before me this 24 day of February 1993.

Notary Public or Authorized Officer

## APPENDIX C

I, Captain Thomas J. Williams, SSN _____ affirm that the following is a true and correct statement of what occurred to the best of my recollection during the voting on the sentence of death in the case of Private Dwight J. Loving.

1. As a panel member in the case, I heard all of the evidence during the sentencing portion of the trial.

2. Following the closing arguments and instructions from the military judge, we adjourned to deliberate.

3. Colonel Aylor was the president of the panel and he took charge in leading the discussions. We discussed the facts and evidence in the case. Then Colonel Aylor told us that we each had two options, we could vote life imprisonment or death, but that death required a unanimous vote.

4. Following Colonel Aylor's remarks, we voted by secret written ballot. Colonel Aylor counted the ballots and the result was seven in favor of death and one in favor of life imprisonment.

5. Since there was no consensus, we discussed the facts and evidence in the case again. We did not seek help from the military judge. Instead, following our continued deliberations, Colonel Aylor instructed us to vote again. We voted using the same procedure as before, picking between death and life imprisonment. The result of the second vote was eight in favor of death and zero in favor of life. Since this vote resulted in an unanimous sentence to death, the voting ceased and the results were marked on the sentencing worksheet.

6. Following these voting procedures, we returned to the courtroom and sentenced Private Loving to death.

THOMAS J. WILLIAMS

State of Utah }
County of Utah }

SWORN AND SUBSCRIBED TO before me this 23RD day of February 1993.

Notary Public

NOTARY PUBLIC
STATE OF UTAH
My Commission Expires
November 20, 1995
ALAUNA J. DUKE
277 East Main
American Fork, Utah 84003

334

ONE HUNDRED THIRD CONGRESS

## Congress of the United States
### House of Representatives

COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515-6216

JACK BROOKS, TEXAS, CHAIRMAN

DON EDWARDS, CALIFORNIA
JOHN CONYERS, JR., MICHIGAN
ROMANO L. MAZZOLI, KENTUCKY
WILLIAM J HUGHES, NEW JERSEY
MIKE SYNAR, OKLAHOMA
PATRICIA SCHROEDER, COLORADO
DAN GLICKMAN, KANSAS
BARNEY FRANK, MASSACHUSETTS
CHARLES E SCHUMER, NEW YORK
HOWARD L BERMAN, CALIFORNIA
RICK BOUCHER, VIRGINIA
JOHN BRYANT, TEXAS
GEORGE E. SANGMEISTER, ILLINOIS
CRAIG A. WASHINGTON, TEXAS
JACK REED, RHODE ISLAND
JERROLD NADLER, NEW YORK
ROBERT C SCOTT, VIRGINIA
DAVID MANN, OHIO
MELVIN L. WATT, NORTH CAROLINA
XAVIER BECERRA, CALIFORNIA

CARLOS J MOORHEAD, CALIFORNIA
HENRY J HYDE, ILLINOIS
F. JAMES SENSENBRENNER, JR. WISCONSIN
BILL McCOLLUM, FLORIDA
GEORGE W GEKAS, PENNSYLVANIA
HOWARD COBLE, NORTH CAROLINA
LAMAR S SMITH, TEXAS
STEVEN SCHIFF, NEW MEXICO
JIM RAMSTAD, MINNESOTA
ELTON GALLEGLY, CALIFORNIA
CHARLES T. CANADY, FLORIDA
BOB INGLIS, SOUTH CAROLINA
BOB GOODLATTE, VIRGINIA

MAJORITY—225-3951
MINORITY—225-6906

November 23, 1993

The Honorable Les Aspin
Secretary of Defense
Department of Defense
Room 3E880
The Pentagon
Washington, D.C. 20301-1000

Dear Secretary Aspin:

I am writing to inquire about the adequacy of the defense services provided in death penalty cases brought against American servicemen under the Uniform Code of Military Justice.

At a time when the Congress has been devoting considerable attention to the adequacy of the defense accorded to capital defendants in state court proceedings, and with the Clinton Administration strongly supporting federal legislation to guarantee that an adequate defense is actually provided in all such cases, it seems to me especially important that the federal government provide, and be seen to provide, the expert legal assistance necessary to ensure that the death penalty will not be erroneously imposed in any court of the United States. Many if not most of the death penalty prosecutions now occurring under federal jurisdiction are brought in military courts martial. However, the military services have not, to my knowledge, adopted standards and procedures governing qualification, appointment, and training of defense counsel in such cases, nor guaranteeing the independent expert and investigative services necessary to an adequate defense.

In recent years, the Congress has been considering various proposals for comprehensive reform of habeas corpus law and procedure. Much of the impetus for this review has been provided by mounting evidence that the adjudication of death penalty cases originating in state courts has been unreasonably protracted, and at the same time that many of these cases are marred by serious factual and constitutional errors. Since 1990, the House Judiciary Subcommittee on Civil and Constitutional Rights, which I chair, has reviewed a great deal of evidence showing that the greatest single cause of both delay and error in capital cases is the systemic inadequacy in the provision of defense services.

To get at the root of this problem, a number of legislative proposals have included thoroughgoing reforms in the way that state criminal courts appoint, train, and compensate defense counsel in the death penalty cases from the trial level onward. One of these proposals, Senator Biden's Habeas Corpus Reform Act of 1993, S. 1441, was introduced last summer with the strong support of President Clinton and the Department of Justice. This legislation would have provided very powerful incentives for the states to create special certification authorities to identify truly competent lawyers available for appointment as defense counsel in death penalty cases at the trial and post-trial stages, and would have helped to ensure that the defense in such cases was provided with the expert and investigative services necessary to ensure a fair and reliable result. Similar legislation has been introduced in the House by Judiciary Committee Chairman Jack Brooks. See Title III of H.R. 3131. While it does not appear that these habeas reform proposals will be acted on in the current session of the Congress, I think it is fair to say that a consensus is developing that whatever habeas reform legislation finally does emerge from the legislative process must include measures to improve the adequacy of defense services in state court capital proceedings.

In view of this emerging trend in habeas corpus reform, and considering the strong support of the President and the Attorney General for federal intervention to improve the level of defender services in state death penalty cases, it seems self-evident to me that the military justice system should review its performance in this area. In particular, I am concerned that

(1) defense counsel in military death penalty cases need not have the level of experience required of their civilian counterparts, CF. 21 U.S.C. § 848(q)95), - (6) (setting substantial minimum experience requirements for appointed counsel in federal death penalty trial and post-trial proceedings),

(2) no procedures are in place--such as a presumptive right to appointment and compensation of qualified civilian co-counsel--to provide continuity of representation,

(3) the military justice system may have failed to recognize the necessity of providing the defense with independent and highly-qualified investigative and expert services in capital cases at the trial and post-conviction levels.

I would appreciate hearing from you as to how current practice concerning the provision of defense services in death penalty cases

within the military justice system measures up to the standards advocated for state criminal justice systems by the Administration. I look forward to working with you to ensure that in proceedings where life itself is at stake, no American serviceman or servicewoman is denied the essential tools of an adequate defense.

Sincerely,

Don Edwards
Chairman
Subcommittee on Civil and
 Constitutional Rights

DE:vsp